**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ARANDELL HOLDINGS, INC., *et al.,*[1] | Case No. 20-11941 (JTD) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) USE CASH COLLATERAL, (B) INCUR POSTPETITION DEBT, (C) PROVIDE ADEQUATE PROTECTION TO CIBC BANK USA, AS AGENT, AND THE OTHER SECURED PARTIES, (D) OBTAIN POSTPETITION FACTORING FROM LSQ FUNDING GROUP, L.C. PURSUANT TO 11 U.S.C. §§ 363 AND 364 AND PROVIDE GUARANTEES IN SUPPORT THEREOF, AND (E) GRANT LIENS AND SUPERIORITY CLAIMS TO LSQ FUNDING GROUP, L.C.; (II) MODIFYING THE AUTOMATIC STAY; (III) APPROVING NOTICE; (IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession hereby submit this motion (this "Motion") for entry of an interim order, substantially in the form attached hereto as Exhibit A (together with the exhibits thereto, the "Interim Order"; and together with any Final Order, the "Proposed Orders"), and a final order (i) authorizing the Debtors to: (a) obtain postpetition financing on the terms described herein; (b) grant liens and superpriority administrative expense claims to CIBC Bank USA, as Postpetition Agent on behalf of the Postpetition Lenders (each as defined below); (c) use cash collateral; (d) obtain postpetition DIP Factoring (defined below) from LSQ Funding Group, L.C. pursuant to sections 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"); (e) provide guarantees in support of obligations under the DIP Factoring; and (f) grant liens and superpriority claims to LSQ Funding Group, L.C.; and (g)

---

[1] The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: Arandell Holdings, Inc. (5311) ("Arandell Holdings"), Arandell Corporation (4270) ("Arandell Corporation"), and Arandell Kentucky, LLC (1505) ("Arandell Kentucky" and together with Arandell Holdings and Arandell Corporation, the "Debtors"). The Debtors' corporate headquarters is located at N82 W13118 Leon Road, Menomonee Falls, WI 53051.

provide adequate protection to Prepetition Agent and Prepetition Lenders (as such terms are defined below); (ii) modifying the automatic stay; (iv) approving notice; (v) scheduling a final hearing with respect to the relief requested herein; and (vi) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of James G. Keane in Support of the Chapter 11 Petitions and First Day Motions* (the "<u>Keane Declaration</u>") and the *Declaration of Bradley J. Hoffman in Support of the Chapter 11 Petitions and First Day Motions* (the "<u>Hoffman Declaration</u>" and together with the Keane Declaration, the "<u>First Day Declarations</u>"), filed concurrently herewith. In further support of this Motion, the Debtors respectfully state as follows:

**<u>Preliminary Statement</u>[2]**

1.      As set forth more fully in the First Day Declarations, the Debtors have been challenged by fundamental changes in the printing business industry resulting from the impact of the Covid-19 pandemic, and other factors, including store closings and supply chain disruptions, in addition to the growing e-commerce marketplace and its impact on retailers.  As a result, the Debtors and their professional advisors, after evaluating the strategic options available to them to maximize the value of the Debtors' estates, have determined to consolidate their operations in Wisconsin, sell or close one of their plants (located in Kentucky), and sell their business under section 363 of the Bankruptcy Code in order to enable their operations to continue as a going concern.

2.      The Debtors, therefore, seek approval of debtor-in-possession ("<u>DIP</u>") financing to provide for their cash needs while they operate during the Chapter 11 Cases, as more fully described in the First Day Declarations.  To preserve estate value, the Debtors have procured the

---

[2] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them below.

26900125.2

"ABL Facility"[3] and the "Factoring Facility"[4] (together, the "DIP Facility") from the ABL Lenders, defined below, and LSQ Funding Group, L.C. (the "Factor"). The ABL Lenders under the ABL Facility are the same lenders that provided the Debtors with their prepetition revolving and term credit facility (the "Prepetition Facility"), consisting of CIBC Bank USA, formerly known as The PrivateBank and Trust Company ("CIBC"), as administrative and collateral agent (in such capacity, the "Prepetition Agent") (and when acting pursuant to the ABL Facility in such capacity, the "Postpetition Agent") pursuant to that certain Amended and Restated Loan and Security Agreement dated as of March 22, 2018 (the "Credit Agreement"), by and among Prepetition Agent, the lenders party thereto from time to time (collectively, the "Prepetition Lenders") (and when acting pursuant to the ABL Facility, collectively, the "Postpetition Lenders"), Arandell Corporation, and Arandell Kentucky, as borrowers, and Arandell Holdings, Falls Express Transit, LLC ("Falls Express"), and Logistics for Print LLC ("Logistics"), as loan parties, and the other loan documents relating thereto (collectively, the "Prepetition Loan Documents"), all as amended, modified, supplemented, replaced, or refinanced from time to time in accordance with the terms thereof.

3.      The additional DIP financing is from Factor LSQ Funding Group, L.C. and its financing will be provided in the form of the proceeds of discretionary purchases of Debtors' postpetition accounts receivable ("Eligible Accounts"). The terms of the Factoring Facility are memorialized in (i) that certain Invoice Purchase Agreement, dated August 13, 2020 (the "IPA"), and DIP Addendum to Invoice Purchase Agreement, also dated August 13, 2020 (the "DIP

---

[3] A super-priority, senior secured, debtor-in-possession revolving credit facility with a maximum credit amount of $7,500,000 plus, upon entry of the Final Order, a term loan in the amount of $4,567,778.06.

[4] A super-priority, senior secured, debtor-in-possession, discretionary, factoring facility in the amount of up to $24,000,000, to be provided by LSQ Funding Group, L.C. The Factoring Facility Documents are attached hereto as Exhibit C. (collectively, the "ABL Lenders")

Addendum"), by and between Arandell Corporation and   Factor (with the IPA and DIP Addendum referred together herein as the   "Invoice Purchase Agreement"), (ii) that certain Entity Guaranty, made by Arandell Holdings and Arandell Kentucky in support thereof, (iii) that certain Validity Guaranty, dated August 13, 2020, by Bradley Hoffman, and (iv) such other supporting documents and instruments, all as amended, modified, supplemented, replaced, or refinanced from time to time in accordance with the terms thereof (collectively, the "Factoring Facility Documents").

4.      Arandell Corporation will be the borrower under the DIP Facility (the "Borrower"), and the Borrower's obligations under the DIP Facility will be guaranteed by Arandell Holdings and Arandell Kentucky (as to the obligations due both the ABL Lenders and the Factor), as well as by Falls Express and Logistics (as to the obligations due to the ABL Lender only), which are non-debtor affiliates of the Debtors and existing guarantors of the Prepetition Facility (collectively, "Guarantors").

5.      Debtors have agreed that advances of the Purchase Price (as defined in the IPA) for Eligible Accounts under the DIP Facility will be used solely to pay the indebtedness and obligations of the Debtors under the Prepetition Obligations (the Roll-Up (as defined below)) and the Postpetition Obligations due the ABL Lenders under the ABL Facility. These payments will, in turn, create new financing availability under the ABL Facility, which the Debtors will be able to use to pay their administrative and operational expenses in these chapter 11 cases, pursuant to the terms of an agreed Budget, as described more fully below. Thus, working together, the ABL Facility and the Factoring Facility will provide the Debtors with the liquidity they need to operate during the pendency of these Chapter 11 Cases.  The DIP Facility is generally secured by a first-priority lien on all present and after-acquired property of the Debtors

of any nature whatsoever, and all the obligations of the Borrower and the Guarantors (together, the "Loan Parties") are entitled to super-priority administrative expense status under section 364(c)(1) of the Bankruptcy Code.  Although the liens securing the DIP Facility prime the liens securing the obligations owing under the Prepetition Facility (collectively, the "Prepetition Obligations"), such priming is consensual, and anticipates the Roll-Up, as more fully explained below.

6.    The ABL Facility is a senior-secured revolving and term loan credit facility that provides the Debtors with critical revolver funding, in the aggregate principal amount of up to $7,500,000, to fund their operations in accordance with, and subject to, the terms of the ABL Loan Documents (as defined below) and a budget approved by the Postpetition Agent (the "Budget").  Subject to certain conditions precedent set forth in that certain Debtor in Possession Loan and Security Agreement, by and among Arandell Corporation, as borrower, Guarantors, Postpetition Agent, and Postpetition Lenders (the "ABL Loan Agreement," a copy of which is attached hereto as Exhibit B) and related loan documents under the ABL Facility (collectively, the "ABL Loan Documents"), the Debtors propose to borrow up to $7.5 million[5] under the ABL Facility on an interim basis, and the balance of $4,567,778.06 (as a term loan) on a final basis provided a Final Order is entered approving these Motions. The Prepetition Agent and Prepetition Lenders will receive adequate protection in the form of, among other things: (a) postpetition replacement liens; (b) an acknowledgement that the Prepetition Obligations, and

---

[5]    The ABL Facility will work in tandem with the Factor Facility (both described more fully below) such that during the expected interim period pending a final hearing on this Motion, the Debtors' net new borrowing under the ABL Facility is expected to be no greater than $800,000 (and is essential to maintaining the Debtors' business).  This is because approximately $6.7 million of the $7.5 million availability is currently drawn and being made available postpetition, and as a revolver, it will provide increased financing availability and liquidity as the proceeds of collections by the Factor reduce the outstanding prepetition amounts (and postpetition amounts) under the ABL Facility. Without the liquidity represented by the difference between the amounts already borrowed under the revolver and the additional availability proposed under the ABL Facility (up to $7.5 million), the Debtors will be unable to meet their obligations and maintain their businesses in these chapter 11 cases.

liens securing the Prepetition Obligations, are valid, perfected, non-avoidable, and allowed claims and obligations, as well as an allowed super-priority claim under section 507(b) for any diminution in value of the collateral securing the Prepetition Obligations; (c) interest on the Prepetition Obligations shall be accrued at the default rate under the Credit Agreement and payable and paid in accordance with the Credit Agreement during the pendency of these Chapter 11 Cases; (d) Debtors will timely make all principal payments in respect of the prepetition term loan in accordance with the Credit Agreement during the pendency of these Chapter 11 Cases; and (e) the Prepetition Agent and the Prepetition Lenders will receive payment of professional fees as well as superpriority administrative expense claims, all as set forth in the Proposed Orders.

7.      The Factoring Facility is a debtor-in-possession credit facility pursuant to which the Factor has discretion to purchase the postpetition Eligible Accounts (as defined in the Invoice Purchase Agreement) of Arandell Corporation and, at the time of purchase, make an advance on the face value of the Eligible Accounts, in the amount of an agreed Purchase Price (as defined in the Invoice Purchase Agreement) minus the Required Reserve Amount (initially set at 20%, but subject to adjustment by Factor, per the terms of the Invoice Purchase Agreement) and minus any amounts due from Arandell Corporation to Factor under the DIP Factoring Documents.

8.      The Debtors have agreed, subject to Court approval, that all Eligible Accounts to be sold to Factor under the Factoring Facility shall be treated as true sales of such Eligible Accounts, and, as a result, Debtors will not retain a legal or equitable interest in the Accounts sold, in conformance with Florida's Uniform Commercial Code (the "FL UCC"),[6] Section 679.3181 (1) ["A debtor who has sold an account, chattel paper, payment intangible, or

---

[6]    The Factoring Facility Documents are governed by Florida law; as such, references to Florida's adoption of the Uniform Commercial Code are included herein. Article 9 of the Uniform Commercial Code governs the sale of Accounts contemplated under the Factoring Facility. Fla. Stat. Ann. § 679.1091(1)(c).

promissory note does not retain a legal or equitable interest in the collateral sold."]. Arandell Corporation's postpetition sale and transfer of Eligible Accounts to Factor are proposed to be legal, valid, and effective transfers of the Eligible Accounts and to vest in Factor all right, title, and interest of Debtors in the Eligible Accounts, free and clear of any and all liens, claims, and interests of any and every kind or nature, providing Factor with the sole and exclusive right to enforce, compromise, and sue to recover the amounts due on each Eligible Account.[7] In this regard, the Debtors and Factor also request herein authority to use, from and after the date of entry of this Order, the Postpetition Factor Lockbox as the exclusive deposit account for the receipt of collections on the post-petition Eligible Accounts.  The receipt of collections to the Postpetition Factor Lockbox will then be managed by the Factor in accordance with the Factoring Facility Documents and the Postpetition Intercreditor Agreement to effectuate the Roll-Up and otherwise provide to the ABL Lenders funds that will be applied to their loans, but which will also increase postpetition financing availability to be used in accordance with the Budget. In addition, Postpetition Agent will remit to Factor and/or the Postpetition Factor Lockbox, in US Dollars, any payments that Postpetition Agent may receive with respect to any of the Debtors' Eligible Accounts, arising after the Petition Date.  Similarly, Factor will remit to Postpetition Agent, where Postpetition Agent may so direct, in US Dollars, any payments that Factor may receive with respect to any of Debtors' accounts receivable, arising on or before the Petition Date.[8] In making these remittances to either of Factor or Postpetition Agent, or vice

---

[7]    In order to protect the Debtors' customer relationships and going concern value, and enhance the likelihood of consensual resolution of any such disputes, the Factor has agreed that notwithstanding its exclusive rights to enforce, compromise or sue to recover amounts due on each Eligible Account, it will make reasonable efforts to communicate with Debtor regarding all such disputes. IPA, section 15.

[8]    The Factoring Facility provides a discretionary facility for purchase of postpetition accounts receivable only.

versa, in accordance herewith, each of Factor and Postpetition Agent will act solely as a payment intermediary or conduit.

9.      The Debtors have also agreed, jointly and severally, to indemnify and hold Factor and the Postpetition Agent harmless from and against any and all any loss, liability, claim, damage or expense, including reasonable and necessary attorneys' fees incurred, respectively (including those incurred at all trial and appellate levels) arising out of or relating to any payment which is the subject of remittance by the Postpetition Agent or Factor to either of the other pursuant to the Proposed Orders or the Postpetition Intercreditor Agreement, if such payment is returned unpaid for any reason or is sought to be recovered pursuant to an Avoidance Claim (as defined in the Interim Order).

10.      In furtherance of the Roll-Up (as defined below), advances of the Purchase Price under the Factoring Facility will be applied by Debtors to repay the Prepetition Obligations in accordance with the Prepetition Loan Documents and the Proposed Orders until they are paid in full and, thereafter, all such proceeds will be applied to repay all of the obligations under the ABL Facility (collectively, the "ABL Facility Obligations") until they are paid in full in accordance with the ABL Loan Documents and the Proposed Orders. This will, in turn, increase the borrowing base under the postpetition ABL Facility for the benefit of the Debtors so that they may borrow substantially the same amount of money under the ABL Facility as would have been available if the Factor's advances were provided directly to the Debtors, subject to the terms of the ABL Loan Documents.

