**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ARANDELL HOLDINGS, INC., *et al.,* [1] | Case No. 20-11941 (JTD) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF JAMES G. KEANE IN SUPPORT OF**
**THE CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, James G. Keane, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1.      I am the Managing Director of HMP Advisory Holdings, LLC, dba Harney Partners ("HP").

2.      On January 14, 2020, Arandell Corporation and Arandell Kentucky, LLC retained HP to work through financial issues between the Debtors and their lenders that culminated in the filing of the Chapter 11 cases (the "HP Engagement").  In the course of my employment with HP, I was assigned to manage the HP Engagement and have spent most of my professional time since January 14, 2020 working on the HP Engagement and supervising the work of the other HP professionals involved in the HP Engagement.

3.      Since its retention, HP has been significantly involved in advising the Debtors on all aspects of their businesses, including cash management, inventory purchases and expense reductions, resolving credit issues relating to their prepetition debt obligations, and advising the Debtors on a potential restructuring transaction or sale of their businesses and/or assets.

---

[1] The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: Arandell Holdings, Inc. (5311) ("Arandell Holdings"), Arandell Corporation (4270), and Arandell Kentucky, LLC (1505) (together, the "Debtors"). The corporate headquarters is located at N82 W13118 Leon Road, Menomonee Falls, WI 53051.

4.      I am the person in charge of the HP Engagement, and, in that role, I supervise other HP professionals in their providing advice and support to the Debtors.  As such, I review the work of other HP employees on the HP Engagement and I am intimately familiar with the details of the work those other HP professionals provide to the Debtors.

5.      I am generally familiar with the Debtors' day-to-day operations, financial affairs, business affairs and books and records. Except as otherwise indicated, all facts set forth in this declaration (this "Declaration") are based upon my personal knowledge, my review of relevant documents, information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable, or my opinion based upon my experience and knowledge of the Debtors' operations and financial affairs. I am over the age of 18 and authorized to submit this Declaration on behalf of each of the Debtors. If called upon to testify, I would testify to the facts set forth herein.

6.      I have also reviewed the Declaration of Bradley J. Hoffman (the "Hoffman Declaration") filed concurrently with this Declaration.  I have relied on the Hoffman Declaration for the history and other background information contained therein.  That information is incorporated herein.

7.      The Hoffman Declaration provides background information about the Debtors' corporate organization, their business operations, and the circumstances and events preceding the filing of these Chapter 11 Cases (defined below).  This Declaration provides additional information about the Debtors' pre-petition financial condition and affirms and incorporates the facts that support the relief requested in the First Day Motions (defined below).

8.      On the date hereof (the "Petition Date"), each of the Debtors commenced a

voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter

11 Cases").

9.      To minimize the adverse effects of filing the Chapter 11 Cases, while at the same

time preserving value for the benefit of stakeholders, the Debtors have filed a number of motions

and applications requesting various kinds of customary "first day" relief (the "First Day

Motions")  The Debtors would suffer irreparable harm if these First Day Motions are not

granted.

a)  *Motion of the Debtors for an Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases;*

b)  *Application of the Debtors for an Order Appointing BMC Group, Inc. as Claims and Noticing Agent;*

c)  *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Use Cash Collateral, (B) Incur Postpetition Debt, (C) Provide Adequate Protection to CIBC Bank USA, as Agent, and the Other Secured Parties, (D) Obtain Postpetition Factoring from LSQ Funding Group, L.C. Pursuant to 11 U.S.C. §§ 363 and 364 and Provide Guarantees in Support Thereof, and (E) Grant Liens and Superiority Claims to LSQ Funding Group, L.C.; (II) Modifying the Automatic Stay; (III) Approving Notice; (IV) Scheduling Final Hearing; and (V) Granting Related Relief;*

d)  *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use their Cash Management System, Including Existing Bank Accounts, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, (II) Authorizing Intercompany Transactions, and (III) Granting Related Relief;*

e)  *Motion of the Debtors for Interim and Final Orders (I) Approving Form of Adequate Assurance to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief;*

f)  *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Employee Compensation and Benefits Obligations, and (II) Granting Related Relief;*

g) *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use Their Insurance Policies and (B) Honor Certain Prepetition Obligations Related Thereto, (II) Authorizing Banks to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief; and*

h) *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay, in the Ordinary Course of Business, Claims for Goods Ordered Prepetition and Delivered Postpetition; (B) Authorizing the Debtors to Pay Certain Prepetition Claims of Shippers and Lien Claimants; and (C) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers.*

10.     Nothing contained herein is intended to in any way comment on the validity, enforceability, or the priority of any particular claim, but rather is a summary of the books and records of the Debtors as they are kept in the ordinary course of business.