11.      The relationship among the Postpetition Agent and the Postpetition Lenders, on the one hand, and the Factor, on the other hand, and their relative priorities in the "Collateral" (all real and personal property of the Loan Parties, including, effective upon entry of the Final

Order, all causes of action and proceeds thereof under chapter 5 of the Bankruptcy Code) is governed by the Postpetition Intercreditor Agreement among the Postpetition Agent and the Factor (the "Postpetition Intercreditor Agreement," a copy of which is attached hereto as Exhibit D) (to be acknowledged by the Loan Parties), which provides as follows (with capitalized terms used as defined therein):

(1) Factor will have a superpriority administrative expense claim and first priority, priming liens as to the Factor Priority Collateral, which means all of each and every Factor Grantor's [Arandell Corporation's] right, title, and interest in and to the following types of property of such Grantor, wherever located and whether now owned by such Grantor or hereafter acquired:

(a) (i) all accounts arising after the Petition Date but prior to the Trigger Date and (ii) all accounts arising from and after the Trigger Date solely to the extent (x) Factor has advanced funds in respect of such account by Arandell to Factor within 5 Business Days of the assignment of the applicable account by Arandell to Factor (with an advance rate of at least 80% and otherwise pursuant to the terms of the Factor Documents (as in effect on the date hereof)) and (y) such funds advanced by Factor described in subclause (x) are applied to reduce the ABL Debt by at least 80% of the gross amount of the account within 1 Business Day of such advance, in each case, excluding all Purchased Accounts and Specified ABL Accounts;

(b) (i) the Factor Lockbox Account and (ii) any cash and other funds or other property held in or on deposit in such Factor Lockbox Account to the extent constituting identifiable proceeds of any Factor Priority Collateral described in subclause (a);

(c) all claims under policies of casualty insurance and/or credit insurance and all proceeds of casualty insurance and/or credit insurance, in each case, payable by reason of loss or damage to any Factor Priority Collateral described in subclause (a), including, without limitation that certain credit insurance policy issued in favor of Arandell by Euler Hermes North America Insurance Co., policy number 5124233;

(d) the Reserve Account as defined in the Factor Purchase Agreement (as in effect on the date hereof); and

(e) all identifiable substitutions, replacements, accessions, products, or proceeds of any of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to, or destruction of, or other involuntary conversion (including claims in

26900125.2

9

respect of condemnation) of any kind or nature of any or all of the foregoing.

(2)     As more fully stated in the Postpetition Intercreditor Agreement, Factor will have liens in all other Postpetition Factor Collateral (other than the Factor Priority Collateral), that are junior and subordinate only to the following, and otherwise priming as to all other claims, liens, and interests:

(a) The liens of the ABL Lenders in the Postpetition Factor Collateral; and

(b) The liens of CapX (as defined below) in the Postpetition Factor Collateral.

12.     The DIP Facility and related Proposed Orders provide the ABL Lenders and Factor with a number of rights, which were required by the ABL Lenders and Factor as a condition to providing the DIP Facility.  Given the existing liens on substantially all of the Debtors' assets and the need for immediate liquidity, the intercreditor arrangements, and the willingness of the Factor to provide financing through its proposed Factoring Facility Documents (which is a condition precedent under the ABL Facility), the Debtors' Prepetition Lenders were the most practical and reasonable source of additional ABL financing.  The ABL Lenders and Factor have indicated that the DIP Facility (expressly including the Factoring Facility) set forth the only terms under which they would agree to provide the Debtors with ABL financing and the Factoring Facility.

13.     The Debtors seek authorization to enter into the DIP Facility to enable them to continue operating while these Chapter 11 Cases are pending.  Access to borrowings under the DIP Facility is critical to funding the Debtors' immediate operational needs and these Chapter 11 Cases so that the value of the Debtors' assets can be preserved and maximized for the benefit of all stakeholders.  If the Debtors are unable to gain access to the DIP Facility, the Debtors will not

26900125.2

have sufficient liquidity to operate as a going concern during the time required to effectuate a sale of the business under Bankruptcy Code § 363.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing* Order *of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15.     The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, and 507(b) of title 11 of the Bankruptcy Code, Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2.

## BACKGROUND

**A.     General Background**

16.     On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors are authorized to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in the Chapter 11 Cases and no request has been made for the appointment of a trustee or an examiner. Additional factual background relating to the Debtors' business, capital

structure and the commencement of these Chapter 11 Cases is set forth in detail in the First Day
Declarations.

**B.      The Debtors' Pre-Petition Funded Debt Structure**

17.      On March 22, 2018, the Debtors, Falls Express, and Logistics entered into the
Credit Agreement.  The Prepetition Facility permits revolving credit borrowings of up to $15
million and a term loan that has a principal balance of not less than $11,334,758.18 as of the
Petition Date. The Prepetition Facility is guaranteed by Holdings, Falls Express, and Logistics,
and it is secured by a first-priority lien in the Collateral (as defined in the Credit Agreement,
collectively, the "Prepetition Collateral"), subject to the below-defined CapX Intercreditor
Agreement.

18.      Contemporaneously with the entry into the Prepetition Facility, the Debtors
entered into that certain Subordination and Intercreditor Agreement, dated March 22, 2018
("Mezzanine Intercreditor Agreement"), among the Prepetition Agent, Farragut Mezzanine
Partners III, L.P. ("Farragut"), Spell Capital Mezzanine Partners SBIC, LP ("Spell") and Accord
CapX, LLC ("CapX") (Farragut, Spell and CapX collectively, the "Junior Claimholders").  The
Junior Claimholders provided various forms of debt and other secured obligations intended to be
junior to the Prepetition Facility.  The Mezzanine Intercreditor Agreement expresses the parties'
agreement to those relative priorities, and further provides, in pertinent part, that in any
bankruptcy proceeding the Junior Claimholders:

> "will not object to or oppose any use of cash collateral consented to
> by [the Prepetition Agent] . . . or any financing provided by any
> [Prepetition Lender] to any [of the Debtors] . . . [defined therein as
> "DIP Financing"] on such terms and conditions as [Prepetition
> Agent] (or any financing provided by any other Person consented to
> by [the Prepetition Agent, which in this case would include LSQ] . .
> . , in [its] sole discretion, may decide."

Mezzanine Intercreditor Agreement, section 2.2(d).[9]

19.     The Debtors believe that the DIP Facility proposed for approval herein is compliant with the Mezzanine Intercreditor Agreement and that no Junior Claimholder is entitled to adequate protection or other relief in relation to the approval of the DIP Facility.

20.     Also contemporaneously with the entry into the Prepetition Facility, the Prepetition Agent entered into a separate Intercreditor Agreement, dated March 22, 2018, with CapX ("CapX Intercreditor Agreement").    CapX provided Debtors with junior secured equipment lease financing (treated as *pari passu* with the other Junior Claimholders pursuant to the terms of the Mezzanine Intercreditor Agreement).  The CapX Intercreditor Agreement gives it certain rights to priority over senior secured creditors on an intercreditor basis on certain specified equipment liens.

---

[9] The full text of the applicable section 2.2(d) of the Mezzanine Intercreditor Agreement reads as follows: "Each Junior Claimholder agrees that it will not object to or oppose any use of cash collateral consented to by Working Capital Agent or Equipment Lessor or any financing provided by any Senior Secured Party to any Loan Party (or any financing provided by any other Person consented to by Working Capital Agent and/or Equipment Lessor) (collectively, "DIP Financing") on such terms and conditions as Working Capital Agent and Equipment Lessor, in their sole discretion, may decide.  In connection therewith, any Loan Party may grant to any Senior Secured Parties or such other lender, as applicable, liens and security interests upon all of the property of such Loan Parties, which liens and security interests (i) may secure payment of all or any applicable portion of any Senior Debt (whether such Senior Debt arose prior to the commencement of any Proceeding or at any time thereafter) and all other financing provided by any Senior Secured Party or consented to by Working Capital Agent or Equipment Lessor during the Proceeding (so long as the liens securing the Working Capital Debt and the Equipment Lease Debt have been subordinated to, or are pari passu with, the liens securing such financing so consented to) such  and (ii) shall be superior in priority to the liens and security interests, if any, in favor of any Junior Claimholder on the property of such Loan Party.  If, in connection with any cash collateral use or DIP Financing, any liens and security interests on the Collateral held by a Senior Secured Party are subject to a surcharge or are subordinated to an administrative priority claim, a professional fee "carve out", or fees owed to the United States Trustee, then the liens on the Collateral of Junior Claimholder shall also be subordinated to such interest or claim and shall remain subordinated to the liens and security interests on the Collateral of Agent consistent with this Agreement.  Each Junior Claimholder agrees that such Junior Claimholder will not, and will not permit, any of its affiliates to, directly or indirectly, provide, participate in or otherwise support, any financing in a Proceeding to any Loan Party without the prior written consent of Working Capital Agent and Equipment Lessor.  Each Junior Claimholder further agrees that it shall not, without Working Capital Agent's and Equipment Lessor's prior written consent, propose any plan of reorganization, arrangement or proposal or file any motion, pleading or material in support of any motion or plan of reorganization, arrangement or proposal that would materially impair the rights of the Working Capital Secured Parties or Equipment Secured Parties, or is otherwise inconsistent with this Agreement."

21.     Availability under the Prepetition Facility is capped by a borrowing base, which is calculated monthly based on percentages of the value of certain of the Debtors' inventory and receivables and is subject to certain reserves and sub-limits.  The Prepetition Facility matures on March 28, 2021. As of the Petition Date, the aggregate amount of all obligations outstanding under the Prepetition Facility is not less than $11,334,758.18, consisting of: (a) Revolving Advances outstanding under (and as defined in) the Prepetition Facility, plus interest (including default rate interest) accrued and accruing thereon at the rate in effect on the Petition Date, plus (b) the Term Loan, plus (c) accrued and accruing fees, plus (d) all accrued and accruing costs and expenses (including attorneys' fees and legal expenses through July 31, 2020), plus (e) any other charges and liabilities accrued, accruing or chargeable, whether due or to become due, matured or contingent, under the Credit Agreement and the other Prepetition Loan Documents.

22.     On May 6, 2020, the Prepetition Agent issued that certain Notice of Default and Reservation of Rights (the "Notice of Default") indicating that the Debtors were in default under the Prepetition Facility.  At the same time, the Prepetition Agent continued its cash dominion structure whereby all cash held in the Debtors' deposit and collections accounts with the Prepetition Agent are swept on a daily basis to pay down the Prepetition Obligations.[10]  Under this structure, the Debtors are required to re-borrow cash under the Prepetition Facility on an as-

---

[10] The dominion and control is established by, *inter alia*, the following agreements: (a) that certain Agreement Re: Blocked Deposit Account dated as of March 22, 2018, by and among Arandell Kentucky, LLC, Prepetition Agent, CIBC Bank USA, Equipment Lease Lender, and Farragut Mezzanine Partners III, LP, (b) that certain Agreement Re: Blocked Deposit Account dated as of March 22, 2018, by and among Arandell Corporation, Prepetition Agent, Equipment Lease Lender, and Farragut Mezzanine Partners III, LP, (c) that certain Deposit Account Control Agreement dated as of March 28, 2014, by and among Arandell Corporation, Prepetition Agent, CapX Partners, and Spell Capital Mezzanine Partners SBIC, LP, and Fifth Third Bank, (d) that certain Agreement Re: Blocked Deposit Account dated as of March 28, 2014, by and among Arandell Corporation, CIBC Bank USA, Prepetition Agent, and Spell Capital Mezzanine Partners SBIC, LP, and (e) any other deposit account control agreement or similar agreement relating to the Prepetition Debt made by or in favor of Prepetition Agent or Prepetition Lenders from time to time, in each case, as amended, supplemented, or otherwise modified from time to time (collectively, the "Control Agreements").

26900125.2

needed basis to make disbursements. The Prepetition Lenders have applied the default rate of interest to the Prepetition Obligations as a result of the Notice of Default.

**C.      The Debtors Have a Critical Need for Funding Through the DIP Facility.**

23.      As further detailed in the First Day Declarations, the Debtors have a significant need to obtain DIP financing to continue their business operations while they pursue the sale of Arandell Corporation as a going concern in these Chapter 11 Cases.

24.      Without access to a ready source of postpetition financing, the Debtors would be unable to pay for necessary operating expenses or business functions critical to the success of their sale efforts.  If the Debtors are unable to pay the expenses necessary to continue their business operations during these Chapter 11 Cases, the value of the Debtors' estates will be significantly diminished.

**D.      The DIP Facility is the Debtors' Best, if not Only, Alternative to Obtain DIP Financing.**

25.      Based on the facts and circumstances of these Chapter 11 Cases and the Debtors' operational performance, after considering the limited alternatives available, it is evident to the Debtors that (i) they are unable to obtain DIP financing from sources other than the ABL Lenders and Factor on terms as or more favorable as those under the DIP Facility, and (ii) any credit extended by the ABL Lenders and Factor should be provided to the Debtors with certain protections provided under the Bankruptcy Code to postpetition lenders, including superpriority claims and liens on the Debtors' assets (to the extent provided for in the ABL Loan Documents, the Factor Facility Agreements, and the Proposed Orders), provision of adequate protection to the Prepetition Lenders, and a roll-up of the Prepetition Obligations (the "Roll-Up") through the application of postpetition collections and proceeds of the Factoring Facility and, upon entry of the Final Order, postpetition debt to repay all of the Prepetition Obligations under the Prepetition

Facility until paid in full and, thereafter, to repay all of the ABL Facility Obligations under the ABL Loan Documents. The Debtors' internal analysis, combined with reference to historical practice, culminated with the ABL Lenders agreeing to provide the Debtors with superpriority secured DIP financing under the DIP Facility, subject to the terms and conditions set forth in the ABL Loan Documents and the Factoring Facility Documents.

26.     The DIP Facility represents the best financing option available to the Debtors and is extended in good faith because, among other things, (a) it serves to provide the Debtors with liquidity necessary to continue the operation of their business during their Chapter 11 Cases, (b) the proposed liens will not prejudice any other creditors of the Debtors, and (c) the DIP Facility is a reasonable and fair financing on market terms.

**E.     Use of the DIP Facility**

27.     Proceeds of the DIP Facility will be used for the payment of certain expenditures, in accordance with the terms of the Budget,[11] the ABL Loan Documents, the Factoring Facility Documents and the Proposed Orders, including:  (a) repayment in full of all of the Prepetition Obligations; (b) payment of fees, costs and expenses required to be paid pursuant to the ABL Facility; (c) general operating and working capital needs in accordance with the Budget; (d) funding the Carve-Out (defined below) in accordance with the Budget; (e) paying for allowed professional and statutory fees allocated to the Debtors during these Chapter 11 Cases in accordance with the Budget; and (f) paying certain prepetition obligations authorized by order(s) of the Bankruptcy Court in accordance with the Budget.

## **RELIEF REQUESTED**

28.     By this Motion, the Debtors request entry of the Proposed Orders, which provide the Debtors with the following relief, among other things:

---

[11] The Budget, as referenced herein, is attached as Exhibit B to the Interim Order attached hereto.