11.     In that regard, and in summary, the major categories of indebtedness as of the Petition Date and the parties thereto are as follows:

a) CBIC Bank USA ("CBIC"), in its capacity as administrative and collateral agent pursuant to that certain Amended and Restated Loan and Security Agreement dated as of March 22, 2018, (in such capacity, "Prepetition Agent") appears to be the first and paramount lienholder, holding a first-position security interest in and on all of the Debtors' assets (except as noted below). Prepetition Agent appears to hold a second-position security interest in the equipment that is subject to two commercial leases with Accord CapX LLC, as described below.

b) Accord CapX LLC ("CapX") appears to be the lessor on two commercial leases involving the lease/purchase of certain equipment used by the Debtors in their printing and post-production processes. One of those leases is between CapX and Arandell Corporation (the "Arandell Corporation Equipment Lease"); the other lease is between CapX and Arandell Kentucky (the "Arandell Kentucky Equipment Lease"). In addition to its rights as lessor, CapX also appears to hold a second-position security interest in all of the assets of Arandell Corporation with respect to the Arandell Corporation Equipment Lease, and in all of the assets of Arandell Kentucky with respect to the Arandell Kentucky Equipment Lease.

c) Farragut Mezzanine Partners III, LP ("Farragut") appears to hold a security interest in all of the Debtors' assets. Farragut's security interest is junior to those of the Prepetition Agent and CapX described above.

d) Spell Capital Mezzanine Partners SBIC, LP ("Spell") appears to hold a security interest in all of the Debtors' assets. Spell's security interest is junior to those of the Prepetition Agent and CapX described above.

e) The relative rights and duties of the Prepetition Agent, CapX, Farragut and Spell to and among one another is described in a series of "Intercreditor Agreements" by and among those parties.

f) There appear to be no other parties that claim a blanket security interest in the Debtors' property, although there may be one or more discrete purchase-money security interests ("PMSIs") in favor of specific creditors relating to a single item of the Debtors' property.

12.    Other than these discrete PMSIs, the balance of the pre-petition obligations owed by the Debtors is unsecured.

**A.    The Debtors' Request to Use Cash Collateral and Incur Post-Petition Financing**

13.    The Debtors have filed a Motion requesting the authority to use cash collateral and to incur post-petition financing (the "DIP Motion").  The following provisions relate to the facts supporting the DIP Motion.

14.    Attached hereto as Exhibit A, and incorporated herein by reference, is a 13-week operating budget, stated on a cash basis, beginning as of the week of the Petition Date (the "DIP Opening Budget").

15.    The DIP Opening Budget represents a best estimate of the amount of receipts, disbursements, and borrowing needs the Debtors will have during the first 13 weeks of the Chapter 11 Cases.

16.    As is demonstrated in Exhibit A, and given the collateral positions of the various secured lenders described above, the Debtors will require post-petition financial assistance, either in the form of cash collateral usage, or in the form of Debtor-in-Possession ("DIP") financing, or more likely both, to meet its post-petition obligations during these Chapter 11 Cases.

17.    The Debtors, in consultation with HP and legal counsel, have determined, in the exercise of the Debtors' sound business judgment, that the Debtors will require post-petition financing to meet the Debtors' ongoing working capital and general business needs.

18.    The Debtors and HP were heavily involved in the request for and the negotiation of an "ABL Facility"[2] and a "Factoring Facility"[3] (together, the "DIP Facility") that is designed to meet the Debtors' financial needs throughout these Chapter 11 Cases.

19.    The Debtors, in consultation with HP and legal counsel, have concluded and determined that terms of the DIP Facility will reasonably address the Debtors' financing ongoing financial requirements and that the DIP Facility terms constitute the best alternative available to the Debtors under the circumstances.

20.    Moreover, the Debtors and HP believe that without the DIP Facility, the Debtors' day-to-day operations would by necessity come to a halt, a result that would be devastating to the Debtors' attempt to market and sell its assets to maximize the value of its assets for the benefit of its creditors.

21.    Throughout the planning process for either an out-of-court restructuring or filing these Chapter 11 cases, Debtors' management, in conjunction with HP and Promontory Point Capital, continually attempted to locate and contract replacement lenders for the Debtors' primary existing lenders.  Those efforts, covering nearly ten months of discussions, resulted in the DIP Facility that has been proposed to the Court in the DIP Motion.

---

[2]      A super-priority, senior secured, debtor-in-possession revolving credit facility with a maximum credit amount of $7,500,000 plus, upon entry of the Final Order, a term loan in the amount of $4,567,778.06 (the "ABL Facility").

[3]      A super-priority, senior secured, debtor-in-possession, discretionary, factoring facility in the amount of up to $24,000,000, to be provided by LSQ Funding Group, L.C.

22.     After review and negotiation, Debtors' management and HP concurred that the proposal represented by the DIP Facility arrangement contained the most favorable and comprehensive terms available under the circumstances to effectively address the Debtors' working capital and liquidity requirements in the Chapter 11 Cases.

23.     The Debtors were unable to obtain alternative post-petition financing through credit allowable simply as an administrative expense, or credit secured by junior liens on the Debtors' assets.

24.     In these circumstances, the Debtors' management, in consultation with HP, and in the exercise of its considered and reasonable business judgment, determined that the  financing provided by the DIP Credit Agreement is the most favorable under the circumstances and provides the Debtors the liquidity necessary to maintain the going concern value of its business pending the sale process.

25.     The DIP Credit Agreement, which is the product of good faith, arms-length negotiations between CIBC, as administrative agent, and LSQ Funding Group, L.C. ("LSQ"), on the one hand, and the Debtors, on the other, provides the Debtors with continued financing pursuant to:

   a)  The terms of the DIP Facility;

   b)  The DIP Opening Budget; and,

   c)  The terms of the proposed Interim Order attached to the DIP Motion.

26.     The Debtors and HP, in the exercise of their collective reasonable business judgment, believe the relief requested in the Interim Order, if granted, will enable the Debtors to accomplish their strategic restructuring goals and/or a sale, and consummate a value-maximizing process.

27.     As of the Petition Date, CIBC, as administrative agent, has agreed to the Debtors' use of cash collateral for the purposes set forth in the DIP Opening Budget.