26900125.2

a.  authorization and approval for the Debtors to obtain postpetition loans, advances and other financial accommodations ("Postpetition Financing"), on an interim basis, for a period through and including the date of a final hearing on the Motion from the Postpetition Agent and the Postpetition Lenders under the ABL Facility in an aggregate amount up to $7.5 million on a revolving basis in accordance with the Interim Order, secured by first-priority perfected security interests in and liens on, senior and above all other liens, all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code and as set forth below, subject to the Postpetition Intercreditor Agreement;

b.  authorization for Debtors to borrow, upon entry of the Interim Order, up to an aggregate principal amount not to exceed $7.5 million to be used in part for working capital, capital expenditures, other general corporate purposes in accordance with the ABL Loan Documents, the Budget, and the Interim Order, and to apply all collateral proceeds to the indefeasible payment and satisfaction of all of the Prepetition Obligations, which shall indefeasibly satisfy all of the outstanding obligations under the Prepetition Loan Documents (including the Credit Agreement and all related security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, subordination agreements, and related agreements and documents);

c.  authorization and approval for Debtors to enter into the Factoring Facility Documents, to sell postpetition accounts receivable to the Factor, and to authorize the Factor to direct the proceeds of the Purchase Price of Eligible Accounts under Factoring Facility to the Postpetition Agent in accordance with the terms of the Factoring Facility Documents, the Interim Order, and the Postpetition Intercreditor Agreement;

d.  granting to the Postpetition Agent and Postpetition Lenders super-priority administrative expense status for all existing and future obligations and liabilities of every kind or nature (including, without limitation, principal, interest, bank products, and indemnity obligations) under or in connection with the ABL Facility, whether due or to become due, absolute or contingent (collectively, the "Postpetition Obligations"), pursuant to section 364(c)(1), and postpetition liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code in accordance with the terms of the Interim Order and the ABL Loan Documents, subject to the terms of the Postpetition Intercreditor Agreement;

e.  granting the Factor super-priority administrative expense status and a first priority lien on the Factor Priority Collateral (as defined above), and a third priority lien on all other Collateral, subject to the terms of the Postpetition Intercreditor Agreement;

f.      authorization for the Debtors' use of "cash collateral" ("Cash Collateral"), which term shall include, without limitation, all cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all collateral pledged to the Prepetition Lenders, as contemplated by section 363 of the Bankruptcy Code, in accordance with the terms set forth in the ABL Loan Documents, the Budget, and the Interim Order;

g.      granting adequate protection to the Prepetition Agent and the Prepetition Lenders in accordance with the terms set forth in the Interim Order, to the extent of the aggregate diminution in value of their interests in the Prepetition Collateral;

h.      modification of the automatic stay and waiving the fourteen (14) day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h); and

i.      setting a final hearing on the Motion for entry of an order authorizing the DIP Facility and use of Cash Collateral on a final basis.

**Concise Statement of DIP Facility Pursuant to
Bankruptcy Rule 4001 and Local Rule 4001-2**

29.      Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2(a), the essential terms of the DIP Facility are as follows:

| MATERIAL TERMS OF DIP FACILITY[12] |
| --- |
| **ABL Facility** |

| | |
| --- | --- |
| **Borrower** | Arandell Corporation<br><br>ABL Loan Agreement, Preamble |
| **Guarantors** | Holdings, Arandell Kentucky, Falls Express, and Logistics<br><br>ABL Loan Agreement, Preamble |
| **Postpetition Lenders** | CIBC Bank USA, as Postpetition Agent, and the Postpetition Lenders from time to time party to the ABL Loan Agreement<br><br>ABL Loan Agreement, Preamble |

---

[12]   This concise statement is qualified in its entirety by reference to the applicable provisions of the ABL Loan Agreement or the Proposed Orders, as applicable.  To the extent there exists any inconsistency between this concise statement and the provisions of the ABL Loan Agreement or the Proposed Orders, the provisions of the ABL Loan Agreement or the Proposed Orders shall control.

| | |
|---|---|
| **Limitation on the Use of Proceeds** | All monies and other property obtained by Borrowers from Administrative Agent and Lenders pursuant to this Agreement shall be used solely for (i) to the extent set forth in the Budget, to pay the fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, the commencement of the Bankruptcy Cases and the transactions contemplated hereby when such expenses are due and payable, (ii) to the extent not otherwise prohibited by the Loan Documents or the Financing Order, to fund working capital needs and general corporate purposes of Borrowers, at such times and in such amounts as set forth in the Budget, (iii) to provide cash "adequate protection" (as set forth in Section 361 of the Bankruptcy Code and the relevant sections of other applicable Insolvency Laws) in favor of the Existing Agent and the Existing Lenders and (iv) to repay upon the entry of the Final Financing Order, in full, the Existing Secured Obligations, including outstanding principal, accrued interest, and accrued fees and expenses owing under or in connection with the Existing Loan Agreement and other Existing Loan Documents; provided, that no part of the proceeds of any Loan or Letter of Credit will be used, directly or indirectly, (u) in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Existing Agent, Existing Lenders, Agent or Lenders, or in connection with the Obligations or Existing Secured Obligations, except for an amount up to the limit set forth in the Financing Order for such purpose, for investigation costs of any official statutory committee appointed pursuant to Bankruptcy Code § 1102, (v) toward repayment of the Equipment Lease Obligations (except to the extent of such payments as are expressly agreed by the Administrative Agent and the Loan Parties in the Budget), the Subordinated Debt or the "Trend Seller Note" (as such term is defined in the Existing Credit Agreement) (including, in each case, any "adequate protection" payments with respect thereto).<br><br>ABL Loan Agreement, Section 12.7 |
| **Budget** | "Budget" shall mean the thirteen (13) week consolidated weekly operating budget of the Debtors setting forth the Projected Information for the periods described therein prepared by the Borrowers' management, in consultation with the Consultant, a copy of the initial one of which is attached as <u>Exhibit C</u>, as amended, modified or supplemented from time to time with Administrative Agent's written consent; such thirteen (13) week Budget to be updated (in substantially the same format as the prior thirteen (13) week Budget) every week by Debtors, in consultation with the Consultant, submitted to Administrative Agent and, upon acceptance in writing by Administrative Agent in its sole discretion, the prior approved Budget, as updated, shall constitute the then approved Budget.<br><br>ABL Loan Agreement, Section 1.1 |
| **Variance Testing** | Measured, on a cumulative basis, as of the last day of (a) the first full three weeks after the Filing Date, (i) post-petition disbursements may not exceed 115% of disbursements included in the Budget during the applicable Budget period, (ii) post-petition receipts may not be less than 85% of receipts included in the Budget during the applicable Budget period, subject to the Receipt Variance Cure Right (defined below) and (iii) post-petition sales may not be less than 85% of sales included in the Budget during the applicable Budget period, subject to the Receipt Variance Cure Right (as defined below); and (b) the fourth full week after the Filing Date and the last day of each week thereafter on a trailing four-week basis, (i) post-petition disbursements may not exceed 110% of disbursements included in the Budget during the applicable Budget period, (ii) post-petition receipts may not be less than 90% of receipts included in the Budget during the applicable Budget period, subject to the Receipt Variance Cure Right, and (iii) post-petition sales may not be less than 90% of sales included in the Budget during the applicable Budget period, subject to the Sales Variance Cure Right.<br><br>"Receipt Variance Cure Right" means that a breach of Section 14.1(b)(ii) will not result in an Event of Default if, as of the applicable measuring date, post-petition receipts are less than 90% of receipts included in the Budget during the applicable measurement period, provided that in |

| | |
|---|---|
| | each case, (i) such actual post-petition receipts are not less than 80% of receipts included in the Budget for such measurement period, and (ii) both (A) actual post-petition receipts as measured on the next measuring date are not less than 85% of receipts included in the Budget for such measurement period and (B) actual post-petition receipts as measured on the next measuring date after that (i.e., after that described in (A)) are not less than 90% of receipts included in the Budget for such measurement period.<br><br>"Sales Variance Cure Right" means that a breach of Section 14.1(b)(iii) will not result in an Event of Default if, as of the applicable measuring date, post-petition sales are less than 90% of sales included in the Budget during the applicable measurement period, <u>provided</u> that in each case, (i) such actual post-petition sales are not less than 75% of sales included in the Budget for such measurement period, (ii) the fact that such actual post-petition sales are less than 90% of sales included in the Budget during such measurement period is not due, in whole or in part, to sale cancellations by purchasers, and (iii) both (A) actual post-petition sales as measured on the next measuring date are not less than 82% of sales included in the Budget for such measurement period and (B) actual post-petition sales as measured on the next measuring date after that (i.e., after that described in (A)) are not less than 90% of sales included in the Budget for such measurement period.<br><br>ABL Loan Agreement, Section 14.1 |
| **Maturity Date** | "Maturity Date" shall mean  the earliest of  (a) November 16, 2020, (b) the consummation of a sale of all or substantially all of the assets of Arandell Corp., including in connection with any Sale (as defined below), (c) the effective date of a Proposed Plan and (d) the date on which the "Term" (or any "Renewal Term") expires under and as each such term is defined in the Factoring Agreement.<br><br>ABL Loan Agreement, Section 1.1 |

| **Interest Rate and Fees** | **Interest Rate Options:** | Borrower may elect that the Obligations bear interest at a rate *per annum* equal to: (i) with respect to the Revolving Loans, the "Base Rate" (as defined in the Existing Credit Agreement with such modifications as Agent deems usual and customary for Agent's financings of this type) plus 3.75%, and (ii) with respect to the Term Loan, the Base Rate plus 4.25%. (ABL Loan Agreement, Section 4.1) |
| | **Interest Payment Dates:** | The first business day of each calendar month. (ABL Loan Agreement, Section 4.1) |
| | **Default Rate:** | Upon the occurrence and during the continuation of any event of default, at the election of Agent or the Required Lenders, all amounts under the ABL Facility would bear interest at 2.0% above the interest rate otherwise applicable thereto. (ABL Loan Agreement, Section 4.1) |
| | **Rate and Fee Basis:** | All *per annum* rates shall be calculated on the basis of a year of 360 days and the actual number of days elapsed (ABL Loan Agreement, Section 4.1) |
| | **Closing Fee:** | *Agent has agreed not to charge a closing fee.* |
| | **Unused Revolver Fee:** | A fee in an amount equal to 0.50% per annum times the unused portion of the Revolver would be due and payable monthly in arrears on the first business day of each month. (ABL Loan Agreement, Section 4.3.1) |
| | **Servicing Fee:** | The fee payable to Existing Agent under the Prepetition Facility plus an additional fee to be set forth in a separate fee letter. |
| | **Appraisals and Examinations**: | Agent will be entitled to conduct appraisals and field examinations upon Agent's request from time to time, and Borrower will promptly reimburse Agent for all fees, costs, and expenses relating to same. (ABL Loan Agreement, Section 12.4) |
| **DIP Collateral** | As security for the payment of all Loans now or in the future made by Administrative Agent and Lenders to Borrowers hereunder and for the payment, performance or other satisfaction of all other Obligations owing to Administrative Agent, Collateral Agent, Lenders and, to the extent constituting Obligations hereunder, any Affiliate of any Lender, each Loan Party hereby assigns to Collateral Agent, for the benefit of itself, the Lenders, their applicable Affiliates, and grants to Collateral Agent, for the benefit of itself, the Lenders, their applicable Affiliates, and each Original Loan Party reaffirms its assignment and grant to Collateral Agent, for the benefit of itself, the Lenders and the applicable Affiliates under the Original Loan Agreement of, a continuing security interest in the following property of such Loan Party, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located:  (a) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by such Loan Party has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, such Loan Party; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, | |

registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contract rights, payment intangibles, security interests, security deposits and rights to indemnification); (c) all Inventory (whether or not Eligible Inventory); (d) all Goods (other than Inventory), including, without limitation, Equipment, vehicles and Fixtures; (e) all Investment Property; (f) all Deposit Accounts, bank accounts, deposits and cash; (g) all Letter-of-Credit Rights; (h) Commercial Tort Claims listed on Exhibit D hereto (i) all Supporting Obligations; (j) all claims, rights, interests, assets and properties recovered by or on behalf of each Loan Party or any trustee of such Loan Party (whether in the Bankruptcy Cases or any subsequent case to which the Bankruptcy Cases are converted), including any proceeds recovered as a result of causes of action under sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(b) of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code; (k) and any other property of such Loan Party now or hereafter in the possession, custody or control of Administrative Agent, Collateral Agent, any Lender, or any agent or any parent, affiliate or subsidiary of Administrative Agent, Collateral Agent, any Lender, or any participant with Administrative Agent, Collateral Agent or any Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (l) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property (including, for avoidance of doubt, the Collateral set forth in clause (j) above), whether coming into existence before the Filing Date or thereafter, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of such Loan Party's books and records relating to any of the foregoing and to such Loan Party's business.

ABL Loan Agreement, Section 5.1

***Postpetition Collateral***. All of the real property and personal property of the Debtors of any description whatsoever, wherever located, and whenever arising or acquired, including, without limitation, any and all accounts, books, cash (including, without limitation, all Cash Collateral, cash deposits, and all cash proceeds held in escrow), cash equivalents, chattel paper, commercial tort claims, deposits, deposit accounts, documents, equipment, fixtures, goods, general intangibles (including, without limitation, effective upon entry of the Final Order, all claims and causes of action under chapter 5 of the Code, including, without limitation, Code §§ 542, 544, 545, 547, 548, 549, 550, 551, and 553, and all proceeds thereof), instruments, intellectual property, intellectual property licenses, inventory, investment property, leasehold interests, negotiable collateral, supporting obligations and all other "Collateral" (as that term is defined in the Postpetition Loan Agreement), and all proceeds, rents, issues, profits, and products, whether tangible or intangible, of any and all of the foregoing, including, without limitation, any and all proceeds of insurance covering any of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts, and other computer materials and records related thereto.

Interim Order, Exhibit A

| | |
|---|---|
| **DIP Superpriority Administrative Expense Claim; Postpetition Liens** | The Postpetition Debt is hereby granted superpriority administrative expense status under Code § 364(c)(1), with priority over all costs and expenses of administration of the Cases that are incurred under any provision of the Code.  In addition, Postpetition Agent is hereby granted the Postpetition Liens, for the benefit of itself, the Postpetition Lenders, and the other Postpetition Secured Parties, to secure the Postpetition Debt. The Postpetition Liens: (1) are in addition to the Prepetition Liens; (2) under Code §§ 364(c)(2), 364(c)(3), and 364(d), are Priority Liens (subject only to Permitted Priority Liens) without any further action by Debtors or Postpetition Agent, and without the execution, delivery, filing, or recordation of any financing statements, security agreements, control agreements, title notations, mortgages, or other documents or instruments; (3) will not be subject to any security interest or lien that is avoided and preserved under Code § 551; (4) will remain in full force and effect notwithstanding any subsequent conversion or dismissal of any Case; (5) will not be subject to Code § 510(c); and (6) upon entry of the Final Order, will not be subject to any landlord's lien, banker's lien, bailee's rights, |

|  | carrier's lien, right of distraint or levy, security interest, right of setoff, or any other lien, right, or interest that any bailee, warehousemen, bank, processor, shipper, carrier, or landlord may have in any or all of the Aggregate Collateral except as provided in this Interim Order. Without limiting the foregoing, Debtors must deliver to Postpetition Agent any such financing statements, security agreements, control agreements, mortgages, title notations, and other documents and instruments as Postpetition Agent may request from time to time in its discretion. Further, Prepetition Agent will serve as agent for Postpetition Agent for purposes of perfecting Postpetition Agent's security interest in any Postpetition Collateral that may require perfection by possession, control, or title notation, including, without limitation, under the Control Agreements. In addition, all Prepetition Third Party Documents will be deemed to be for the benefit of Postpetition Agent and the Postpetition Secured Parties without any further order of Court or action by any Person. Without limiting the foregoing, Postpetition Agent, for itself and the Postpetition Secured Parties, has, and will be deemed to have, a perfected Postpetition Lien on all existing deposit accounts of each Debtor and any new deposit account that any Debtor may establish on or after the date hereof, with the exception of the Postpetition Factor Lockbox, without any further action by Debtors or Postpetition Agent. Interim Order, Paragraph 3(e) |
|---|---|
| **Adequate Protection** | Prepetition Agent and Prepetition Secured Parties have consented to the terms of this Interim Order and are entitled to adequate protection as set forth herein and to the extent required under Code §§ 361, 362, 363, 364 and 507(b) (or any such provision, as applicable) for any decrease in the value of such interests in the Prepetition Collateral from and after the Filing Date on account of the stay, use, sale, lease, license, grant, or other disposition of any Prepetition Collateral. |

Interim Order, Paragraph 3(e)

Prepetition Agent and Prepetition Secured Parties have consented to the terms of this Interim Order and are entitled to adequate protection as set forth herein and to the extent required under Code §§ 361, 362, 363, 364 and 507(b) (or any such provision, as applicable) for any decrease in the value of such interests in the Prepetition Collateral from and after the Filing Date on account of the stay, use, sale, lease, license, grant, or other disposition of any Prepetition Collateral.