28.     Notwithstanding, the Debtors are facing a liquidity crisis due to ramping up, on a seasonal basis, their core business activities, and therefore, require immediate access to credit under the DIP Facility to fund working capital needs and certain other costs.

29.     Absent the new liquidity provided by the DIP Facility, not only would the Debtors' ability to maximize the value of its estate and successfully preserve asset values be jeopardized, but the Debtors also could be forced to immediately and abruptly cease operations at its facilities to the direct detriment of all of the Debtors' stakeholders, including its customers, employees, vendors and lessors.

30.     Accordingly, without immediate access to the proposed DIP Facility, the Debtors would suffer immediate, substantial, and irreparable harm, that could threaten their ability to successfully consummate a sale transaction and preserve going concern value.

31.     By contrast, should the Court authorize the Debtors' proposed DIP Facility, the Debtors' ability to minimize disruption to their businesses and instill confidence in their various stakeholders will be substantially enhanced.

32.     The Debtors' need for access to the financing contained in the DIP Facility, therefore, is urgent.

33.     In addition, because the Debtors have no unencumbered funds to meet certain imminent expenses necessary both to preserve value and to facilitate a smooth transition in and out of these Chapter 11 Cases, it is essential for the Debtors to obtain interim financing under the DIP Facility pending a final hearing.

34.     It is essential for the Debtors to immediately obtain financing necessary to continue, among other things, certain key components of the Debtors' business; to make certain essential capital expenditures; and, to satisfy certain working capital requirements of the Debtors' business pending a sale transaction.

35.     The DIP Facility is also essential to continue and to maintain the Debtors' relationships with its various stakeholders, including customers, employees, suppliers, and dealers and other key constituencies pending a sale.

36.     The terms and conditions of the DIP Facility are fair, reasonable, and adequate, and were negotiated by the parties in good faith and at arm's-length.

37.     The various fees and charges required to be paid by the Debtors under the DIP Facility are reasonable, appropriate, and consistent with the market terms for such financing.

38.     As described above, the DIP Facility provides the only alternative available under the circumstances presented by these Chapter 11 Cases

39.     As noted above, the Debtors require the use of cash collateral in connection with the financing provided under the DIP Credit Agreement.

40.     Although insufficient by itself, absent use of cash collateral, the Debtors will be unable to generate availability under the DIP Facility in amounts necessary or sufficient to sustain ordinary course of business operations.

41.     Simply stated, without access to cash collateral, the Debtors will not be able to access financing under the DIP Facility, in which event, their operations would be brought to a grinding halt, resulting in immediate and irreparable harm to the Debtors and their stakeholders.

42.     To adequately protect the interests of Prepetition Agent and the existing ABL Lenders for the Debtors' use of its cash collateral, the Debtors propose to provide Prepetition Agent and such lenders with the protections described above and in the proposed Interim Order.

43.     The Debtors have an urgent and immediate need for cash to fund the activities necessary to protect and preserve the assets of the Debtors' estates (including the going concern value of its business).

44.     CIBC, as administrative agent, has, at this time, consented to the use of its cash collateral as described above.

45.     Without access to post-petition financing and absent immediate authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed.

46.     The availability of interim loans under the DIP Facility and use of cash collateral will provide the necessary assurance to suppliers, dealers, employees, and customers, of the Debtor's ability to meet its near-term obligations.  The Debtors would suffer irreparable harm if such DIP Facility and use of Cash Collateral are not available.

**B.     Cash Management Systems; Bank Accounts; Business Forms**

47.     The Debtors have filed a Motion requesting authority to maintain their current Cash Management System, current bank accounts and utilize existing business forms (the "Cash Management Motion"). The following provisions relate to the facts supporting the Cash Management Motion.

48.     The Debtors' Cash Management System is similar to cash management systems utilized by other similar Debtors.  The chart attached as Exhibit D to the Cash Management

Motion illustrates the flow of funds through the Debtor's Cash Management System.  The following is a brief description of the Cash Management System.

49.      Pre-petition, the Debtors maintained multiple bank accounts (collectively, the "Bank Accounts") with two different banks, CIBC Bank USA ("CIBC") and PNC Bank, National Association ("PNC"), as follows:

a) Arandell Corporation

|       |      |         |                                            |
|-------|------|---------|--------------------------------------------|
| i.    | CIBC | xxx7076 | Receivables Lockbox Account                |
| ii.   | CIBC | xxx7084 | Operating Account                          |
| iii.  | CIBC | xxx7408 | Falls Express Account                      |
| iv.   | CIBC | xxx7872 | SBA Account                                |
| v.    | CIBC | xxx8552 | Controlled Disbursement Account            |
| vi.   | PNC  | xxx4332 | FSA Funding Account                        |
| vii.  | PNC  | xxx4359 | HSA Funding Account                        |
| viii. | PNC  | xxx4367 | Payroll Funding Account (checks)           |
| ix.   | PNC  | xxx4375 | Payroll Funding Account (direct deposit)   |
| x.    | PNC  | xxx4383 | Benefits Account                           |

b) Arandell Kentucky

|      |      |         |                                  |
|------|------|---------|----------------------------------|
| i.   | CIBC | xxx8355 | Receivables Lockbox Account      |
| ii.  | CIBC | xxx8862 | Operating Account                |
| iii. | CIBC | xxx9253 | SBA Account                      |
| iv.  | CIBC | xxx4406 | Controlled Disbursement Account  |
| v.   | PNC  | xxx5585 | HSA Account                      |
| vi.  | PNC  | xxx5593 | Benefits Account                 |
| vii. | PNC  | xxx5606 | Payroll Funding Account          |