Principal Payments to Prepetition Lenders (Prepetition Term Loan Obligations). Debtors will timely make all principal payments in respect of the Prepetition Term Loan Obligations as provided for in, and in accordance with, Section 2.5 of the Credit Agreement commencing on the first scheduled payment date occurring after the Filing Date, whether or not included in the Budget.

Interest Payments to Prepetition Lenders. Debtors will timely make monthly payments of interest to the Prepetition Lenders at the default rate as provided for in, and in accordance with, Section 4.1(c) of the Credit Agreement commencing on the first scheduled payment date occurring after the Filing Date, whether or not included in the Budget.

Priority of Prepetition Liens; Allowance of Prepetition Agent's and the Prepetition Secured Parties' Claim. Subject to the terms of Paragraph 10 of this Interim Order: (1) the Prepetition Liens constitute Priority Liens, subject only to Permitted Priority Liens and Postpetition Liens; (2) the Prepetition Debt constitutes the legal, valid, and binding obligation of each Debtor, enforceable in accordance with the terms of the Prepetition Documents; (3) no offsets, defenses, or counterclaims to the Prepetition Debt exist, and no portion of the Prepetition Debt is subject to avoidance, recharacterization or subordination pursuant to the Code or applicable non-bankruptcy law; and (4) Prepetition Agent's and Prepetition Secured Parties' claim with respect to the Prepetition Debt is for all purposes an allowed claim within the meaning of Code § 506 in an amount not less than $11,334,758.18, exclusive of accrued and accruing Allowable 506(b) Amounts.

Replacement Liens.  Subject to the terms of Paragraph 10 of this Interim Order, Prepetition Agent is hereby granted the Replacement Liens, for the benefit of itself and the Prepetition Secured Parties, as security for the complete payment and performance of the Prepetition Debt. The Replacement Liens: (1) are in addition to the Prepetition Liens; (2) are properly perfected, valid, and enforceable liens without any other or further action by Debtors or Prepetition Agent, and without the execution, filing, or recordation of any financing statement, security agreement,

| | |
|---|---|
| | control agreement, mortgage, title notation, or any other agreement, document, or instrument; and (3) will remain in full force and effect notwithstanding any subsequent conversion or dismissal of any Case. Without limiting the foregoing, Debtors are authorized to, and must, execute and deliver to Prepetition Agent any such financing statements, security agreements, control agreements, mortgages, title notations and other documents and instruments as Prepetition Agent may request from time to time in its discretion in respect of the Replacement Liens.<br><br>Allowed Code § 507(b) Claim.  If and to the extent the adequate protection of the interests of Prepetition Agent and the other Prepetition Secured Parties in the Prepetition Collateral granted pursuant to this Interim Order proves insufficient, Prepetition Agent and the other Prepetition Secured Parties will have an allowed claim under Code § 507(b), subject to the Carveout, in the amount of any such insufficiency, with priority over (1) any and all costs and expenses of administration of the Cases (other than the claims of Postpetition Agent, Postpetition Lenders, and the other Postpetition Secured Parties under Code § 364) that are incurred under any provision of the Code and (2) the claims of any other party in interest under Code § 507(b).<br><br>Cash Consideration. As further adequate protection of the interests of Prepetition Agent and the other Prepetition Secured Parties in the Prepetition Collateral, any sale or other disposition of all or any portion of the Aggregate Collateral outside of the ordinary course of Debtors' businesses must be for cash consideration until the Aggregate Debt has been Paid in Full pursuant to the Prepetition Documents and the Postpetition Documents.<br><br>Interim Order, Paragraph 5(a) – (f) |
| **Modification of Automatic Stay** | Effect of Termination Date. Unless extended by this Court upon the written agreement of Postpetition Agent, upon the Termination Date without further notice or order of Court: (1) Debtors' authorization to use Cash Collateral and to incur Postpetition Debt hereunder will automatically terminate; and (2) at Postpetition Agent's election (i) the Postpetition Debt will be immediately due and payable in full in cash, (ii) Debtors will be prohibited from using any Cash Collateral for any purpose other than for application to the Aggregate Debt in accordance with Paragraph 2(d) of this Interim Order, and (iii) Agents will be entitled to setoff any and all Cash Collateral in the possession or control of any Agent or any Lender and apply such Cash Collateral to the Aggregate Debt in accordance with Paragraph 2(d) of this Interim Order.<br><br>Rights and Remedies. On the fifth (5th) business day after the Termination Date, at Postpetition Agent's election without notice or further order of this Court:  (1) Agents will have automatic and immediate relief from the automatic stay with respect to the Aggregate Collateral (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)), and will be entitled to exercise all rights and remedies available to them under the Prepetition Documents, the Postpetition Documents, and applicable non-bankruptcy law; and (2) Debtors must surrender the Aggregate Collateral promptly upon written demand by any Agent and will not interfere in any manner with Agents and Lenders in the exercise of their rights and remedies under the Prepetition Documents, the Postpetition Documents, and applicable non-bankruptcy law, including, without limitation, by filing a motion to retain one or more agents to sell, lease, or otherwise dispose of the Aggregate Collateral (or by one or more Debtors acting as such agents themselves) upon the request of, and subject to terms and conditions acceptable to, the Agents. Notwithstanding the foregoing, during the five (5) business day period following the Termination Date, Debtors, any Committee, and the United States Trustee may seek an order of this Court determining that an Event of Default alleged to have given rise to the Termination Date did not occur; provided, however, that during such five (5) business day period, Postpetition Lenders will have no obligation whatsoever to advance any Postpetition Debt to Debtors.<br><br>Access to Aggregate Collateral.  Upon the entry of the Final Order, notwithstanding anything to |

|  | the contrary herein or in any Prepetition Third Party Document or Postpetition Document, upon written notice to the landlord of any of the Debtors' leased premises that an Event of Default has occurred and is continuing, Agents may elect to (but will not be obligated to) enter upon any such leased premises for the purpose of exercising any right or remedy with respect to the Aggregate Collateral located thereon and will be entitled to such Debtor's rights and privileges under such lease without any interference from such landlord; provided, however, that such Agent shall pay to such landlord rent first accruing after the date on which such Agent commences occupancy of the leased premises, calculated on a per diem basis at the non-default rate of rent, solely for the period during which Agent actually occupies such leased premises.<br><br>Interim Order, Paragraphs 6(a) – (c)<br><br>Modification of Stay. The automatic stay of Code § 362 is hereby modified with respect to Agents and Lenders and Factor to the extent necessary to effectuate the provisions of this Interim Order, including, without limitation, after the Termination Date to permit Agents and Lenders and Factor to exercise their respective rights contemplated by Paragraph 6 above.<br><br>Interim Order, Paragraph 21 |
|---|---|
| **Indemnification** | IN CONSIDERATION OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE AGREEMENT TO EXTEND THE COMMITMENTS PROVIDED HEREUNDER, EACH LOAN PARTY HEREBY AGREES TO INDEMNIFY, EXONERATE AND HOLD ADMINISTRATIVE AGENT, EACH LENDER AND EACH OF THE OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES AND AGENTS OF ADMINISTRATIVE AGENT AND EACH LENDER (EACH A "LENDER PARTY") FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES, INCLUDING ATTORNEY COSTS (COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"), INCURRED BY LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (A) ANY TENDER OFFER, MERGER, PURCHASE OF CAPITAL SECURITIES, PURCHASE OF ASSETS (INCLUDING THE RELATED TRANSACTIONS) OR OTHER SIMILAR TRANSACTION FINANCED OR PROPOSED TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF ANY OF THE LOANS, (B) THE USE, HANDLING, RELEASE, EMISSION, DISCHARGE, TRANSPORTATION, STORAGE, TREATMENT OR DISPOSAL OF ANY HAZARDOUS MATERIAL AT ANY PROPERTY OWNED OR LEASED BY ANY LOAN PARTY, (C) ANY VIOLATION OF ANY ENVIRONMENTAL LAWS WITH RESPECT TO CONDITIONS AT ANY PROPERTY OWNED OR LEASED BY ANY LOAN PARTY OR THE OPERATIONS CONDUCTED THEREON, (D) THE INVESTIGATION, CLEANUP OR REMEDIATION OF OFFSITE LOCATIONS AT WHICH ANY LOAN PARTY OR THEIR RESPECTIVE PREDECESSORS ARE ALLEGED TO HAVE DIRECTLY OR INDIRECTLY DISPOSED OF HAZARDOUS MATERIALS OR (E) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BY ANY OF LENDER PARTIES, EXCEPT FOR ANY SUCH INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE LENDER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, EACH LOAN PARTY HEREBY AGREES TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL OBLIGATIONS PROVIDED FOR IN THIS SECTION 19.4 SHALL SURVIVE REPAYMENT OF THE LOANS, CANCELLATION OF THE NOTES, EXPIRATION OR TERMINATION OF THE LETTERS OF CREDIT, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF |

| | |
|---|---|
| | THE COLLATERAL DOCUMENTS AND TERMINATION OF THIS AGREEMENT.<br><br>ABL Loan Agreement, Section 19.4<br><br>Indemnification.  Debtors will indemnify and hold harmless Prepetition Agent and Prepetition Lenders, and Postpetition Agent and Postpetition Lenders, and Factor, in accordance with the terms of the Prepetition Documents and the Postpetition Documents and the DIP Factoring Documents, respectively.<br><br>Interim Order, Paragraph 17 |
| **Prepetition Intercreditor Agreements** | ***Subordination Agreements.***  Collectively, (a) the CapX Intercreditor Agreement, (b) the Mezzanine Intercreditor Agreement, (c) the Seller Subordination Agreement, and (d) any other subordination agreement, intercreditor agreement, or similar agreement relating to the Prepetition Debt made by or in favor of Prepetition Agent or any Prepetition Lender from time to time, in each case, as amended, supplemented or otherwise modified from time to time.<br><br>Interim Order, Exhibit A<br><br>Nothing in this Interim Order will modify any of the terms or provisions of the Mezzanine Intercreditor Agreement, the CapX Intercreditor Agreement, or the Seller Subordination Agreement.<br><br>Interim Order, Paragraph F<br><br>Force and Effect of Prepetition Documents; Subordination Agreements.  Except as modified herein, and subject to the other provisions of this Interim Order (including Paragraph 10 hereof) and the Code, the Prepetition Documents and the Prepetition Third Party Documents will remain in full force and effect with respect to the Prepetition Debt. To the extent that there exists any conflict among the terms of the Motion, the Prepetition Documents, the Prepetition Third Party Documents, and this Interim Order, this Interim Order governs and controls. Without limiting the foregoing, the Mezzanine Intercreditor Agreement, the CapX Intercreditor Agreement, and each other Subordination Agreement (a) is and will remain valid and binding on each of the parties thereto notwithstanding the entry of this Interim Order, (b) constitutes a "subordination agreement" within the meaning of Code § 510, and (c) is fully enforceable in accordance with its terms and provisions. The consent by any Agent or Lender to entry of this Interim Order will not prejudice any rights of any Agent or Lender under the Seller Subordination Agreement, the Mezzanine Intercreditor Agreement, the CapX Intercreditor Agreement, or any other Subordination Agreement.<br><br>Interim Order, Paragraph 20 |
| **Postpetition Intercreditor Agreement** | Postpetition Agent (on behalf of Postpetition Lenders), Prepetition Agent (on behalf of Prepetition Lenders), and Factor will enter into an intercreditor agreement (the "Postpetition Intercreditor Agreement"), acknowledged by Loan Parties, which will set forth certain priorities in the Collateral as between the Postpetition Agent, the Prepetition Agent and the Factor, among other provisions.  The Factor will have a first priority lien on all of the accounts receivable arising out of inventory sold after the Filing Date until the occurrence of a Trigger Date (as defined below) and all post-Trigger Date accounts to the extent Factor advances at least 80% of the gross invoice value less discounts which amounts are used to reduce the ABL Facility by an amount equal to at least 80% of the gross invoice value less discounts, and a third priority lien on all other Collateral; provided, however, that (i) from and after the date on which Postpetition Agent or the Factor receives written notice from the other of the occurrence and continuance of any Event of Default under the ABL Facility or the Factoring Facility, respectively, and, as a result thereof, of the election of Agent or the Factor to declare a "Trigger Event" under the |

Postpetition Intercreditor Agreement (such notice, a "Trigger Notice"; and the date on which the Agent or the Factor first receives such notice, "Trigger Date"), all payments received in respect of any Specified Customer Account owing by a Specified Customer with respect to which shall be applied as follows: (1) first, to the repayment of the Factor Priority Debt in an aggregate amount not to exceed the Specified Factor Balance in respect of all outstanding Specified Customer Accounts constituting Factor Priority Collateral (if any) and (2) second, to the payment of the ABL Debt and CapX Debt in accordance with the ABL Documents and the CapX Intercreditor Agreement until the Payment in Full of ABL Debt and the payment in full in cash of all CapX Debt.

In addition to, and without limiting, the foregoing, Agent will have a continuing right (but not an obligation) to purchase, directly from the Factor, any unpaid accounts receivable owing by such customer that may have been factored by the Factor, in each case, for a cash purchase price equal to 100% of the face amount of the unpaid portion of all such account(s) receivable of such customer as of the purchase date, in each case, after accounting for any discount or modification, if any, that the Factor may have made with such customer on or prior to such purchase date (in each case, subject to the receipt of an Agent Consent, as defined below).