50.      The Debtors use the Bank Accounts maintained at CIBC for operating, collecting accounts receivable, to facilitate the borrowing of working capital advances by the existing ABL lenders to the Debtors and repaying those borrowed funds (through sweeps of the accounts), as follows:

26902648.1

a) Arandell Corporation

   i.   CIBC Receivables Lockbox (blocked) #xxx7076. The function of this account is to receive customer payments which are swept daily and applied to the Line of Credit. Regularly scheduled loan payments to CIBC are deducted from this account.

   ii.   CIBC Operating Account #xxx7084. The function of this account is to disburse operating payments to vendors. It is funded via the CIBC Line of Credit as well as the SBA Account (xxx7872).

   iii.   CIBC Falls Express Account #xxx7408. The function of this account is to fund freight carrier disbursements that are presented on a daily basis. By only funding these daily payments, the company is able to preserve cash until needed and reduce interest costs. It is funded by transfers from the CIBC Operating Account #xxx7084.

   iv.   CIBC SBA Account #xxx7872. The function of this account is to hold proceeds from an SBA loan (dated April 15, 2020) and transfer funds, as needed, to the CIBC Operating Account #xxx7084.

   v.   CIBC Controlled Disbursement Account #xxx8552. The function of this account is to fund company vendor disbursements that are presented on a daily basis. By only funding these daily payments, the company is able to preserve cash until needed and reduce interest costs. It is funded by transfers from the CIBC Operating Account #xxx7084.

b) Arandell Kentucky

   i.   CIBC Receivables Lockbox (blocked) #xxx8355. the function of this account is to receive customer payments which are swept daily and applied to the Line of Credit. Regularly scheduled loan payments to CIBC are deducted from this account.

   ii.   CIBC Operating Account #xxx8862. The function of this account is to disburse operating payments to vendors. It is funded by the CIBC Line of Credit #xxx7084 as well as the SBA Account #xxx9253.

   iii.   CIBC SBA Account #xxx9253. The function of this account is to hold proceeds from an SBA loan (dated April 15, 2020) and transfer them as needed to the Operating Account #xxx8862.

   iv.   CIBC Controlled Disbursement Account #xxx4406. The function of this account is to fund company vendor disbursements that are presented on a daily basis. By only funding these daily payments, the company is able to

preserve cash until needed and reduce interest costs.  It is funded by transfers from CIBC Account #xxx8862

51.    In addition to the CIBC accounts, the Debtors maintained several of the Bank Accounts at PNC, each of which serve a specialized function, as follows:

a)  Arandell Corporation's PNC accounts

   i.    PNC Bank FSA Account #xxx4332.  This account funds employee and company contributions to individual employees FSA accounts.  A file is submitted to PNC bank and they distribute funds to FSA accounts based on the file instructions.  It is funded by acct #xxx7084.

   ii.   Arandell Corporation HSA Account #xxx4359.  This account funds employee and company contributions to Arandell Corporation's employees' HSA accounts.  A file is submitted to PNC bank and they distribute funds to HSA accounts based on the file instructions.  It is funded by acct #xxx7084.

   iii.  PNC Payroll Check Account #xxx4367.  The function of this account is to disburse funds by check to cover the wages and salaries (including any bonus compensation) of Arandell Corporation's Wisconsin employees who have not elected to receive such payments by direct deposit.  It is funded by the Arandell Corporation CIBC Operating Account.

   iv.   PNC Payroll Funding Account #xxx4375.  The function of this account is to disburse funds electronically to cover the wages and salaries (including any bonus compensation) of Arandell Corporation's Wisconsin employees who have elected to receive such payments by direct deposit into the employee's bank account.  It is funded by the Arandell Corporation CIBC Operating Account.

   v.    PNC Benefits Account #xxx4383.  This account is used to pay dental, medical, stop loss and administrative fees.  Amounts are requested by UMR, Delta Dental, etc.  They draw down the funds once funded.  It is funded by the Arandell Corporation CIBC Operating Account.

b)  Arandell Kentucky's PNC Accounts

   i.    PNC HSA Account #xxx5585.  This account funds employee and company contributions to individual employees' HSA accounts.  A file is submitted to PNC bank and they distribute funds to HSA accounts based on the file instructions.  It is funded by the Arandell Kentucky CIBC Operating Account.

   ii.   PNC Benefits Account #xxx5593.  This account is used to pay dental, medical, stop loss and administrative fees.  Amounts are requested by UMR, Delta Dental, etc.  They draw down the funds once funded.  It is funded by the Arandell Kentucky CIBC Operating Account.

    iii.    PNC Payroll Funding Account #xxx5606.  The function of this account is to disburse funds electronically to cover the wages and salaries (including any bonus compensation) of Arandell Kentucky's employees, all of whom have elected to receive such payments by direct deposit into the employee's bank account.  It is funded by the Arandell Kentucky CIBC Operating Account.

52.    I am informed by legal counsel to the Debtors that Both CIBC and PNC have executed a Uniform Depository Agreement with, and are designated as authorized depositories by, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"). Likewise, all of the Bank Accounts are insured by the Federal Deposit Insurance Corporation. The Debtors do not have any investment accounts.  Thus, the Debtors believe that any funds that are deposited in these Bank Accounts are secure.

53.    By their Cash Management Motion, the Debtors are seeking a waiver of the U.S. Trustee's requirement that all of its bank accounts be closed and that new DIP bank accounts be opened.