With respect to any Specified Customers for whom the Factor has elected to not factor accounts receivable generated after a Trigger Notice, the Factor agrees that it may not discount, compromise, settle, or otherwise modify the payment terms relating to any accounts receivable that the Factor has factored with such Specified Customers, in an amount greater than 5% of the balance due on such account(s) receivable without the prior written consent of Agent (each, an "Agent Consent").

| | |
|---|---|
| **Borrowing Limits** | <u>Advances</u>.  Subject to the terms and conditions of this Agreement and the other Loan Documents, prior to the Maturity Date, each Revolving Loan Lender shall make its Pro Rata share of revolving loans and advances (the "<u>Revolving Loans</u>") to Borrowers up to its Revolving Loan Commitment, upon request of the Borrowers and at the discretion of the Administrative Agent; <u>provided</u> that the aggregate unpaid principal balance of the Revolving Loans plus the amount of any Swing Line Loans outstanding at such time shall not at any time exceed the lesser of (i) Revolving Loan Availability minus (x) the Letter of Credit Obligations, (y) the principal amount of any Reinstated Existing Secured Obligations and (z) the principal amount of the Existing Secured Obligations (other than the Prepetition Term Loan) and (ii) the Total Revolving Loan Commitment minus (x) the Letter of Credit Obligations, (y) the principal amount of any Reinstated Existing Secured Obligations and (z) the principal amount of the Existing Secured Obligations<br><br>ABL Loan Agreement, Section 2.1.1<br><br><u>Term Loan</u>. Upon entry of the Final Financing Order (and subject to the terms thereof), the Lenders holding a Term Loan Commitment on such date shall make a term loan to Borrower (the "<u>Term Loan</u>") in an aggregate principal amount equal to the then outstanding principal balance of the Prepetition Term Loan (provided, that no Lender shall be required to advance a Term Loan in excess of such Lender's Term Loan Commitment), the proceeds of which shall be immediately applied to repay in full the Prepetition Term Loan.  Upon the making of the Term Loan following entry of the Final Financing Order pursuant to this <u>Section 2.2</u>, the Term Loan Commitments of all Lenders shall immediately terminate.  Amounts repaid with respect to the Term Loan may not be reborrowed.<br><br>ABL Loan Agreement, Section 2.2 |
| **Conditions to Effectiveness** | <u>Conditions to Effectiveness</u>:<br><br>The effectiveness of this Agreement is subject to the satisfaction or waiver of the following conditions precedent (and the date on which all such conditions precedent have been satisfied and the initial Loans are advanced by Lenders is called the "<u>Closing Date</u>"):<br><br>(a) Administrative Agent shall have received each of the agreements, opinions, reports, approvals, consents, certificates and other documents set forth on the closing document list attached hereto as <u>Schedule 17.1</u> (the "<u>Closing Document List</u>") in each case in form and substance satisfactory to Administrative Agent;<br><br>(b) Administrative Agent shall have received payment in full of all fees and expenses payable to it by any Borrower or any other Person in connection herewith, on or before the effectiveness of this Agreement;<br><br>(c) The Related Transactions are consummated in accordance with the Related Transaction Documents and applicable law contemporaneously with the effectiveness of this Agreement;<br><br>(d) Administrative Agent shall have completed its business and legal due diligence;<br><br>(e) Administrative Agent shall have received and approved the Budget;<br><br>(f) All first day and related orders entered by the Bankruptcy Court in the Bankruptcy Cases shall be in form and substance satisfactory to the Administrative Agent;<br><br>(g) All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with this Agreement, and the approval thereof shall be in form and |

substance satisfactory to the Administrative Agent;

(h) The Bankruptcy Court shall have entered the Interim Financing Order within three (3) Business Days after the commencement of the Bankruptcy Cases, in form and substance satisfactory to the Administrative Agent and each of the Lenders, entered on notice to such parties as may be reasonably satisfactory to the Administrative Agent and the Lenders, (i) authorizing and approving the terms of this Agreement, the other Loan Documents and the Factoring Documents and the transactions contemplated thereby and hereby, including, without limitation, the granting of the super-priority status, security interests and priming liens, and the payment of all fees; (ii) lifting or modifying the automatic stay to permit the Loan Parties to perform their obligations and Administrative Agent, Collateral Agent and the Lenders to exercise their rights and remedies with respect to this Agreement and the other Loan Documents, (iii) except to the extent required to be paid pursuant to the Final Financing Order, authorizing the use of cash collateral for purposes of reducing the outstanding balance of the Existing Secured Obligations, (iv) providing for adequate protection in favor of Existing Agent and Existing Lenders, and (v) including terms and conditions customary for transactions of this type (including, without limitation, that any amount of the gradual roll-up or other repayment of the Existing Obligations that is undone shall be first applied to outstanding amounts of the Obligations);

(i) CIBC's receipt of (i) all applicable internal approvals with respect to this Agreement and (ii) acceptable commitments from Lenders satisfactory to CIBC in an amount of not less than 40% of the aggregate Commitment; and

(j) The Loan Parties shall have executed and delivered to Administrative Agent all such other documents, instruments and agreements which Administrative Agent determines are reasonably necessary to consummate the transactions contemplated hereby.

ABL Loan Agreement, Section 17.1

| | |
|---|---|
| **Conditions to Borrowing** | <u>Conditions to All Loans</u>:<br><br>Lenders shall not be obligated to fund any Loans, arrange for the issuance of any Letters of Credit or grant any other accommodation for the benefit of any Borrower, unless the following conditions are satisfied; <u>provided</u>, that if Administrative Agent chooses to cause Loans to be advanced or Letters of Credit to be issued notwithstanding the failure of any such conditions to be satisfied, all Revolving Loan Lenders shall be required to fund such Loans and participate in such Letters of Credit unless the Revolving Loan Lenders having the majority of the Pro Rata Shares thereof has directed Administrative Agent not to fund such Loans or caused such Letters of Credit to be issued:<br><br>(a) No Default or Event of Default shall exist at the time of or result from such funding, issuance or grant;<br><br>(b) The representations and warranties of each Loan Party in this Agreement and the other Loan Documents shall be true and correct as of the date, and after giving effect to such funding, issuance or grant (except for representations and warranties that expressly relate to an earlier date which must be true and correct as of such earlier date);<br><br>(c) No event shall have occurred or circumstances exist that has or could reasonably be expected to have a Material Adverse Effect; and<br><br>(d) With respect to any borrowing under this Agreement after twenty-one (21) days after the Closing Date, the Bankruptcy Court shall have entered the Final Financing Order approving this Agreement, the other Loan Documents and Factoring Documents, in |

| | |
|---|---|
| | form and substance satisfactory to Administrative Agent and each of the Lenders, which Final Financing Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and each of the Lenders.<br><br>Each request (or deemed request) by a Borrower for funding of a Loan, issuance of a Letter of Credit or grant of an accommodation shall constitute a representation by Borrowers that the foregoing conditions are satisfied on the date of such request and on the date of such funding, issuance or grant.  As an additional condition to any funding, issuance or grant, Agent shall have received such other information, documents, instruments and agreements as it deems appropriate in connection therewith.<br><br>ABL Loan Agreement, Section 17.2 |
| **Events of Default and Remedies** | The occurrence of any one or more of the following events shall constitute an "<u>Event of Default</u>" by Borrowers hereunder:<br><br>(a)  The failure of any Loan Party to pay (a) when due, declared due, or demanded by Administrative Agent (at the request of Required Lenders), any of the Obligations or (b) all or any portion of the Existing Secured Obligations as and when due and payable in accordance with the Financing Order;<br><br>(b)  The failure of any Loan Party to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Loan Party under this Agreement or any of the other Loan Documents;<br><br>(c)  The failure of any Loan Party to perform, keep or observe (after any applicable notice and cure period) any of the covenants, conditions, promises, agreements or obligations of such Loan Party under any other agreement (other than any Subordinated Debt Document or any Equipment Lease Document) with any Person if such failure could reasonably be expected to have a Material Adverse Effect on such Loan Party;<br><br>(d)  The making or furnishing by any Loan Party to Administrative Agent, Collateral Agent or any Lender of any representation, warranty, certificate, schedule, report or other communication within or in connection with this Agreement or the other Loan Documents or in connection with any other agreement between such Loan Party and Administrative Agent or any Lender, which is untrue or misleading in any material respect as of the date made;<br><br>(e)  The loss, theft, damage or destruction of any of the Collateral not adequately covered by insurance as to which the insurance company has acknowledged responsibility in an amount in excess of $10,000 in the aggregate for all such events during any Fiscal Year as determined by Administrative Agent in its sole discretion determined in good faith, or (except as permitted hereby) the sale, lease or furnishing under a contract of service of, any of the Collateral;<br><br>(f)  The making or any attempt by any Person to make any levy, seizure or attachment upon any of the Collateral;<br><br>(g)  The entry of any judgments or orders aggregating in excess of $25,000 against any Loan Party which remains unsatisfied or undischarged and in effect for thirty (30) days after such entry without a stay of enforcement or execution;<br><br>(h)  The dissolution of any Loan Party which is a partnership, limited liability company, corporation or other entity;<br><br>(i)  The occurrence of an event of default under, or the revocation or termination of, any agreement, instrument or document executed and delivered by any Person to Administrative Agent pursuant to which such Person has guaranteed to Administrative |

Agent and Lenders the payment of all or any of the Obligations or has granted Administrative Agent a security interest in or lien upon some or all of such Person's real and/or personal property to secure the payment of all or any of the Obligations;

(j) The institution in any court of a criminal proceeding against any Loan Party which would have a Material Adverse Effect on such Loan Party, or the indictment of any Loan Party, for any crime which would have a Material Adverse Effect on such Loan Party;

(k) The failure of (a) Bradley Hoffman to (i) own one hundred percent (100%) of the issued and outstanding voting equity interests of Holdings and (ii) have the right to appoint a majority of the board of directors of Holdings (it being understood that Holding's board of directors may have the right to approve replacement independent directors appointed to Holding's board of directors), (b) Holdings to own and control at least one hundred percent (100%) of each Borrower, or (c) any Borrower to own and control at least one hundred percent (100%) of each of its Subsidiaries;

(l) If Bradley Hoffman shall cease to be the President of Holdings and each Borrower at any time and a replacement for Bradley Hoffman is not found within 180 days (or such longer period of time as agreed to by the Administrative Agent in its sole discretion) of the date he ceases to be President of Holdings and each Borrower, which replacement shall be satisfactory to the Administrative Agent in its reasonable discretion;

(m) The withdrawal or partial withdrawal from any Multiemployer Plan;

(n) The occurrence of any event having a Material Adverse Effect;

(o) Any "Event of Default" under and as defined in the Existing Loan Documents first arising after the Filing Date other than any default (x) arising prior to the Filing Date, (y) due to Debtors' filing, commencement and continuation of the Bankruptcy Cases and the events that customarily result from the filing, commencement and continuation of the Bankruptcy Cases (including any litigation resulting therefrom) or (z) due to restrictions on payments arising under the Bankruptcy Cases;

(p) (i) Any "Event of Default" shall occur under the terms of and as defined in (x) any Subordinated Debt Document or (y) any Equipment Lease Document or (ii) or any default shall occur under the terms applicable to any other Indebtedness (other than the Obligations) of any Loan Party in an aggregate amount (for all such Indebtedness so affected and including undrawn committed or available amounts) exceeding $25,000 and such default shall (A) consist of the failure to pay such Indebtedness when due, whether by acceleration or otherwise, or (B) accelerate the maturity of such Indebtedness or permit the holder or holders thereof, or any trustee or agent for such holder or holders, to cause such Indebtedness to become due and payable (or require any Loan Party to purchase or redeem such Indebtedness or post cash collateral in respect thereof) prior to its expressed maturity other than, in each case, (1) any default arising prior to the Filing Date, (2) due to Borrowers' filing, commencement and continuation of the Bankruptcy Cases and any litigation arising therefrom or (3) due to restrictions on payments arising as a result of the Bankruptcy Cases;

Bankruptcy Events:

(a) The Final Financing Order is not entered within twenty-one (21) days following the Filing Date;

(b) The Interim Financing Order or Final Financing Order is stayed, revised, revoked, remanded, rescinded, amended, reversed, vacated, or modified in any manner not acceptable to Administrative Agent;

(c) Any person or entity shall file a pleading seeking to modify or otherwise alter the

Interim Financing Order, the Final Financing Order, any Loan Document, any of the Existing Loan Documents or any of the transactions contemplated in any of the foregoing without the prior consent of Administrative Agent, and such pleading shall not be dismissed or withdrawn, with prejudice, within 5 days after the assertion thereof;

(d) Any person or entity, without the consent of Administrative Agent, uses, or seeks the use of, cash collateral other than in accordance with the terms of the Interim Financing Order or the Final Financing Order;

(e) An order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court (A) appointing a trustee under Section 1104, or an examiner with enlarged powers relating to the operation of the business of the Loan Parties under Section 1106(b) of the Bankruptcy Code or (B) terminating or shortening any Loan Party's exclusive rights to file and solicit acceptances for its plan;

(f) (i) Administrative Agent, any Lender, Existing Agent, any Existing Lender or any Collateral securing the Obligations or Existing Obligations are surcharged pursuant to Sections 105, 506(c) or 552 or any other section of the Bankruptcy Code, or

(ii) any person or entity other than a Loan Party shall assert any claim in the any of the Bankruptcy Cases arising under Sections 105, 506(c) or 552 or any other section of the Bankruptcy Code against Administrative Agent, any Lender, Existing Agent, any Existing Lender or any Collateral, and such claim shall not be dismissed or withdrawn, with prejudice, within 10 days after the assertion thereof;

(g) Any person or entity other than the Loan Parties shall commence any action in any of the Bankruptcy Cases adverse to Administrative Agent, any Lender, Existing Agent or any Existing Lender, the extent, validity, perfection, enforceability or priority of any of their liens or claims, or any of their rights and remedies under the Loan Documents, the Existing Loan Documents, the Financing Order or any other order of the Bankruptcy Court and such claim shall not be dismissed or withdrawn, with prejudice, within 10 days after the assertion thereof;

(h) (i) Any Loan Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of Administrative Agent and the Lenders, claims or rights against Loan Parties or any of their Subsidiaries or to subject any Collateral to assessment pursuant to Section 105, 506(c), 552 or any other section of the Bankruptcy Code,

(ii) any lien, security interest or superpriority claim created by created by this Agreement, the Loan Documents, the Existing Loan Agreement, the Existing Loan Documents or the Financing Order shall, for any reason, cease to be valid,

(iii) any action is commenced by any Loan Party or any of its Subsidiaries which contests the extent, validity, perfection, enforceability or priority of any of the liens and security interests of Administrative Agent, Existing Agent, the Lenders or Existing Lenders created by this Agreement, the Loan Documents, the Existing Loan Agreement, the Existing Loan Documents or the Financing Order or

(iv) any Loan Party or any Subsidiary of any Loan Party challenges the extent, validity or priority of the Obligations or the Existing Obligations or the application of any payments or collections received by Administrative Agent, Lenders, Existing Agent, or Existing Lenders to the Obligations or Existing Obligations as provided for herein

or in the Financing Order;

(i) (i) Any filing of a motion to dismiss any of the Bankruptcy Cases or to convert any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, and such motion shall not be dismissed or withdrawn, with prejudice, within 5 days after the assertion thereof, or

(ii) an order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court dismissing any of the Bankruptcy Cases or converting any of the Bankruptcy Cases (or any case comprising part of any of the Cases) to a case under chapter 7 of the Bankruptcy Code;

(j) Any motion, supplement, amendment or other document relating to the Financing Order, this Agreement, the Existing Loan Agreement or the transactions contemplated in any of the foregoing that is not in form in substance satisfactory to Administrative Agent is filed by any Loan Party or entered by the Bankruptcy Court;

(k) Entry of any order requiring any Borrower or any other Loan Party to pay (before all Existing Obligations and Obligations have been paid in full) any amounts in respect of Section 503(b)(9) of the Bankruptcy Code or otherwise on account of goods shipped to any Borrower or any other Loan Party prior to the Filing Date, other than those agreed in the Budget by the Administrative Agent and the Loan Parties;

(l) Any sale of, or motion to sell Collateral is pursuant to Section 363 of the Bankruptcy Code is filed, to which the Administrative Agent does not consent;