54.    Complying with this U.S. Trustee requirement would be time-consuming, disruptive, and would divert the Debtors' efforts from focusing on its restructuring and/or sale efforts.

55.    Furthermore, maintaining the bank accounts that were utilized pre-petition would greatly facilitate the Debtors' transition to the post-petition period.

56.    Maintaining the pre-petition bank accounts will avoid delays in paying debts incurred post-petition and would ensure as smooth a transition into these Chapter 11 Cases as possible.

57.    Also, to facilitate the DIP Facility terms, the Debtors may need to open new accounts and close existing accounts in the ordinary course of business operations.

58.    In the event a new account is opened at one of the existing banks, the procedures outlined by the U.S. Trustee for opening DIP accounts could be followed at that stage.

59.     To maintain a clear distinction between pre-petition and post-petition claims and payments, and to prevent the inadvertent payment of pre-petition claims from existing bank accounts, the Debtors have established a detailed, internal system for tracking claims and payments that will separate pre-petition and post-petition payments such that each can be treated in accordance with the requirements of the Bankruptcy Code and this Court's orders, pursuant to advice provided by legal counsel.

60.     Furthermore, the Debtors will work closely with CIBC and PNC to ensure that the bank honors only those payments that the Debtors are authorized and intend to make.

61.     To minimize expense to its estate, the Debtors are requesting that they be authorized to continue to use all correspondence, business forms (including, but not limited to, letterheads, purchase orders, and invoices) existing immediately prior to the Petition Date without reference to the Debtors' status as debtors-in-possession.

62.     With regard to correspondence, business forms and the like, parties doing business with the Debtors will likely be aware of their status as debtors-in-possession as a result of the size and notoriety of their Chapter 11 Cases in this industry, general press coverage, and the publication notice for these Chapter 11 Cases.

63.     The Debtors have further requested that they be authorized to use their existing stock of checks despite their lack of debtor-in-possession designation.  With respect to checks, replacement of the Debtor's check stock would take three weeks or more.  It would be a major hardship on the Debtors, and potentially a violation of the DIP Facility, to postpone purchases or to defer payments pending a stationer's delivery of new check stock.  A requirement that the Debtors replace their existing checks and business forms would be expensive and burdensome to the Debtors' estate and would be disruptive to the Debtors' reorganization and sales efforts.

64.     Maintenance of the Cash Management System will prevent the undue disruption of the Debtors' business during the reorganization process.

65.     It is critical that the Debtors be authorized to continue to maintain their Cash Management System and centrally coordinate fund transfers to operate their businesses efficiently and effectively.

66.     Disrupting the Debtors' Cash Management System would severely impair the Debtors' ability to preserve and enhance their going concern value and to reorganize or sell assets successfully during these Chapter 11 Cases.

67.     The Cash Management System functions well for the Debtors in terms of tracking corporate expenditures, matching cash with cash needs, and facilitating account record keeping, movement of funds, and developing timely and accurate account balance, process and presentment information.

68.     Thus, under the circumstances, maintaining the Debtor's Cash Management System is both essential and in the best interests of its estate and creditors.  The Debtors would suffer irreparable harm if such Cash Management Systems are not available

69.     If allowed to continue its Cash Management System, the Debtors will continue to maintain strict records with respect to all transfers of cash so that transactions can be readily traced and evaluated.

**C.    Protection of Utilities**

70.     The Debtors have filed a motion requesting authorization to provide assurance to public utilities, as provided by the Bankruptcy Code, and to set up a deposit account as part of that protection (the "Utility Motion"). The following provisions relate to the facts supporting the Utility Motion.

71.     A list of substantially all of the Utility Companies with which the Debtors deal is attached as Exhibit C to the Utility Motion (the "Utilities List").

72.     The inclusion of any entity on or the exclusion of any entity from the Utilities List is not dispositive of such an entity's status as a Utility for these Chapter 11 Cases.

73.     The Debtors have made a best effort to include all of its utility providers on the Utilities List, but inclusion or lack thereof should not be considered an admission by the Debtors that such entity is, or is not, a "utility" for purposes of section 366 of the Bankruptcy Code.

74.     The Debtors and HP reserve the right to contest an entity's legal classification as a utility at a later date.

75.     The utility services provided by the providers listed on the Utilities List to the Debtors include, but are not necessarily limited to, electrical power, natural gas, water, sewer, waste hauling, telephone services, and internet services (the "Utility Services").

76.     The Debtors cannot operate without these Utility Services that are provided by the Utilities, and any disruption, particularly in the Debtor's electrical, gas, water, sewer, waste hauling, telephone, mobile phone and internet services, would cause irreparable damage to the Debtors' ongoing business operations and estates.

77.     Cessation of the Debtors' business operations will also impact the Debtors' customers and potentially hundreds of their employees.

78.     For these reasons, the Debtors must ensure the continued provision of Utility Services during these Chapter 11 Cases.

79.     The Debtors incur, on average, utility charges of approximately $300,000 per month, in the aggregate for all of their Utility Services.

80.     The majority of these charges are for gas and electric services, but critical utilities also include waste hauling, telephone, internet, and water services.

81.     To avoid interruption of service and to comply with the Bankruptcy Code (as advised by legal counsel), the Debtors propose to provide assurance of payment by funding a segregated and dedicated bank account (the "Utility Deposit Account") into which a deposit for the benefit of all of the Utilities will be made, and by establishing a procedure for Utilities to make any objection to the Debtors' offered assurance.