(m) An order with respect to any of the Bankruptcy Cases shall be entered without the express prior written consent of Administrative Agent, (i) to revoke, vacate, reverse, stay, modify, supplement or amend this Agreement, the Existing Loan Agreement, any Loan Document, any Existing Loan Document, the Financing Order, or the transactions contemplated in any of the foregoing, or (ii) to permit any administrative expense, claim or lien (now existing or hereafter arising, of any kind or nature whatsoever) to have priority equal or superior to the priority of the Collateral Agent, Existing Agent, Lenders and Existing Lenders in respect of the Obligations and Existing Obligations, except for the amounts having a priority over the Obligations to the extent set forth in the definition of Carve-Out and except for the Factoring Facility (subject to the terms of the Factoring Intercreditor Agreement);

(n) An order shall be entered by the Bankruptcy Court granting relief from the automatic stay to any creditor(s) of any Loan Party or any Subsidiary of any Loan Party;

(o) Any plan of reorganization is filed that, or an order shall be entered by the Bankruptcy Court confirming a reorganization plan in any of the Bankruptcy Cases which, does not (i) contain a provision that all Obligations and all Existing Obligations shall be paid in full in a manner satisfactory to the Administrative Agent on or before the effective date, or substantial consummation, of such plan and (ii) provide for the continuation of the liens and security interests granted to Administrative Agent and priorities until such plan effective date all Obligations and Existing Obligations are paid in full;

(p) Other than the Factoring Obligations (subject to the terms of the Factoring Intercreditor Agreement), a motion shall be filed seeking authority (and such motion shall not be dismissed or withdrawn, with prejudice, within 5 days after the assertion thereof), or an order shall be entered in any of the Bankruptcy Cases, that (i) permits any Loan Party or

any Subsidiary of any Loan Party to incur indebtedness secured by any claim under Bankruptcy Code Section 364(c)(1) or by a Lien pari passu with or superior to the lien granted under the Loan Documents and the Existing Loan Documents and Bankruptcy Code Sections 364(c)(2) or (d) unless (A) all of the Obligations and Existing Obligations have been paid in full at the time of the entry of any such order, or (B) the Obligations and the Existing Obligations are paid in full with such debt, or (ii) permits any Loan Party or any Subsidiary of any Loan Party the right to use Collateral other than in accordance with the terms of the Financing Order, unless all of the Obligations and Existing Obligations shall have been paid in full;

(q) Proceeds of any sale of all or substantially all assets of Loan Parties are not directly remitted to Administrative Agent or Factor at the closing thereof, to be applied in accordance with the   Financing Orders, the Loan Documents, the Equipment Intercreditor Agreement, and the Factoring Intercreditor Agreement;

(r) Any motions to approve any severance, retention or incentive plan or program for employees that is not in accordance with the Budget and is otherwise not in form and substance acceptable to Administrative Agent;

(s) Any motions to sell Collateral or approve procedures regarding the same, or any orders approving or amending any of the foregoing, are not in form and substance acceptable to Administrative Agent;

(t) The automatic stay terminates or expires unless all of the Obligations and Existing Obligations shall have been paid in full at the time of such termination or expiration;

(u) Payment of or granting adequate protection with respect to any indebtedness that was existing prior to the Filing Date (other than as provided herein or as approved by Administrative Agent);

(v) Any Loan Party or any Subsidiary of any Loan Party shall fail to maintain sufficient projected borrowing capacity under this Agreement and the Factoring Agreement to pay all accrued administrative obligations and other administrative claims when due, and sufficient additional borrowing capacity to enable such other unpaid administrative obligations and administrative claims that are required to be paid in full prior to such time that all Obligations and Existing Obligations are paid in full;

(w) Any Loan Party fails to timely comply with the covenants or to perform any of its obligations in strict compliance with the terms of the Interim Financing Order or the Final Financing Order;

(x) Promontory Point Capital is no longer investment banker to Arandell for any reason ("Investment Banker Event") and Arandell has not selected and engaged a replacement investment banking firm reasonably acceptable to Administrative Agent, on terms acceptable to Administrative Agent, within five (5) business days after such Investment Banker Event;

(y) Harney Partners is no longer financial advisor to Arandell for any reason ("Financial Advisor Event") and Arandell has not selected and engaged a replacement financial advisory firm reasonably acceptable to Administrative Agent, on terms acceptable to Administrative Agent, within five (5) business days after such Financial Advisor Event.

(z) Any "Event of Default" shall occur under the Factoring Agreement or any other

Factoring Document or the Factoring Agreement shall be terminated; or the "Advance Rate" shall be less than 80% at any time.

ABL Loan Agreement, Section 15

*Event of Default*.  At Postpetition Agent's election, the occurrence of any of the following: (a) the occurrence and continuance of any "Event of Default" (as defined in the Postpetition Loan Agreement) first arising after the Filing Date under the Postpetition Loan Agreement or any other Postpetition Document; (b) any Debtor fails to timely comply with the covenants or perform any of its obligations in strict accordance with the terms of this Interim Order; (c) any Debtor fails to comply with any Sale Covenant; (d) any Debtor, without the consent of the Agents and Lenders, use, or seek the use of, Cash Collateral other than in accordance with the terms of this Interim Order; (e) any Debtor, without the written consent of Agents and Lenders, file a motion to incur debt secured by a lien with priority equal to, or superior to, the Prepetition Liens or the Postpetition Liens or which is given superpriority administrative expense status under Code § 364(c) other than in accordance with the terms of this Interim Order; (f) any Debtor files a motion to conduct a Code § 363 sale of all or any part of the Aggregate Collateral on terms unacceptable to Agents and Lenders; (g) any Debtor or other Person files a chapter 11 plan that is not acceptable to Agents and Lenders; (h) entry of any order authorizing any party in interest to reclaim any of the Aggregate Collateral, granting any party in interest relief from the automatic stay with respect to the Aggregate Collateral, or requiring that any Debtor turnover any of the Aggregate Collateral, in each case, prior to the full, final, and indefeasible repayment of all of the Aggregate Debt; (i) entry of any order requiring any Debtor to pay (prior to full, final and indefeasible repayment of all Aggregate Debt) any amounts in respect of claims under Code § 503(b)(9) or otherwise on account of goods shipped to any Debtor prior to the Filing Date; (j) any material representation or warranty made by any Debtor in any certificate, report, or financial statement delivered to any Agent or to any Lender proves to have been false or misleading in any material respect as of the time when made or given (including by omission of material information necessary to make such representation, warranty, or statement not misleading); (k) any Person files a motion in any Case to dismiss any Case or to convert any Case to a case under chapter 7 of the Code; (l) any Case is dismissed or converted to a case under chapter 7 of the Code; (m) a Trustee is appointed or elected in any Case, or an examiner with the power to operate any Debtor's business is appointed in any Case; (n) commencement of any adversary proceeding or contested matter objecting to the extent, validity, amount, perfection, priority or enforceability all or any portion of the Prepetition Debt, Prepetition Documents, or Prepetition Liens; (o) any Debtor's exclusivity period under Code § 1121 is terminated or shortened for any reason whatsoever; (p) any payment is made by any Debtor, or any adequate protection is granted by any Debtor, with respect to any indebtedness of Debtors other than as provided in this Interim Order or otherwise consented to in writing by Agents and approved by this Court; (q) any Debtor fails at any time to pay all accrued administrative expenses and other obligations when due in accordance with, and subject to, the Budget and the Postpetition Documents; (r) this Interim Order is modified, amended, reversed, vacated, or stayed in any manner not consented to in writing by Agents; (s) the Final Order is not entered within twenty one (21) days following the entry of this Interim Order in form and substance satisfactory to Agents; or (t) any Event of Default under any DIP Factoring Document.

Interim Order, Exhibit A

| | |
|---|---|
| **Waiver of Marshalling** | No Marshalling.  Upon entry of a Final Order, none of the Agents, Lenders, Factor, or any of the Aggregate Collateral will be subject to the doctrine of marshaling.<br><br>Interim Order, Paragraph 18 |
| **Factoring Facility** | |

| | |
|---|---|
| **Borrower** | Arandell Corporation |
| **Guarantors** | Arandell Holdings, Inc.; Arandell Kentucky, LLC; Bradley Hoffman |
| **Postpetition Lenders** | LSQ Funding Group, L.C. |
| **Limitation on Use of Proceeds** | Advances of the Purchase Price under the Factoring Facility will be solely employed by Debtors to pay the Roll-Up of Prepetition Obligations and Postpetition Obligations due the ABL Lenders.<br><br>Interim Order, Paragraph 4(b). |
| **Budget** | As provided under the ABL Facility (above). |
| **Variance Testing** | As provided under the ABL Facility (above) |
| **Maturity Date** | Barring earlier termination under the Invoice Purchase Agreement, the Factoring Facility term is one (1) year from the Effective Date; provided however, that all indebtedness and obligations to Factor must indefeasibly be paid in full at any sale of Debtors' business.<br><br>Invoice Purchase Agreement, at section 18; Interim Order, Paragraph 4(j). |
| **Interest Rate and Fees** | **Invoice Purchase Fee -**   0.75% multiplied by the Face Amount of a Purchased Account, charged at the time of purchase of an Account (Invoice Purchase Agreement, at section 1.19)<br><br>**Origination Fee -**   $150,000.00 (Invoice Purchase Agreement, at section 1.23; DIP Addendum, at section 3.1(b).<br><br>**Default Rate -**   The lesser of eighteen percent (18%) per annum or maximum rate allowed by law. (Invoice Purchase Agreement, at sections 1.10, 11, 19.2).<br><br>**Misdirected Payment Fee -** 15.00% percent of the amount of any payment on account of a Purchased Account which has been received by Arandell Corporation or by a third party and not paid to Factor on the fifth Business Day following the date of receipt by Arandell Corporation or the date of Arandell Corporation's knowledge of receipt by such third party. (Invoice Purchase Agreement, at sections 1.21.)<br><br>**Funds Usage Daily Fee -**   .0201% (Prime Rate + 4.00%/360 = .0201%)  The Funds Usage Daily Fee shall increase or decrease on the same date as any change in the Prime Rate, by the Prime Rate Adjustment  (the "Prime Rate Adjustment"  is  0.0007% daily for every 0.25% change in the Prime Rate compared to the Prime Rate as of the date of Invoice Purchase Agreement, except that the Prime Rate Adjustment shall not be less than zero). (Invoice Purchase Agreement, at 1.16 and 1.26)<br><br>**Aging and Collection Fee –** A percentage multiplied by the Face Amount of each Account for the following periods that an Account remains unpaid: .075% for each 15 day period beyond day 91 from the date of each Account, charged at the time of the collection of an Account, provided, however, that accounts with 90-day terms shall be charged such fee for each 15 day period beyond day 120 (Invoice Purchase |

26900125.2

|  | Agreement, at 1.3)<br><br>**Other Charges and Expenses** -  $15.00 for wire fees, the actual UCC Filing fees, and the actual field examination fees directly incurred by Factor in the administration of the Invoice Purchase Agreement. (Invoice Purchase Agreement, at section 7.) |
|---|---|
| **Postpetition Factor Collateral** | All now owned and hereafter acquired personal property and fixtures, and proceeds thereof, (including proceeds of proceeds) including without limitation: Accounts, including health-care insurance receivables; Chattel Paper; Inventory; Equipment; Instruments, including Promissory Notes; Investment Property; Documents; Deposit Accounts; Letter of Credit Rights; General Intangibles; Supporting Obligations; the Reserve; and the Postpetition Factor Lockbox.<br><br>(Invoice Purchase Agreement, at section 9; DIP Addendum, at section 5.) |
| **DIP Superpriority Administrative Expense Claim; Postpetition Liens** | As more fully stated in the Postpetition Intercreditor Agreement (with each term used as defined therein), Factor will have a superpriority administrative expense claim and first priority, priming, liens as to the Factor Priority Collateral, which means all of each and every Factor Grantor's [Arandell Corporation's] right, title, and interest in and to the following types of property of such Grantor, wherever located and whether now owned by such Grantor or hereafter acquired:<br><br>(a) (i) all accounts arising after the Petition Date but prior to the Trigger Date and (ii) all accounts arising from and after the Trigger Date solely to the extent (x) Factor has advanced funds in respect of such account within 5 Business Days of the assignment of the applicable account by Arandell to Factor (with an advance rate of at least 80% and otherwise pursuant to the terms of the Factor Documents (as in effect on the date hereof)) and (y) such funds advanced by Factor described in subclause (x) are applied to reduce the ABL Debt by at least 80% of the gross amount of the account within 1 Business Day of such advance, in each case, excluding all Purchased Accounts and Specified ABL Accounts;<br><br>(b) (i) the Factor Lockbox Account and (ii) any cash and other funds or other property held in or on deposit in such Factor Lockbox Account to the extent constituting identifiable proceeds of any Factor Priority Collateral described in subclause (a);<br><br>(c) all claims under policies of casualty insurance and/or credit insurance and all proceeds of casualty insurance and/or credit insurance, in each case, payable by reason of loss or damage to any Factor Priority Collateral described in subclause (a), including, without limitation that certain credit insurance policy issued in favor of Arandell by Euler Hermes North America Insurance Co., policy number 5124233;<br><br>(d) the Reserve Account as defined in the Factor Purchase Agreement (as in effect on the date hereof); and<br><br>(e) all identifiable substitutions, replacements, accessions, products, or proceeds of any of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to, or destruction of, or other involuntary conversion (including claims in respect of condemnation) of any kind or nature of any or all of the |

|  | foregoing.<br><br>(f)  .<br><br>As also more fully stated in the Postpetition Intercreditor Agreement, Factor will have postpetition liens in all other Postpetition Factor Collateral (other than the Factor Priority Collateral), that are junior and subordinate only to the following, and otherwise priming as to all other claims, liens, and interests:<br><br>    (a) The liens of the ABL Lenders in the Postpetition Factor Collateral; and<br>    (b) The liens of CapX in the Postpetition Factor Collateral. |
|---|---|
| **Adequate Protection** | N/A |
| **Modification of Automatic Stay** | The automatic stay imposed by virtue of Code §362 is hereby vacated and modified insofar as necessary (i) to permit the Debtors to execute and deliver to Factor such other agreements, instruments and documents as may be necessary or deemed appropriate by Factor in order to evidence or secure the DIP Factoring Agreement or the Postpetition Factor Debt, (ii) to permit Factor to take any action authorized or contemplated by this Order,  the DIP Factoring Documents, or the Postpetition Intercreditor Agreement,  and (iii) to carry out the terms thereof, subject, however, to the satisfaction of any notice, procedural and other conditions contained in this Order,  the DIP Factoring Documents, or the Postpetition Intercreditor Agreement. Factor, further, may apply the proceeds of the Postpetition Factor Collateral to the Postpetition Factor Debt in accordance with the terms of the DIP Factoring Agreement and the Postpetition Intercreditor Agreement without further Order of the Court.<br><br>(Interim Order, at Paragraph 4(i).) |
| **Indemnification** | Arandell Corporation agrees to indemnify Factor and save it harmless against any suits, claims, liabilities, demands and expenses, including but not limited to, any loss arising out of the assertion of any Avoidance Claim, and shall pay to Factor on demand the amount thereof including attorneys' fees and expenses, resulting from or arising under the Invoice Purchase Agreement. This provision shall survive termination of this Agreement.<br><br>(Invoice Purchase Agreement, at section 17.) |
| **Borrowing Limits** | The maximum credit facility under the DIP Factoring Agreement (measured by the unpaid face amount of all Accounts purchased by Factor under the DIP Factoring Agreement minus the balance of the Reserve Account) is $24,000,000.<br><br>(Invoice Purchase Agreement, at section 1; Interim Order, Paragraph 4(c).) |
| **Events of Default and Remedies** | In addition to the Events of Default as provided for in paragraph 19 of the IPA, the following shall also constitute Events of Default, during the pendency of the Bankruptcy Case:  (a) The Bankruptcy Court converts the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, dismisses the Bankruptcy Case or appoints a Chapter 7 or Chapter 11 trustee or examiner; (b) The failure of Seller to comply with the terms of and operate in accordance with a confirmed plan of reorganization, or any order of the Bankruptcy Court in connection therewith, or any modification of a plan of reorganization without the prior written consent of Purchaser;  (c) the venue of the Bankruptcy Case is changed from the United States Bankruptcy Court, District of Delaware; (d) any person or interested party (in the broadest possible terms) commences or joins in any lawsuit, adversary proceeding or contested matter commenced against Purchaser in the Bankruptcy Case which (1) seeks to invalidate any of the obligations of Seller or any of Seller's liens or security interests upon or in the Collateral (whether owned by Seller as of or acquired by Seller following the commencement of the Bankruptcy Case), or any part thereof, or (2) seeks to |