82.     Notwithstanding the establishment of the Utility Deposit Account, the Debtors intend to pay, when due, all undisputed post-petition charges for Utility Services.

83.     The Debtors expect that available cash collateral and post-petition financing, as well as cash from operations, will be more than sufficient to pay for the Debtors' post-petition Utility Services.

84.     The undersigned has read the procedures proposed by the Debtors in their Utility Motion and can represent to the Court that the process proposed therein is both feasible and workable for the Debtors.  The Debtors would suffer irreparable harm if Utility services are interrupted.

## D.    Employees' Wages and Benefits

85.     The Debtors have filed a motion (the "Wages and Benefits Motion") requesting the authority to pay its employees, to fund employee benefits and to honor employee paid time off, in the ordinary course of business post-petition, and to honor wages and benefits earned by employees pre-petition but payable post-petition, and to allow checks for wages issued pre-petition to be honored by the Debtors' banks post-petition. The following provisions relate to the

facts supporting the Wages and Benefits Motion. The Debtors would suffer irreparable harm if authority sought in the Wage and Benefits Motion is not granted.

86.    As of the Petition Date, the Debtors employ approximately 523 people; 522 are employed by Arandell Corporation and one (1) is employed by Arandell Kentucky.  Arandell Holdings does not have any employees.

87.    The Debtors' employees perform a variety of critical functions for the Debtors' business, including manufacturing, print operation, procurement and supply, sales, marketing, accounting, administration, shipping, environmental health and safety, human resources, communications, and other duties.

88.    The employees' skills and their specialized knowledge and understanding of the Debtors' infrastructure, assets, production schedules, protocols, and operations, as well as their unique relationships with the Debtors' customers, vendors, and other third parties, are essential to the continued successful business operations, administration of this case, the preservation of the Debtors' business, the Debtors' ability to consummate a successful reorganization or a sale process, and the Debtors' ability to preserve and maximize the value of its estate for the benefit of all of its stakeholders.

89.    Without the continuing employment, and payment therefore, of the employees for varying periods of time, the Debtors would not be able to produce products for its customers, fulfill pending orders, and the enterprise value of the Debtor would be lost.

90.    Further, in discussions with potential purchasers of the Debtors' businesses, completion of pending orders is important to preserving the value of relationships with customers and, therefore, preserving the going concern value of the Debtors' business and assets.

91.     It is critical for the Debtors to retain their workforce in this period of very tight skilled labor supplies, and the Debtors fears that if its current employees would decide to leave their employment at this stage, the Debtors would be unable to find suitable skilled replacements.

92.     In the ordinary course of the Debtors' business prior to the Petition Date, the active employees were owed or had accrued various sums for wages, salaries, overtime pay, benefit programs such as certain life, disability or other insurance programs, and other accrued compensation (collectively, the "Prepetition Compensation").[4]

93.     The Debtors' most recent payroll payment, including all payments on account of Employee Compensation and Benefits (the "Last Prepetition Payroll") was made on August 7, 2020 in the aggregate amount of approximately $450,386.89.

94.     The majority of the Debtors' employees have been paid, and such payments have cleared their respective banks due to the substantial use of ACH payroll payments.

95.     Based on historical payroll, the Debtors believe that, as of the Petition Date, approximately $980,280 in the aggregate remains outstanding on account of unpaid accrued wages, salaries, overtime pay, and other compensation due from the Debtors to the Employees, (the "Unpaid Employee Compensation Obligations") exclusive of any amounts attributable to uncashed paychecks on account of the Last Payroll.

96.     No single employee is owed more than the statutory priority amount of $13,650.00, as set out in section 507(a)(4) of the Bankruptcy Code for prepetition wages, salaries or commissions accruing in the 180 days before the Petition Date.

---

[4] For the purpose of the Wages and Benefits Motion, Pre-Petition Compensation does not include self-funded or union-sponsored health, vision, disability, or similar plans which will be addressed in a separate Motion.

97.     The Debtors are not seeking in their Wages and Benefits Motion and do *not* request permission to pay accrued vacation to any employee who is terminated or who voluntarily terminates his or her employment with the Debtors.

98.     Neither do the Debtors seek to pay any severance to any employee.

99.     No employee "pay to stay" bonuses or plans are included in the currently pending Wages and Benefits Motion, but I am informed by legal counsel that such a motion would likely be brought later, separate from the current Wages and Benefits Motion.

100.    It is the Debtors' intention that all payments proposed to be made to employees in the proposed Motion that are for pre-petition compensation shall reduce, dollar-for-dollar, each priority wage claim of an affected employee pursuant to section 507(a)(4) of the Bankruptcy Code.

101.    As of the Petition Date, the Debtors also had made and accrued deductions from affected employees' paychecks to make payments on behalf of specific employees, at their or some third party's direction, for garnishments, family support payments, insurance programs, membership dues, union dues, and other similar programs on account of which the Debtors deduct a sum of money from an employee's paycheck each pay period and then pays that amount to a designated third-party payee (collectively, the "Wage Deductions").

102.    As of the Petition Date, approximately $422,900 remains unremitted for Wage Deductions to the various third-party recipients (the "Third-Party Recipients") on account of prepetition Wage Deductions for Trust Fund Taxes, Retirement Plans, Union Pensions, Union Dues and Voluntary Life Insurance It is important to note that the Deductions represent amounts withheld from employees' pay by the Debtors with the intention that such amounts will be paid

to third-party payees or specified employee benefit plans and, as such, constitute trust funds in the hands of the Debtors for the benefit of each specific employee.