| | |
|---|---|
| | set off, counterclaim against, or subordinate any of the obligations due Purchaser or any of Purchaser's liens or security interests upon or in the Collateral, or (3) seeks to recover any legal or equitable remedy against Purchaser or causes any third party to do any of the above; (e) an order is entered in any lawsuit, adversary proceeding or contested matter in the Bankruptcy Case which invalidates any of the obligations or security interests upon or in the Collateral or any part thereof or which permits the surcharge, set off, counterclaim against, or subordination of any obligations or any of Purchaser's liens or security interests upon or in the Collateral or recovers any legal or equitable remedy against Purchaser; (f) The Bankruptcy Court grants to any person an order for relief from or modification of the automatic stay under Bankruptcy Code Section 362 that would, in Purchaser's judgment, adversely affect Seller's payment or performance of the obligations or Purchaser's right to or interest in the Collateral; (g) the Bankruptcy Court grants to any party in interest (other than Purchaser) in the Bankruptcy Case a lien upon any Collateral pursuant to Bankruptcy Code Section 364(c) or Section 364(d), other than a purchase money security interest; (h) the Bankruptcy Court rules that Purchaser's interest in the accounts factored are assets of the Seller or the Seller's bankruptcy estate and thus cash collateral available for the Seller to use subject to an Order from the Bankruptcy Court; (i) Seller fails to comply with its obligations as a Chapter 11 debtor pursuant to the confirmed plan of reorganization (as amended, modified or supplemented) as approved by the Bankruptcy Court in the Bankruptcy Case; (j) the Seller defaults on any provisions of the DIP Factoring Agreement, including this DIP Addendum; (k) Seller fails to obtain entry of a final Order in the Bankruptcy Case, with terms and provisions in form and substance substantially similar to the sample Order attached as Exhibit "1" to the DIP Addendum; (l) The effective date or authorization period under any interim or final Order in the Bankruptcy Case approving the factoring facility hereunder expires without renewal; (m) the threat or institution of any Avoidance Claim against Purchaser, its affiliates, or participants in the Bankruptcy Case or any successor Bankruptcy Case; or (n) Seller's assignment of any Avoidance Claim against Purchaser, its affiliates, or participants to any third party.<br><br>In addition to all other remedies available in contract and at law to Purchaser, Purchaser shall be entitled to apply to the Bankruptcy Court on shortened notice to Seller and all interested parties as required by the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy rules of the Bankruptcy Court of no more than ten (10) calendar days from the date of the occurrence of any Event of Default, for relief from the automatic stay to exercise any and all other rights hereunder which require relief from stay.<br><br>Invoice Purchase Agreement, at section 19; DIP Addendum, at section 6. |
| **Waiver of Marshaling** | None of the Agents, Lenders, Factor, or any of the Aggregate Collateral or Postpetition Factor Collateral will be subject to the doctrine of marshaling.<br><br>Interim Order, Paragraph 18. |

**Requirements Under Local Rule 4001-2**

30.     Rule 4001-2 of the Local Rules requires that certain provisions contained in the ABL

Loan Documents and Factoring Facility Documents be highlighted and that the Debtors provide

justification for the inclusion of such highlighted provisions.   The Debtors hereby identify the

following provisions of the Post-Petition Financing and the relevant portions of the Interim Order.

The justifications for such provisions, if applicable, are set forth below in the "Basis for Relief"

section of the Motion.

| No Cross-Collateralization<br><br>Local Rule. 4001-2(a)(i)(A) | Other than replacement liens to protect against diminution of value, and the basic mechanics of the Roll-Up (which has features that may resemble cross-collateralization) which do not require specific disclosure, the DIP Financing Documents do not grant cross-collateralization protections. |
| --- | --- |
| **Stipulations and Waivers**<br><br>**Local Rule 4001-2(a)(i)(B)** | The Debtors make certain customary stipulations with respect to, among other things, the amounts outstanding in respect of the Prepetition Credit Agreement and the validity, perfection, enforceability and priority of liens and security interests securing the same, which are subject to the Challenge Period described in Paragraph 10 of the Interim Order.<br><br>Interim Order, Paragraph D |
| **Lien Challenges**<br><br>**Local Rule 4001-2(a)(i)(B)** | Reservation of Rights; Bar of Challenges and Claims.  The stipulations and representations contained in this Interim Order, including, without limitation, in Paragraph D, will be binding on all Challenge Parties and all other parties-in-interest, unless, and solely to the extent that, (i) a Challenge Party timely commences a Challenge during the Investigation Period and (ii) this Court rules in favor of the plaintiff in any such timely and properly filed Challenge, in which case all of the stipulations and representations contained in this Interim Order will be binding on all such Persons other than the specific stipulations or representations that were the subject of any such successful Challenge.<br><br>Challenge Procedure.  During the Investigation Period, a Challenge Party will be entitled to determine whether a basis to assert a Challenge exists.  If a Challenge Party identifies a basis to assert a Challenge, then it must notify Debtors and Prepetition Agent in writing during the Investigation Period of its demand that Debtors initiate a contested matter or an adversary proceeding in these Cases in respect of such Challenge. From the date that Debtors and Prepetition Agent receive such written notice, Debtors will then have five (5) days to notify the Challenge Party of whether Debtors intends to initiate any such action and ten (10) days to initiate any such action. If Debtors notify such Challenge Party that Debtors do not intend to initiate a contested matter or an adversary proceeding, then such Challenge Party will have ten (10) days from the receipt of such notice to file a motion with this Court for standing to initiate a contested matter or an adversary proceeding in respect of such Challenge.  Nothing herein grants standing in favor of any Challenge Party absent further order of this Court. Debtors, if timely notified of a potential Challenge, will retain authority to prosecute, settle, or compromise any such Challenge in the exercise of its business judgment and subject to any |

|  | applicable further order of Court. |
|---|---|
|  | Bar of Challenges and Claims.  If Debtors and Prepetition Agent do not receive written notice of a potential Challenge during the Investigation Period (or such later date as agreed to in writing by Prepetition Agent and Prepetition Lenders, in their discretion, or for cause shown by an order of this Court), or a timely-asserted Challenge is not successful, then without further order of this Court, (1) all of the claims and Prepetition Liens of the Prepetition Agent, the Prepetition Lenders and the other Prepetition Secured Parties will be, and will be deemed to be, allowed for all purposes in the Cases and will not be subject to any challenge whatsoever by any party in interest, including, without limitation, as to validity, extent, amount, perfection, priority, enforceability, or otherwise, and (2) Debtors and their respective estates will be deemed to have absolutely, unconditionally, and irrevocably waived, released, and discharged Prepetition Agent, each Prepetition Lender, each other Prepetition Secured Party, and each of their respective successors and assigns, and each of their respective present and former shareholders, members, managers, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, advisors, principals, employees, consultants, agents, legal representatives, and other representatives of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every kind, nature, and description whatsoever, that may have occurred on or prior to the date of entry of this Interim Order with respect to, or in connection with, or relating to the Prepetition Debt, the Prepetition Liens, or any of the Prepetition Documents.<br><br>Interim Order, Paragraph 10<br><br>***Challenge***.  A claim or cause of action challenging the extent, validity, perfection, amount, priority, or enforceability of the Prepetition Debt, the Prepetition Liens, or any other claims or causes of action against Prepetition Agent, Prepetition Lenders, or any other Prepetition Secured Party, which Debtors or any other Challenge Party may bring in accordance with Paragraph 10 of this Interim Order.<br><br>***Challenge Party***. Any party-in-interest with the requisite standing.<br><br>***Investigation Period***.  The period from the Filing Date until the date that is the earlier of (a) seventy-five (75) days after the Filing Date, (b) sixty (60) days after the date that a Committee is formed, if any, or (c) unless Prepetition Agent (on behalf of the Prepetition Lenders) or Postpetition Agent (on behalf of the Postpetition Lenders) have credit bid for all, or substantially all, of any Debtor's assets, the date that this Court first enters any order approving the sale of all, or substantially all, of such Debtor's assets.<br><br>Interim Order, Exhibit A |
| **Releases**<br><br>**Local Rule 4001-2(a)(i)(B)** | Subject to Paragraph 10 of this Interim Order, each Debtor admits, stipulates, and agrees that: Debtors do not have, and each of the Debtors hereby absolutely, unconditionally, and irrevocably releases, remises, and discharges, and is forever barred from bringing or asserting, any claims, counterclaims, causes of action, defenses, setoff rights, or any other offset rights arising under or relating to the Prepetition Documents, the Prepetition Liens, the Prepetition Collateral, and the Prepetition Debt, against Prepetition Agent, any Prepetition Lender, any other Prepetition Secured Party, and each of their respective successors and assigns, and their respective present and former shareholders, members, managers, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, advisors, principals, employees, consultants, agents, legal representatives, and other representatives<br><br>Interim Order, Paragraph D<br><br>Upon the date that the Postpetition Debt is Paid in Full and prior to the release of the |

|  | Postpetition Liens, each Debtor will, and will cause each other Loan Party (as defined in the Postpetition Loan Agreement) to, on behalf of its estate and itself, execute and deliver to Postpetition Agent, Postpetition Lenders, the other Postpetition Secured Parties, and each of their respective successors and assigns, and each of their  respective present and former affiliates, shareholders, subsidiaries, divisions, predecessors, members, managers, directors, officers, attorneys, employees, agents, advisors, principals, consultants, and other representatives (collectively, the "Lender Releasees"), a general release of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every kind, nature, and description, that the Debtors and such other Loan Parties (as defined in the Postpetition Loan Agreement) (or any of them) had, have, or hereafter can or may have against the Lender Releasees (or any of them), whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, in equity, or otherwise, in respect of events that occurred on or prior to the date on which the Postpetition Debt is Paid in Full.<br><br>Interim Order, Paragraph 24(a) |
|---|---|
| **Section 506(c) and 552(b) Waiver**<br><br>**Local Rule 4001-2(1)(i)(C), (H)** | Subject to entry of the Final Order, Debtors (or any Trustee) agree that there will be no surcharge of the Aggregate Collateral for any purpose unless agreed to in writing by Agents and Lenders and Factor, and effective upon entry of the Final Order, each Debtor (or any Trustee), on behalf of its estate, will be deemed to have irrevocably waived any and all rights, benefits, or causes of action under Code § 506(c), the enhancement of collateral provisions of Code § 552, and under any other legal or equitable doctrine (including, without limitation, unjust enrichment) as they may relate to, or be asserted against, any Agent, any other Secured Party, Factor, or any of the Aggregate Collateral. In reliance on the foregoing, Agents and Lenders and Factor have agreed to the entry of this Interim Order.<br><br>Interim Order, Paragraph 9 |
| **Liens on Avoidance Actions**<br><br>**Local Rule 4001-2(a)(i)(D)** | No liens on avoidance actions are being requested effective upon entry of the Interim Order, but Agent will obtain a lien and security interest on all avoidance actions and other claims under chapter 5 of the Code upon entry of the Final Order<br><br>Interim Order, Exhibit A (definition of "Postpetition Collateral") |
| **Roll-up Provisions**<br><br>**Local Rule 4001-(2)(a)(i)(E)** | The ABL Loan Agreement contemplates, and the Proposed Orders request, authorization for a partial repayment of the Pre-Petition Obligations upon entry of the Interim Order (by a gradual roll-up until the entry of the Final Order) and a full repayment of the Pre-Petition Obligations at the discretion of the Agent upon entry of the Final Order.<br><br>Interim Order, Paragraphs 2(d) and 3(c) |
| **No Disparate Treatment of Committee Professionals**<br><br>**Local Rule 4001-2(a)(i)(F)** | The ABL Loan Agreement and Proposed Orders do not provide disparate treatment for the professionals retained by any official committee of unsecured creditors from those professionals retained by the Debtors with respect to a professional fee carve-out, other than different amounts set forth in the Budget for each set of professionals that are consonant with the roles the Debtors anticipate those professionals playing in these Chapter 11 Cases. |
| **No Non-Consensual Priming**<br><br>**Local Rule 4001-2(a)(i)(G)** | The Pre-Petition Secured Parties have consented to the priming liens. |

**BASIS FOR RELIEF**

**A.     The Debtors Satisfy the Requirements for Obtaining DIP Financing on a Secured and Superpriority Basis Pursuant to Section 364 of the Bankruptcy Code.**

31.     The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that the debtors in possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c);[13] *see generally In re Photo Promotion Assocs., Inc.*, 881 F.2d 6, 8 (2d Cir. 1989) (stating that secured or priority credit under section 364(c) of the Bankruptcy Code is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (discussing secured or superpriority financing options under section 364 if the debtor cannot obtain credit as an administrative expense).  The statutory requirement for obtaining post-petition credit under section 364(d) of the Bankruptcy Code is a finding, made after notice and a hearing, that the debtors in possession are "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).

32.     Here, the Debtors propose to incur the Postpetition Obligations on a senior secured basis, providing the ABL Lenders a senior lien on the Debtors' assets, as well as a

---

[13]     Section 364(c) of the Bankruptcy Code provides that:

(c)     If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

   (1)   with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;

   (2)   secured by a lien on property of the estate that is not otherwise subject to a lien; or

   (3)   secured by a junior lien on property of the estate that is subject to a lien.

superpriority administrative expense claim.  As described below, the Debtors also will provide adequate protection for the Prepetition Agent and Prepetition Lenders to the extent of aggregate diminution in value of their interests in the Prepetition Collateral.  The Court should approve the DIP Facility because:  (i) the Debtors could not obtain financing on better terms than under the DIP Facility; (ii) the proposed financing is on market terms and does not include payment of excessive fees or other onerous terms and is a sound exercise of the Debtors' business judgment; and (iii) approval of the DIP Facility is fair and reasonable and in the best interests of the Debtors' estates.

*(i)*      **The DIP Facility is the Best Option Available to the Debtors.**

33.     To show that the credit required is not obtainable on an unsecured basis, the debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential DIP lenders by the Bankruptcy Code.  *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see 495 Cent. Park Ave.*, 136 B.R. at 630-31.  Where few DIP lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

34.     The Debtors' ability to obtain DIP financing from a third-party source on the same or better terms than those obtained from the ABL Lenders and Factor would have been extremely unlikely.  The Debtors' balance sheet is over-leveraged, making it unlikely that third parties other than the ABL Lenders and Factor would provide further debt to the Debtors.  Further, substantially all of the Debtors' assets are currently encumbered by the Prepetition Obligations.  Accordingly, the Debtors could not have obtained comparable DIP financing because the Prepetition Lenders would not have consented to being primed if the other DIP

financing proposals did not repay the Prepetition Obligations in full in cash, potentially requiring the Debtors to undertake a costly and challenging priming dispute, which would be uncertain at best.