103.    As of the Petition Date, approximately 50 employees were owed or had accrued reimbursable out-of-pocket business expenses relating to personal vehicle use, meals, and travel costs incurred on behalf of the Debtors in connection with their employment (the "Reimbursable Expenses").

104.    In addition, prior to the Petition Date, the Debtors withheld money from employees' paychecks on account of various federal, state and local income taxes, FICA contributions, Medicare contributions, and other withholding taxes that are held for remittance to the appropriate federal, state, or local taxing authorities.

105.    Additionally, the Debtors are required to pay the employer portion of such taxes and contributions, as well as unemployment compensation tax contributions, related processing fees, administrative charges, and similar obligations to Taxing Authorities and third-party providers.

106.    The Debtors estimate that the total unreimbursed pre-petition Reimbursable Expenses is approximately $20,000, in the aggregate and as of the Petition Date, approximately $422,900 remains unremitted for Wage Deductions to the various third-party recipients on account of prepetition Wage Deductions for Trust Fund Taxes, Retirement Plans, Union Pensions, Union Dues and Voluntary Life Insurance.

107.    Prepetition Compensation, Outstanding Paychecks, Business Expenses, Deductions, Withholdings and Taxes were due and owing as of the Petition Date because, among other things:

a) The Debtors filed the Chapter 11 Cases in the midst of their regular and customary payroll periods, as well as in the midst of their regular reimbursement cycle for employee business expenses;

b) Certain checks issued employees prior to the Petition Date have not yet been presented for payment at the Debtors' banks, or they have not yet cleared the banking system and, accordingly, were not honored and paid as of the Petition Date;

c) Certain employees have not yet been paid portions of their salaries, contractual compensation, and wages for services previously rendered to the Debtors or have not yet been reimbursed for business expenses previously advanced on behalf of the Debtors;

d) Certain other forms of employee compensation related to pre-petition employment have not yet been paid to, or for the benefit of, the employees because such amounts, although accrued in whole or in part prior to the Petition Date, were not due and payable at such time, but rather have or will become payable in the future in the ordinary course of the Debtors' business; and,

e) Certain forms of Withholdings and Taxes related to pre-petition employment have not yet been paid because such amounts, although accrued in whole or in part prior to the Petition Date, were not due and payable at such time, but rather have or will become payable in the future in the ordinary course of the Debtors' business.

108.    After due consideration of the amounts owed, and after consultation with HP, the Debtors believe that the Pre-petition Compensation owing to or on account of any particular active employee will not exceed the sum of $13,650.00, which I am informed by legal counsel is allowable as a priority claim under section 507(a)(4) of the Bankruptcy Code, and it is the intention of the Debtors that such payments shall be credited as an advance payment to the recipients for their respective priority claims under section 507(a)(4).

109.    As a result, I do not believe the payment of the amounts requested in the Wage Motion would deplete assets otherwise available to creditors having a lower priority claim under a plan or other distribution in accordance with section 507 of the Bankruptcy Code.

110.    To avoid the serious disruption of the Chapter 11 Cases that could result from the non-payment of withholding taxes, the Debtors are seeking authority to remit all Withholdings to

the applicable Taxing Authorities to the extent that the Withholdings have not already been remitted in the ordinary course of business.[5]

111.    I am informed by legal counsel that the Withholdings are held in trust by the Debtors for the benefit of the appropriate Taxing Authority for employees on behalf of whom such payment is being made.

112.    Further, many Taxing Authorities impose personal liability on the officers and directors of entities responsible for collecting taxes from employees to the extent any such taxes are collected but not remitted to the proper Taxing Authorities.

113.    Accordingly, if these amounts remain unpaid, there is a risk that the Debtors' officers and directors may be subject to lawsuits or administrative proceedings on account of any such nonpayment during the pendency of these Chapter 11 Cases.

114.    I am informed by legal counsel that lawsuits or administrative enforcement proceedings of this type are not stayed by the bankruptcy stay.

115.    Obviously, such proceedings against officers and directors would constitute a significant distraction for said officers and directors at a time when they should be focused on the Debtors' efforts to administer this case and preserve and maximize the value of its assets.

116.    The majority of the value of the Debtors' business in a potential sale is dependent upon its ability to continue operating their business as a going concern, including the maintenance of their workforce and customer base. Loss of these employees would surely cause the Debtors irreparable harm.

---

[5] The Debtors are current in its required payments of withholding taxes, however, the amount owed at any point in time varies depending on various state and federal withholding cycles.

117.    Without continuing payments to the Debtors' employees, it is unlikely that the workforce would remain highly motivated to produce quality products and services timely, even assuming the employees would even remain in the Debtors' employ.

118.    The Debtors, in conjunction with HP, have investigated the sale of their business and marketed it to certain prospective purchasers.

119.    Without exception, the discussions with potential buyers have included an assumption, without any debate, that pre-sale wages and benefits need to be paid timely and the Debtors' workforce must be preserved to maximize the value of the business.

120.    Any delay or disruption in the payment of Prepetition Compensation under these extraordinary and difficult circumstances will destroy the Debtors' relationships with its active employees and will irreparably impair morale of the Debtors' remaining workforce at the very time when their dedication, confidence, and cooperation are most critical.