35.     In light of the Debtors' belief that they are unable to access capital markets, obtaining third-party financing on better terms than what the ABL Lenders and Factor are offering is not likely.   Because there is little, if any, chance of obtaining better third-party financing, the Debtors believe that further searching is not a viable course of action or prudent expenditure of time and resources.

36.     The Debtors therefore assert that they have made the requisite showing that post-petition credit is not available on an unsecured basis, and that the proposals offered by ABL Lenders and the Factor is the best DIP financing available at this time.   The DIP Facility is an essential part of an overall bankruptcy structure that will aid the Debtors in maximizing the value of their estates in their sale process and the recovery to creditors and interest holders.

### *(ii)*     **The DIP Facility is on Market Terms and the Debtors are Entering into the DIP Facility in their Sound Business Judgment.**

37.     As stated above, the Debtors submit that the DIP Facility is fair and reasonable, and represents terms better than those available from third-parties.   Further, the Debtors submit that the terms and conditions of the DIP Facility reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

38.     A debtor's decision to enter into a DIP facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.   *See In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that courts defer to a debtor's business judgment "so long as the financing agreement does not contain terms that leverage the bankruptcy process

and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). The business judgment standard is a deferential one. In the context of DIP financing, courts have held that it is appropriate to interfere with a debtor's business judgment only if a decision is clearly erroneous, or is made arbitrarily, in bad faith, with fraudulent intent, on the basis of inadequate information, in violation of fiduciary duties, or in violation of the Bankruptcy Code. *See, e.g.*, *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005); *see also In re Filene's Basement, LLC.*, et al., No. 11-13511, 2014 WL 1713416, at *12 (D. Del. Apr. 29, 2014). Here, the Debtors' decision to enter into the DIP Facility is an exercise of the Debtors' sound business judgment. Before the Petition Date, the Debtors undertook a thorough review as to their projected financing needs during these Chapter 11 Cases, including the costs of administration and the necessary time to complete a going concern sale process. The Debtors have determined that the amounts available under the DIP Facility are sufficient to fund their post-petition operations and the administration of these Chapter 11 Cases. This, in turn, will inure to the benefit of their stakeholders, by helping to prevent the unnecessary accrual of additional claims against their estates, and will support the Debtors' sale efforts. In addition, as discussed above, financing on better (or any alternative) terms likely was not available to the Debtors and, as discussed below, the terms of the DIP Facility are fair and reasonable, especially given the circumstances surrounding these Chapter 11 Cases. The Debtors respectfully submit that the Court should approve the Debtors' business judgment and decision to accept and enter into the DIP Facility.

> **(iii)    Approval of the DIP Facility is Fair and Reasonable and in the Best Interests of the Debtors.**

39.     The proposed terms of the DIP Facility are fair and reasonable. This funding will provide the Debtors with adequate financing to support their working capital needs. Further, it is

a fair and reasonable transaction, both from the perspective of the ABL Lenders and the Factor, who will be paid a reasonable rates of interest or other fee-based compensation based on past lending and factoring practices, granted certain liens and provided superpriority claims by the Debtors, and, for the Debtors, who will receive funding—at market rates and without onerous terms—that would otherwise be unavailable from other lenders.

40.     In considering whether the terms of DIP financing are fair and reasonable, courts "examine all the facts and circumstances," and will generally permit "reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process or powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." *In re Ames Dept. Stores, Inc.*, 115 B.R. at 39-40; *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (evaluating reasonableness of terms in light of the "relative circumstances of the parties").

41.     Here, the terms of the DIP Facility are fair and reasonable and the Debtors have determined to enter into this transaction in a clear exercise of their business judgment.  Indeed, not only are the terms of the DIP Facility fair and reasonable, they are an integral part of the Debtors' efforts to maximize value through the going concern sale process.  Thus, in addition to approval of the DIP Facility being warranted on the basis that better financing terms are not available elsewhere, approval is warranted "also because the credit acquired is of significant benefit to the debtor's estate and [because] the terms of the proposed loan are within the bounds of reason, *irrespective of the inability of the debtor to obtain comparable credit elsewhere*." *In re Aqua Assocs*., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (emphasis added).

42.     Entry into the DIP Facility and securing the financing available thereunder is critical to the preservation of estate assets and is in the best interest of the Debtors' creditors and

all parties in interest.  Thus, the Debtors respectfully submit that entry into the DIP Facility is an exercise of the Debtors' sound business judgment.

### (iv)    The Roll-Up is Appropriate.

43.    A roll-up occurs when a post-petition lender lends "enough post-petition to pay off the pre-petition loan, whether owing to the post-petition lender or a different lender, immediately converting all of the lender's pre-petition debt to post-petition debt."  3 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 364.04[2][e] (16th ed. 2018).  A roll-up should not be "controversial from the technical perspective of the priority or satisfaction of liens if the pre-petition lender is fully secured on the petition date[.]"  *Id.*

44.    Consistent with the prepetition revolving credit facility, the DIP Facility contemplates the application of cash, collections, and proceeds of collateral and the Factoring Facility, including any sales of Prepetition Collateral, to pay down the Prepetition Obligations upon entry of the Interim Order.  Subject to entry of the Final Order, the Postpetition Agent will be granted the ability to repay in cash in whole or part, in its discretion, any or all Prepetition Obligations with the proceeds of new money advances made under the DIP Facility. This structure allows the Prepetition Obligations to be gradually "rolled-up" into the DIP Facility over time prior to the entry of a Final Order and, thereafter, for the Prepetition Obligations to be indefeasibly repaid in full.

45.    The Roll-Up of the Prepetition Obligations into the Postpetition Obligations is necessary component of the DIP Facility and is appropriate under the circumstances of these cases.  The approval of the roll-up of all outstanding Prepetition Obligations into Postpetition Obligations, at the discretion of the Postpetition Agent, is a condition of the DIP Facility, which enables the Debtors to obtain financing that they urgently need to administer these Chapter 11 Cases and fund their operations while the Debtors conduct the going concern sales process.

Moreover, the Postpetition Agent and Postpetition Lenders are not willing to provide the DIP Facility absent the Roll-Up and it has been a condition of the DIP Facility from the outset of negotiations. As explained in the First Day Declarations, the Prepetition Lenders are fully secured as of the Petition Date so the Debtors do not believe that the Prepetition Lenders will be unduly benefitted by the Roll-Up. Finally, because the Roll-Up is subject to the reservation of rights in the Interim Order, it will not prejudice the right of any party in interest as set forth therein.

46.      Accordingly, the Roll-Up should be approved by this Court as a necessary and appropriate component of the DIP Facility.

### (v)      The Debtors Will Provide Sufficient Adequate Protection to Prepetition Lenders.

47.      The proposed Postpetition Financing also meets the second requirement of section 364(d)(1) of the Bankruptcy Code. In connection with the DIP Facility, the Debtors propose providing the Prepetition Lenders with adequate protection in accordance with sections 361, 362, 363 and 364 of the Bankruptcy Code. The Bankruptcy Code does not define "adequate protection" but rather sets forth three nonexclusive examples:

> When adequate protection is required under Section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by –
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under Section 362 of this title, use, sale, or lease under Section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

> (3) granting such other relief, other than entitling such entity to
> compensation allowable under Section 503(b)(1) of this title
> as an administrative expense, as will result in the realization
> by such entity of the indubitable equivalent of such entity's
> interest in such property.

11 U.S.C. § 361. Thus, in the context of section 364(d), collateral only requires adequate

protection to the extent that a priming lien will result in a decrease in the "value of such entity's

interest in such property." *Id.; see also* 11 U.S.C. § 363(e).

48.    Adequate protection is determined on a case-by-case basis. *See In re Columbia

Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992). The critical

purpose of adequate protection is to guard against the diminution of a secured creditor's interest

in its collateral during the period when such collateral is being used by the debtor in possession.

*See 495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the

secured creditor from diminution in the value of its interest during the chapter 11

reorganization."); *Beker*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680, 685

(Bankr. E.D.N.Y. 1996). When priming of liens is sought pursuant to section 364(d), the courts

also examine whether the pre-petition secured creditors are being provided adequate protection

for the value of their liens. *Beker*, 58 B.R. at 737; *Utah 7000*, 2008 WL 2654919, at *3.

Because all of these tests are satisfied here and the Debtors have met all of their obligations

under section 364 of the Bankruptcy Code, the Motion should be granted, and the Post-Petition

Financing should be approved.

49.    Under the DIP Facility, the liens of the Prepetition Agent and Prepetition Lenders

are being primed. The Prepetition Lenders are either participating in the DIP Facility or have

explicitly consented to the priming liens. In any event, as set forth in the Proposed Orders, the

Prepetition Lenders will each receive an adequate protection package, which will include, among

other things, replacement liens, superpriority administrative expense claims, principal and

26900125.2

interest payments, and professional fees. Section 361 of the Bankruptcy Code expressly describes cash payments and replacement liens as appropriate forms of adequate protection. Thus, the provision of these forms of adequate protection is appropriate.

**B.      Interim Approval of the DIP Facility Will Prevent Immediate and Irreparable Harm to the Debtors' Estates.**

50.      The Debtors are requesting the Court approve interim availability under the DIP Facility in the aggregate amount of $7.5 million.[14]   This amount is essential to the continued operation of the Debtors' business during the going concern sale process.   The liquidity provided by the DIP Facility also will provide assurances to potential purchasers of the business that the Debtors will be able to maintain the value of those assets during these Chapter 11 Cases. Without such liquidity, the Debtors have determined that they will not be able to adequately fund the administration of their cases through the consummation of a going concern sale.   Finally, as detailed in the ABL Loan Agreement, entry of the Interim Order is a prerequisite to funding the Postpetition Financing.   Thus, entry of the Interim Order is crucial to maximizing the value of the Debtors' estates.

**C.      Approval of Immediate Use of Cash Collateral is Appropriate.**

51.      By this Motion, the Debtors also seek immediate use of Cash Collateral in a manner consistent with the terms of the ABL Loan Documents, the Budget, and the Interim Order. As set forth below, this request, which comports with Bankruptcy Rules and applicable law, is essential to the Debtors' ability to maintain and maximize the value of their businesses during the pendency of these Chapter 11 Cases.

52.      Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral

---

[14] *See* explanation *supra* note 5.

provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c). As explained above, the Prepetition Lenders have consented to the Debtors' immediate use of cash collateral in connection with entry into the DIP Facility, and are receiving adequate protection on the basis set forth above. As a result, the requirements of section 363(c)(2) are satisfied.

53.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *see also In re Ames Dep't Stores Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990). After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

54.     The Debtors submit that the requirements of Bankruptcy Rule 4001(b) are met. To operate and manage the Debtors' business, the Debtors require the use of Cash Collateral. Such use will provide the Debtors with the necessary funds to fully honor all obligations arising in the ordinary course of their business, maximizing the value of the estates while these Chapter 11 Cases are pending. Failure to grant such relief would result in an immediate cessation of the Debtors' operations, which would cause substantial and irreparable harm to the Debtors' estates. Accordingly, the Debtors' request that the Court authorize the Debtors' immediate use of Cash Collateral.

26900125.2

**D.      Modification of the Automatic Stay is Appropriate.**

55.      The Interim Order contemplates that the automatic stay arising under section 362 of the Bankruptcy Code shall be modified as necessary to permit, among other things, the Postpetition Agent to effectuate all of the terms and provisions of the Interim Order and the ABL Loan Documents, including, without limitation, the application of collections, authorization to make payments, granting of liens, and perfection of liens.

56.      Stay modification provisions of this sort are ordinary features of debtor-in-possession financing and, in the Debtors' sound business judgment, are reasonable under the circumstances. *See, e.g.*, *In Am. Apparel, Inc.*, Case No. 15-12055 (BLS) [Docket No. 248] (Bankr. D. Del. Nov. 2, 2015) (authorizing stay modifications in order to permit DIP lenders to exercise remedies upon an event of default); *In re Molycorp, Inc.*, Case No. 15-11357 (CSS) [Docket No. 278] (Bankr. D. Del. July 24, 2015) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Coldwater Creek, Inc.*, Case No. 14-10867 (BLS) [Docket No. 573] (Bankr. D. Del. June 12, 2014) (modifying stay to authorize exercise of remedies upon default); *In re Broadway 401 LLC*, Case No. 10-10070 (KJC) [Docket No. 55] (Bankr. D. Del. Feb. 16, 2010) (modifying the stay to the extent necessary to effectuate the order).  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms of the Proposed Orders.

**E.      Interim and Final Hearings Should Be Scheduled.**

57.      Bankruptcy Rule 4001(b)(2) and (c)(2) provides that a final hearing on the Motion may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors estates.

26900125.2

58.     The Debtors request that the Court schedule hearings on the Motion as follows: (i) an interim hearing to be held at the Court's earliest opportunity to authorize the Debtors to obtain credit under the terms contained in the ABL Loan Agreement until the final hearing; and (ii) a final hearing to be held on a date to be determined by the Court to approve the Motion on a final basis.

59.     Based upon the foregoing, the Debtors respectfully request that the Court grant interim approval of the DIP Facility in accordance with the terms set forth in the proposed Interim Order, the ABL Loan Documents, and the Factoring Facility Documents.

## NOTICE

60.     Notice of this Motion shall be given to (i) the United States Trustee for the District of Delaware; (ii) the Internal Revenue Service and all taxing authorities of states in which the Debtors are doing business; (iii) counsel to the Postpetition Agent and Prepetition Agent; (iv) counsel to the Factor; (v) the holders of the twenty (20) largest unsecured claims against the Debtors' estates; (vi) all parties known to the Debtors who hold any liens or security interests in the Debtors' assets, including those parties who have filed UCC-1 financing statements against the Debtors, or who, to the Debtors' knowledge, have asserted any liens on any of the Debtors' assets; (vii) all landlords and warehouseman of the Debtors; (viii) all guarantors of the Prepetition Obligations; (ix) all creditors known to the Debtors to be holding a judgment against any of the Debtors; (x) any governmental bodies holding a claim against the Debtors; (xi) any other parties claiming an interest in the Pre-Petition Collateral; and (xii) all other parties entitled to receive notice pursuant to the Bankruptcy Rules and the Local Rules. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Interim Order

and Final Order and (ii) grant such other and further relief as is just and proper.


Dated: August 13, 2020                    YOUNG CONAWAY STARGATT & TAYLOR, LLP
Wilmington, Delaware

_/s/ Andrew L. Magaziner_
Michael R. Nestor (No. 3526)
Andrew L. Magaziner (No. 5426)
Matthew P. Milana (No. 6681)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email: mnestor@ycst.com
            amagaziner@ycst.com
            mmilana@ycst.com

-and-

STEINHILBER SWANSON LLP
James D. Sweet
Michael P. Richman
Virginia E. George
Elizabeth L. Eddy
122 W. Washington Ave., Suite 850
Madison, Wisconsin 53703
Tel:    (608) 630-8990
Fax:    (608) 630-8991
Email: jsweet@steinhilberswanson.com
            mrichman@steinhilberswanson.com
            vgeorge@steinhilberswanson.com
            eeddy@steinhilberswanson.com

_Proposed Co-Counsel for the Debtors and Debtors in
Possession_

26900125.2