121.    There are no practical or legal alternatives to retention of the active employees if a sale is to be successful.

122.    Not doing so would substantially jeopardize the value of the Debtors' business.

123.    The Debtors maintain identifiable payroll Bank Accounts, as described in prior paragraphs herein, on which Prepetition Compensation payments are drawn and through which the Deductions, Withholdings and Taxes can be separately identified and accounted for by the Debtor's accounting staff.

124.    Accordingly, the Debtors believes that checks, other than those relating to authorized payments, will not be honored inadvertently.

125.    The Debtors anticipate that they will have access to sufficient funds from use of cash collateral and/or debtor in possession financing to pay all Prepetition Compensation,

Business Expenses, Deductions, Withholdings, and Taxes, to the extent described herein, as such amounts become due in the ordinary course of its business.

**E.  Insurance Policies and Obligations**

126.     The Debtors have filed a motion requesting authorization to maintain their current business insurance policies and honor their pre-petition insurance payment obligations, including the granting the banks authority to honor and process any checks and transfers, postpetition, as required to maintain the insurance policies, as provided by the Bankruptcy Code, and to set up a deposit account as part of that protection (the "Insurance Motion"). The following provisions relate to the facts supporting the Insurance Motion.

127.     In the ordinary course of their businesses, the Debtors maintain numerous insurance policies with various insurance providers that provide coverage for, among other things, general liability, property, automobile, umbrella liability, excess liability, crime, and directors and officers liability (collectively, the "Insurance Policies").  A summary list of the Debtors' Insurance Policies is provided in the list attached as Schedule 1 to the Insurance Motion.

128.     The Debtors incur approximately $354,057.66 (exclusive of workers compensation and health related policies which are covered in the Wage Motion) in the aggregate, in premiums, brokers fees, and other costs related to their Insurance Policies as well as other obligations, including their broker fees and premiums (collectively, the "Insurance Obligations").  The Debtors, in the ordinary course of its business, prepay the premiums for many of the Insurance Policies, but some of the premiums are paid on a less-than annual basis (including monthly). It appears that approximately $68,152 of Insurance Obligations will become due and payable within the first thirty (30) days after the Petition Date.

129.    The Debtors maintain the Insurance Policies to help manage and limit the various risks associated with operating their businesses, which is essential to the preservation of the value of the Debtors' businesses and assets.  Some of the Insurance Policies are required by certain regulations, laws, and contracts that govern the Debtors' commercial activities.

130.    Maintaining the coverage provided under the Insurance Policies, which requires the payment of the Insurance Obligations, is essential to maintaining and protecting the value of the Debtors' businesses and the estate.

131.    The Debtors expect that available cash collateral and post-petition financing, as well as cash from operations, will be more than sufficient to pay for the Debtors' post-petition Insurance Obligations.  Failure to maintain all the insurance policies will surely result in irreparable harm to the Debtors.

**F.  Post-Petition Delivery of Goods Ordered Prepetition and Payment of 503(B)(9) Claims**

132.    The Debtors have filed a motion (the "Shippers Motion") requesting authorization to pay any obligations incurred prepetition that come due after the Petition Date on account of the Debtors' ordinary course cash on delivery transactions with its critical suppliers and shippers. The following provisions relate to the facts supporting the Shippers Motion.

133.    In the ordinary course of the Debtors' business, they receive goods at the dock and then issue payments for these goods.  In the 20 days pre-petition, the Debtors received goods or services and issued payment for these goods which, as of the Petition Date, remain outstanding in the sum of approximately $225,000.

134.    In the ordinary course of the Debtors' business, many of the vendors and suppliers upon from whom the Debtors order goods and materials are not paid in advance, but rather invoice the Debtors for goods and shipping services after delivery.  These fall into four

categories: (a) purchase order issued, goods received at the dock and "COD" payment in the queue but not yet executed (total $372,324.90); (b) purchase orders issued, not paid, and goods in transit (total $300,020.62); (c) purchase orders issued, not paid, and goods not shipped (total $4,378,84.92); and (d) purchase order issued, paid, goods not yet shipped (total $425,626.27); for an approximate total, in the aggregate, of $5,115,000 owed on account of the Outstanding Orders.

135.    As a result of the commencement of these Chapter 11 Cases, the suppliers and shippers of outstanding orders may be concerned about their status as unsecured creditors as a result of the mismatched time between order, delivery, and payment.

136.    Because of the Debtors' financial position, the Debtors believe that the trade relationships with their shippers and suppliers of goods and materials may materially deteriorate if the Debtors are unable to pay the amounts owed on account of any outstanding orders. Any such disruption in the Debtors' supply chain, even minor, could threaten the Debtors' businesses and chances at success in these Chapter 11 Cases.

137.    The Debtors will greatly benefit from the authority to pay all undisputed obligations from the acceptance of goods subject to outstanding orders and they will avoid the costs, delays, and damage to the Debtors' business that would result from any such disruptions. Absent the authority granted from the court as requested in the Shippers Motion the Debtors will likely suffer irreparable harm if the shippers are not assured of the terms in the context of the Chapter 11 Cases

138.    Cash maintained by the Debtors, combined with the requested postpetition financing and the cash generated in the ordinary course of business, will provide ample liquidity

for the payment of the outstanding order obligations, as well as for the Debtors to conduct operations during these Chapter 11 Cases.

## **Conclusion**

139.    For the reasons described herein and in the First Day Motions, I believe that the success of these Chapter 11 Cases for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions.

*[The remainder of this page is intentionally blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the foregoing Declaration are true and correct to the best of my information and belief.

Executed on August 13, 2020.

*/s/ James G. Keane*
James G. Keane