## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ARANDELL HOLDINGS, INC., *et al.,* [1] | Case No. 20-11941 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Proposed Hearing Date: October 16, 2020 at 1:00 p.m. (ET)** |
| | **Proposed Obj. Deadline: October 13, 2020 at 4:00 p.m. (ET)** |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL THE ASSETS OF ARANDELL CORPORATION AND ARANDELL HOLDINGS , (B) APPROVING STALKING HORSE PROTECTIONS, (C) SCHEDULING AUCTION FOR, AND HEARING TO APPROVE SUCH SALE, (D) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION AND SALE HEARING, (E) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (F) GRANTING RELATED RELIEF, AND (II)(A) APPROVING SUCH SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**")

respectfully represent as follows in support of this motion (this "**Motion**"):[2]

---

[1]  The Debtors in these chapter 11 cases, and the last four digits of their U.S. taxpayer identification numbers are: Arandell Holdings, Inc. (5311) ("Arandell Holdings"), Arandell Corporation (4270) ("Arandell Corporation"), and Arandell Kentucky, LLC (1505) ("Arandell Kentucky"). The Debtors' corporate headquarters is located at N82 W13118 Leon Road, Menomonee Falls, WI 53051.

[2]  The facts and circumstances supporting the relief requested herein are set forth in the First Day Declarations (as defined below).  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declarations.

## RELIEF REQUESTED

1.      By this Motion[3], the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"):

   a.      approving the proposed bidding procedures (the "**Bidding Procedures**") attached to the Bidding Procedures Order as **Exhibit 1**, pursuant to which the Debtors will solicit and, in consultation with the Consultation Parties (as defined below), select the highest or otherwise best offer for the sale or sales (each, a "**Sale Transaction**") of the assets (the "**Purchased Assets**") of Debtors Arandell Corporation (the "**Arandell**") and Arandell Holdings, Inc. ("**Holdings**") (together, the "**Debtors**" or the "**Company**");

   b.      approving the Stalking Horse Protections provided by the Debtors to the Stalking Horse Bidder in accordance with the terms and conditions set forth in the Stalking Horse APA (each as defined below) and the Bidding Procedures;

   c.      scheduling an auction for the Purchased Assets (the "**Auction**"), if necessary;

   d.      scheduling a hearing (the "**Sale Hearing**") to consider approval of the proposed Sale Transaction on November 24, 2020;

   e.      authorizing and approving the (i) notice of the (a) Sale Transaction, (b) Bid Deadline (as defined below), and (c) Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** thereto (the "**Sale Notice**"), and (ii) notice to each relevant non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired lease related to the Purchased Assets of the potential assumption and assignment of their executory contract (the "**Contracts**") or unexpired lease (the "**Leases**" and together with the Contracts, the "**Contracts and Leases**") and the calculation of the amount necessary to cure any monetary defaults thereunder (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** thereto (the "**Potential Assumption and Assignment Notice**");

   f.      authorizing and approving procedures for the assumption and assignment of the Contracts and Leases and the determination of Cure Costs with respect thereto, , collectively, the "**Assumption and Assignment Procedures**"); and

   g.      granting related relief.

---

[3] Contemporaneously with the filing of this Motion, the Debtors have also filed a motion (the "**Motion to Shorten**") requesting that the Motion be heard on October 16, 2020 at 11:00 a.m. (ET).  The Motion to Shorten also requests that objections to the Motion must be filed on or before October 13, 2020 at 4:00 p.m. (ET).

2.     The Debtors further request at the Sale Hearing that this Court enter an order (the "**Sale Order**"), a proposed form of which is annexed as an exhibit to the Stalking Horse APA (as defined below), (i) authorizing and approving the sale of the Purchased Assets to the ultimate purchaser of such assets as determined in accordance with the Bidding Procedures (the "**Successful Bidder**"), free and clear of all liens, claims, interests, and encumbrances, (ii) authorizing and approving the assumption and assignment of the Debtors' Contracts and Leases in accordance with the Assumption and Assignment Procedures in connection with the proposed Sale Transaction, and (iii) granting related relief.

## JURISDICTION AND VENUE

3.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.   This is a core proceeding pursuant to 28 U.S.C. § 157(b).   Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

4.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

5.      On August 13, 2020 (the "**Petition Date**"), each of the Debtors commenced with the Court voluntary cases (the "**Chapter 11 Cases**") for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An official committee of unsecured creditors (the "**Committee**") was appointed on August 25, 2020 [Docket No. 63].  No trustee or examiner has been appointed in the Chapter 11 Cases.

6.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Bradley J. Hoffman in Support of the Chapter 11 Petitions and First Day Motions* [D.I. 12]*, and the *Declaration of James G. Keane in Support of the Chapter 11 Petitions and First Day Motions* [D.I. 11] (the "**First Day Declarations**"),[4] filed on the Petition Date and incorporated herein by reference.

## PRE-PETITION MARKETING AND SALE PROCESS

7.      As set forth in greater detail in the First Day Declarations, the Debtors and their advisors worked for months in the face of the Debtors' liquidity constraints and operational challenges to solicit and develop various strategic alternatives throughout the first seven months of 2020 to maximize stakeholder value.  These efforts included retaining Promontory Point Capital ("**PPC**") and HMP Advisory Holdings, LLC (dba Harney Partners) ("**HMP**"), commencing at first a refinancing process involving contacts with thirty (30) funding sources, and later (and concurrently), a sale marketing process involving an additional thirty-one (31) targets with

---

[4]      The First Day Declarations and other relevant case information is available on the following website maintained by the Debtors' claims and noticing agent, BMC Group at:   https://bmcgroup.com/arandell

strategic and financial interests. Of this total of sixty-one (61) targets, twenty-nine (29) were considered primarily strategic buyers and twelve (12) were primarily financial buyers. The balance consisted of funding sources and investors. At the time of filing, the target list had grown to seventy-three (73). Twenty-seven (27) were potential financing sources, and forty-six (46) were potential financial and strategic purchasers. Of that group, fourteen (14) parties offered term sheets or indications of interest, and one financial buyer (Arandell Acquisition Company ("**AAC**"), the proposed Stalking Horse herein) emerged with an indication of sufficient proceeds to extinguish senior debt and a portion of the subordinated debt.

8.     Following the Petition Date, and while negotiations continued with AAC, the Debtors continued to reach out to potential purchasers, including several strategic parties who learned of the sale opportunity through the Debtors' filings herein, as well as financial purchasers and liquidators. These additional post-petition targets increased the overall list of potential interested parties to one hundred seventeen (117), including thirty-one (31) candidates submitted by financial advisors to the Committee. Non-disclosure agreements were signed by fifty-two (52) parties, and thirteen (13) of those remain active.

9.     As a result of the foregoing sales efforts, a potential strategic purchaser emerged with a proposed acquisition that appeared to be competitive with AAC, and negotiations continued with both parties until on or about September 25, 2020, when Debtors concluded that the potential transaction with AAC was the best and most desirable of the two.[5]

10.    On September 30, 2020, the Debtors entered into a stalking horse asset purchase agreement (the "**Stalking Horse APA**") with AAC for the sale of substantially all of the assets of

---

[5] Under the Milestones (schedule 12.13 to the DIP Credit Agreement), the Debtors were under a deadline of September 18, 2020 to have completed an approved asset purchase agreement and filed this Motion. Given the status of the negotiations at that time, the Agent consented to continue that deadline by one week to September 25, 2020, and then agreed to further extensions to September 29 and 30, 2020, respectively.

Arandell Corporation and certain insurance rights and other assets of Holdings (the "**Purchased Assets Bid**") as described in greater detail below.  AAC was formed by Saothair Capital Partners ("**Saothair**") and Farragut Mezzanine Partners III, L. P. ("**Farragut**," one of the Debtors' junior secured creditors) for the purpose of making the proposed acquisition.

11.     The Stalking Horse APA preserves the Company's business as a going concern, including (i) preserving much of the Debtors' current printing facilities and operations, (ii) contemplating the continued employment of substantially all of the Company's employees under modified collective bargaining agreements,[6] (iii) continuing ongoing relationships with many of the Company's contract counterparties and assuming certain liabilities related thereto, and (v) providing consideration (including the assumption of obligations) sufficient to repay or satisfy all amounts due to the Debtors' "Agents,"  "Lenders" and "Factor" (as such terms are defined in the below-defined DIP Order), and provide certain wind down costs in accordance with an approved budget to facilitate the orderly wind down of the estates.

12.     The Stalking Horse APA does not include exclusivity rights, and the Debtors, with the assistance of their advisors, are actively continuing to engage with other potential bidders to facilitate a competitive sale process, which will continue in accordance with the Bidding Procedures.  Specifically, the Debtors, PPC and HMP will continue marketing and soliciting in accordance with the proposed Bidding Procedures and welcome any and all bids for the Debtors' assets.  Continued marketing will invite any higher and better bids or otherwise ensure the Stalking Horse Bid represents the highest or best value for the Company's assets.

---

[6] AAC believes that the continued employment of the Debtors' President Bradley J. Hoffman is material to the value of the Purchased Assets. The parties have agreed that Mr. Hoffman may negotiate with any other potential purchaser (so any agreement reached will not be exclusive) and that if the Stalking Horse reaches an agreement with Mr. Hoffman, the terms of any such agreement will be disclosed to other Qualified Bidders.

13.     The Debtors filed these Chapter 11 Cases to pursue a value-maximizing sale for the benefit of the Debtors' stakeholders and to facilitate the orderly wind down of their estates.  The Stalking Horse APA is the product of the Debtors' thorough prepetition and postpetition marketing process to date.  To ensure that the Debtors obtain the highest or otherwise best offer for their assets, the Debtors will continue to market the Company and its assets through the Bidding Procedures, which will provide for an open, comprehensive sale process that encourages the participation of Qualified Bidders and the submission of bids for the Purchased Assets.

**NEED FOR SALE PROCESS TIMETABLE AND DEADLINES**

14.     The Debtors believe that the auction process and time periods set forth in the Bidding Procedures are the only viable means to ensure a value-maximizing sale, which is in the best interests of all the Debtors' constituencies.  Due to the Debtors' scarce available resources given the sudden downward shift in retail demand resulting from the ongoing COVID-19 pandemic, the Debtors submit that the timeline—which contemplates a closing of the Sale Transaction on or before December 4, 2020—is reasonable under the circumstances and provides viable bidders with sufficient time and information necessary to formulate a bid to purchase the Purchased Assets.

15.     The Debtors entered these cases with limited cash on hand due to a confluence of factors including competition, technological change in the industry, and the COVID-19 pandemic, which had very negative impacts to the Debtors' customers and suppliers.

16.     In response to these issues and the significant need for the auction process, the Debtors and their advisors, concurrently with their sale marketing process, engaged in a

competitive marketing process to obtain postpetition financing on the best available terms.[7]  The

Debtors and their advisors worked diligently to evaluate options for financing from the Senior

Lenders, and potential third-party lenders.  The postpetition financing provides the Debtors with

sufficient liquidity to effectuate a going concern sale of the Company's assets through the proposed

sale process.  In coordination with the Senior Lenders' postpetition financing, the Debtors have

agreed to this process to preserve and maximize value of their estates, to consummate a going

concern sale, and to, hopefully, facilitate an orderly wind down of their estates.  Given the

significant cash burn of the Debtors, and in the face of the uncertain environment, to maximize the

probability that the Debtors can effectuate the sale and utilize the proceeds of the Carveout (as

defined in the below-defined DIP Order) for winding down the estates, it is critical that the Sale

Transaction close on or before December 4, 2020.  Doing so is necessary to avoid the incurrence

of additional administrative costs that could jeopardize the Sale Transaction.

17.    It is in this context that the Debtors agreed to the various milestones that are

attached as a schedule to the Postpetition Loan Agreement (as defined in the below-defined DIP

Order), as approved by the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,*

*507 and 552 (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting (A) Liens*

*and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain*

*Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay;*

*(V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 48], as amended or

otherwise modified from time to time, and together with any "Final Order" (as defined therein), as

amended or otherwise modified from time to time (the "**DIP Order**").  Under the milestones set

---

[7]  The Debtors' marketing process related to obtaining postpetition financing is more fully described in the First Day
Declarations.

forth in detail in Schedule 12.13 of the Postpetition Loan Agreement (as defined in the DIP Order), as amended, the Debtors must obtain entry of an order of the Court approving the Sale Transaction by no later than November 24, 2020, and closing of a sale by no later than December 4, 2020, or they risk losing access to their DIP Financing (as defined in the DIP Motion).  In such a circumstance, the Debtors may be left with no choice but to cease operations and liquidate their assets to the detriment of all parties in interest.  Thus, it is critical that the sale process proceed under the timeline detailed herein to ensure that the Debtors can achieve the requisite milestones and ensure their access to the DIP Financing.  Overall, the schedule as set forth in the Bidding Procedures ultimately is designed to maximize value for the Purchased Assets while, at the same time, positioning the Debtors to consummate the Sale Transaction within the milestones provided for in the DIP Order and the Postpetition Loan Agreement (as defined in the DIP Order).

18.     All of the "Aggregate Debt" and all of the "Postpetition Factor Debt" (as defined in the DIP Order) will be "Paid in Full" (as defined in the DIP Order) upon, and in connection with, the consummation of the Sale Transaction.

## THE STALKING HORSE APA

19.     By this Motion, the Debtors request authority to, among other things, provide the Stalking Horse Bidder with standard stalking horse protections, in particular (a) the payment of a break-up fee equal to $225,000 (the "**Break-Up Fee**"), and (b) reimbursement of up to $550,000 for documented and reasonable out-of-pocket fees and expenses incurred in connection with the preparation, negotiation, and documentation of the Stalking Horse APA and related agreements, and implementation of the Sale Transaction (the "**Expense Reimbursement Amount**" and together with the Break-Up Fee, the "**Stalking Horse Protections**"), provided that (i) by the Bid Deadline (as defined in the Bid Procedures), the Stalking Horse has waived  the conditions set forth in section 6.2(h) (concerning financing) of the APA, and has produced by the Bid Deadline

evidence as is reasonably necessary to demonstrate to the Debtors, in consultation with the Consultation Parties (as defined in the Bid Procedures), that the Stalking Horse Bidder has the financial ability to acquire the Purchased Assets, including, but not limited to, written commitments from the Stalking Horse's equity holders, sponsors or other financial backers, or (ii) the Purchase Agreement has been terminated by the Stalking Horse Bidder prior to the Bid Deadline pursuant to sections 7.1(c), (d), (g), (h),  (i)(iii), (i)(iv) or (j) of the Purchase Agreement, and such termination right was exercised within three calendar days of the Stalking Horse Bidder having learned or receiving notice of the facts giving rise to such right.  The Stalking Horse APA includes various customary representations, warranties, and covenants in the context of a section 363 sale by and from the Debtors and the Stalking Horse Bidder.  In addition, the Stalking Horse APA includes certain conditions to closing the contemplated Sale Transaction and customary termination rights.

20.    The Stalking Horse Protections are junior and subordinate in all respects to (x) the Liens, claims, and interests (including, without limitation, in respect of adequate protection rights) arising under, or in connection with, the DIP Financing and the DIP Order, the "Prepetition Documents," the "Postpetition Documents," and the "DIP Factoring Documents" (as such terms are defined in the DIP Order) from time to time in favor of any holder of "Aggregate Debt" and "Postpetition Factor Debt" (as such terms are defined in the DIP Order) and (y) the Carveout (as defined in the DIP Order).

21.     In accordance with Local Rule 6004-1, the chart below summarizes the significant terms of the Stalking Horse APA. [8]

| | **MATERIAL TERMS OF THE STALKING HORSE APA**[9] |
|---|---|
| **Sellers** | Arandell Corporation (and Arandell Holdings, Inc. with respect to certain insurance policies and other assets). |
| **Stalking Horse Bidder** Local Rule 6004-1(b)(iv)(A) | Arandell Acquisition Company, LLC ("AAC"), whose members are Saothair and Farragut. |
| **Consideration** | The closing consideration shall be approximately $31,325,000 (subject to potential adjustments up or done), consisting of (i) an aggregate cash amount equal to the sum of (A) the DIP Loan Payment Amount (including the Administrative Claims Cash Amount) estimated to be $20,500,000, *plus* (ii) a credit bid (A) by Farragut in the amount of $2,400,000 ("**Credit Bid**") (the sum of subclauses (i) and (ii), the "**Purchase Price**") and  (iii) AAC's assumption of the Assumed Liabilities. *See* Stalking Horse APA § 2.2 |
| **Purchased Assets** | The Purchased Assets are: <br><br> 1.     All cash, cash equivalents, and investment accounts of Seller on hand or on deposit which exceed the Administrative Claims Cash Amount; <br><br> 2.     All credits, pre-paid expenses, advance payments, prepayments, security deposits, deferred charges, letters of credit and other deposits (excluding deposits related to Contracts that are not Assigned Contracts), and claims for refunds or reimbursements and other current assets (other than any Accounts Receivable), in each case, to the extent related to the Business; <br><br> 3.     All accounts receivable and other rights to payments of Seller (the "Accounts Receivable"), in each case, to the extent related |

---

[8]     To the extent that there is any inconsistency between the terms of the Stalking Horse APA and the summary of such terms in this Motion, the terms of the Stalking Horse APA shall control. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Stalking Horse APA.

[9]     All references to sections or schedules in this summary refer to the Stalking Horse APA, unless otherwise specified.

to the Business (the "Transferred Accounts Receivable"), other than the Excluded Accounts;

4.  All inventory, including all raw materials, work-in-progress and finished goods, and including all packaging materials, merchandise, supplies, accessories, spare parts and other supplies that are owned by Seller or subject to a lease or license that constitutes an Assigned Contract, in each case, to the extent used in, or to the extent related to, the Business, including such inventory previously purchased and in transit and any such inventory paid for but not yet delivered or received by Seller (collectively, the "Transferred Inventory");

5.  The Wisconsin Lease;

6.  All tangible property and interests therein, including all machinery, equipment, furniture, appliances, artwork, computers (including all computer hardware, networking and communication assets and servers), computer terminals and printers, telephone systems, telecopiers and photocopiers, office supplies and office equipment, factory machinery and equipment (including, without limitation, all printing presses), all materials handling and plant vehicles, all other vehicles, and all other tangible personal property of every kind and description (collectively, "Personal Property"), which is owned by Seller or subject to a lease or license that constitutes an Assigned Contract, in each case, to the extent used in, or to the extent related to, the Business (collectively, the "Transferred Personal Property") including, but not limited to the Personal Property more specifically listed on Schedule 1.2(f) ;

7.  Those contracts, leases (including the Wisconsin Lease), subleases, licenses, sublicenses, customer agreements, vendor agreements, purchase orders, sales orders, installation and maintenance agreements, hardware lease or rental agreements, and other arrangements, commitments and agreements (each, including any amendments or modifications thereto, a "Contract") of Seller or Holdings to the extent related to the Business that are designated by Buyer (the "Assigned Contracts");

8.  All Intellectual Property of Seller, whether registered or unregistered, to the extent used in or related to the Business, along with all goodwill associated therewith and all remedies against infringements thereof and rights to protection of interests therein under the laws of all jurisdictions (the "Transferred Intellectual Property");

9.    To the extent legally transferrable, all qualifications, registrations, filings, privileges, immunities, certifications, accreditations, consents, licenses, permits, waivers, variances, authorizations and approvals of Governmental Authorities and non-Governmental Authorities, including, without limitation, all certificates of occupancy and certificates, licenses and permits relating to zoning, building, housing, safety, Environmental Laws, fire and health ("Permits"), which are used or required by Seller to own the Purchased Assets and operate the Business (the "Transferred Permits");

10.    The Seller Benefit Plans set forth on Schedule 1.2(j) as such Schedule may be amended by Buyer at any time prior to the Bid Deadline (as defined in the Bidding Procedures Order), and all underlying assets and rights of Seller in respect of such Transferred Benefit Plans;

11.    All Records of the Business, including without limitation, equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, tax records and other similar documents and records (all in the state in which such records and information currently exist); provided, that Seller shall be entitled to retain copies of such books, records, files and papers;

12.    All social media accounts and related rights;

13.    All sales, marketing, advertising literature, and development and expansion plans, strategic plans, projections, studies, reports and other documents and data (including, without limitation, websites, and current and past lists of customers, suppliers, vendors and sources), and all training materials and marketing brochures related to the Business;

14.    All of Seller's rights, claims, credits, remedies, rights of set-off or recoupment, causes of action, choses in action and rights of recovery, in each case, whether choate or inchoate, known or unknown, contingent or non-contingent, (i) against Buyer or any of its Affiliates, or (ii) to the extent used in or related to the Business, the Purchased Assets or the Assumed Liabilities, including but not limited to such rights, claims and remedies under any warranties, representations, indemnities, guarantees or otherwise, against a manufacturer, vendor, supplier, contractor or other Person, but specifically excluding the Excluded Actions;

15.    Except as expressly provided in in the Stalking Horse APA, (i) all insurance policies of Seller or Holdings  set forth on Schedule 1.2(o) relating to the operation of the Business, as

<table>
<tr><td></td><td>such Schedule may be amended by Buyer at any time prior to the Bid Deadline (as defined in the Bidding Procedures Order), and (ii) all rights of Seller or Holdings under or arising out of all insurance policies relating to the operation of the Business (including all claims arising thereunder) set forth on such Schedule, unless non-assignable as a matter of law;

16.    All vested rights and privileges of Seller under or relating to any Contracts to which Seller is or was a party that are not capable of being assumed and/or assigned under Section 365 of the Bankruptcy Code to the extent such rights or privileges relate to or affect any Purchased Asset;

17.    All rights under confidentiality agreements, non-disclosure agreements and similar agreements related to or affecting any Purchased Asset;

18.    All depository accounts, safety deposit boxes, lock boxes and other cash management accounts of Seller to the extent used in or related to the Business;

19.    All of Seller's telephone, cell phone, and facsimile numbers, e-mail listings and addresses, web sites, post office boxes, and all listings in all telephone books, directories, and web sites relating to the Business;

20.    All goodwill of Seller to the extent related to the Business;

21.    All other assets, properties, and rights (whether tangible or intangible) of Seller to the extent used in, or related to, the Business and not enumerated above; and

22.    All other assets, properties, and rights (whether tangible or intangible) of Holdings that are necessary for the operation of the Business after the Closing in the same manner as the Business is currently conducted.

*See* Stalking Horse APA § 1.2</td></tr>
<tr><td>**Assumed Liabilities**</td><td>Assumed Liabilities means only the following Liabilities, to be assumed by AAC:

1.    all accounts payable and trade payables, to the extent related to goods received by or non-professional services rendered to the Business in the ordinary course of business after the Petition Date and prior to the Closing (collectively, the "<u>Assumed Accounts Payable</u>");</td></tr>
</table>

| | |
|---|---|
| | **2.**     all Liabilities of the Transferred Employees that Buyer has specifically agreed to assume (the "<u>Covered Employee Liabilities</u>"); and<br><br>**3.**     all Cure Amounts under any Assigned Contract.<br><br>*See* Stalking Horse APA § 1.4 |
| **Agreements with Management or Key Employees**<br>Local Rule 6004-1(b)(iv)(B) | There are no agreements in place between AAC and the Debtors' current management team or key employees. The parties have agreed that Debtors' President, Mr. Hoffman, may negotiate with AAC and any other potential purchaser (so any agreement reached will not be exclusive), and that if the Stalking Horse reaches an agreement with Mr. Hoffman the terms of any such agreement will be disclosed to other Qualified Bidders. |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to the Stalking Horse APA or the Transaction Documents may be made only against (and are expressly limited to) the Persons that are expressly identified as parties thereto (the "**<u>Contracting Parties</u>**").  In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person. No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("**<u>Non-Party Affiliates</u>**"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to the Stalking Horse APA or the Transaction Documents or based on, in respect of, or by reason of the Stalking Horse APA or the Transaction Documents or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby knowingly and voluntarily waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby knowingly and voluntarily waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of the Stalking Horse APA or the Transaction Documents or any representation or |

| | |
|---|---|
| | warranty made in, in connection with, or as an inducement to the Stalking Horse APA or the Transaction Documents. |
| | *See* Stalking Horse APA § 9.13. |
| **Closing and Other Deadlines** Local Rule 6004-1(b)(iv)(E) | 1. On or before October 21, 2020 (or such later date as Administrative Agent may agree to in writing in its sole discretion), Loan Parties will obtain entry of an order of the Bankruptcy Court, in form and substance acceptable to Agent, granting the Sale Procedures Motion (the "Sale Procedures Order"). |
| | 2. On or before November 18, 2020 (or such later date as Administrative Agent may agree to in writing in its sole discretion), Loan Parties will conduct one or more auctions with respect to the Sale, and in accordance with, the Sale Procedures Order **("Auction")**. |
| | 3. On or before December 1, 2020 (or such later date as Administrative Agent may agree to in writing in its discretion), Loan Parties will obtain entry of an order of the Bankruptcy Court, in form and substance satisfactory to Agent ("Sale Order"), authorizing and approving the Sale pursuant to one or more definitive purchase agreements in form and substance acceptable to Administrative Agent, including, without limitation, with respect to the identity of the prospective purchaser, purchase price, any conditions to closing, the closing date, and other terms and conditions (each, a "Purchase Agreement"). |
| | 4. On or before December 4, 2020 (or such later date as Administrative Agent may agree to in writing in its discretion), Loan Parties shall have consummated the Sale, pursuant to, and in accordance with, the terms of the Sale Order and the Purchase Agreement(s), and remitted all of the proceeds thereof (net only of such fees, expenses, charges, or other amounts that may be expressly agreed to, in writing, by Administrative Agent) to Administrative Agent for application in accordance with the terms of the Financing Orders, as applicable (the consummation of such sales, the **"Sale Closing")**. |
| **Good Faith Deposit** Local Rule 6004-1(b)(iv)(F) | Substantially concurrent with the execution of the Stalking Horse APA, AAC has made a deposit with Debtors' counsel (the "**Deposit Agent**") in the amount of $225,000 by wire transfer of immediately available funds (the "**Deposit**"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor or any of the Debtors or AAC and shall be released (together with all accrued investment income thereon, if any) (and AAC and the Debtors shall deliver any written instructions to the Deposit Agent to effect the distribution of the Deposit) solely in accordance with the Stalking Horse APA. |
| | If the Stalking Horse APA is terminated pursuant to the Section 7, the Deposit, together with all accrued investment income thereon, if any, shall be retained by the Deposit Agent and delivered to the Debtors, subject to the Liens, claims, |

| | |
|---|---|
| | interests, and encumbrances of the "Agents," the other "Secured Parties," and "Factor" (as such terms are defined in the DIP Order).<br><br>*See* Stalking Horse APA §§ 2.3 and 7.6. |
| **Use of Proceeds**<br>Local Rule 6004-1(b)(iv)(H) | The Closing Payment Amount shall be in an amount sufficient for Payment in Full in cash of the Working Capital Debt, each as defined in that certain Subordination and Intercreditor Agreement dated as of March 22, 2018, as modified by that First Amendment to Subordination and Intercreditor Agreement dated August 11, 2020, and shall be used by the Debtors to cause all of the "Aggregate Debt" and all of the "Postpetition Factor Debt" to be "Paid in Full" (as defined in the DIP Order) on and as of the Closing Date (including the amount of all accruals of interest, fees and expenses arising on account of the Prepetition Senior Credit Facility through the Closing Date), which amount shall include all funds required to be paid into the Carveout (as defined in the DIP Order).<br><br>*See* Stalking Horse APA §§ 6.2(m) and (n). |
| **Tax Exemption**<br>Local Rule 6004-1(b)(iv)(I) | There are no tax exemptions sought in connection with the Sale Transaction. |
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | Access to records and premises shall be provided from the Closing until the date that is 180 calendar days after the entry of an order by the Court closing Seller's Bankruptcy Case.<br><br>Stalking Horse APA § 2.10 |
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | The Purchased Assets expressly exclude (i) all claims accruing in favor of Debtors' bankruptcy estate under Sections 544, 545 and 548-551 of the Bankruptcy Code, (ii) all claims against Persons under Section 547 of the Bankruptcy Code and all proceeds thereof, (iii) all claims to the extent related to or arising from an Excluded Contract or an Excluded Liability, (iv) any and all claims or causes of action against any administrative agent, collateral agent or other agent, lead arranger, any lender or any secured party related to any prepetition or post-petition credit facility, and (v) all commercial tort claims, in each case to the extent not included in the immediately foregoing clauses  (each, an "Excluded Action")<br><br>Stalking Horse APA § 1.3(f) |
| **Requested Findings as to Successor Liability** | **No Successor or Other Derivative Liability. Except as expressly set forth in the Asset Purchase Agreement, the Buyer and its affiliates, successors and assigns shall have no liability for any Claim or Excluded Liabilities, whether known or unknown as the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as** |

| Local Rule 6004-1(b)(iv)(L) | **a transferee, successor, alter ego, or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity, including Claims or Excluded Liabilities arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to the Debtors or any of Debtors' affiliates or predecessors or any current or former employees of any of the foregoing, including, without limitation, the MEPPs and any participation or other agreements related to the MEPPs, or the termination of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving the Debtors; and (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to (A) the Employee Retirement Income Security Act of 1974, as amended, (B) the Fair Labor Standards Act, (C) Title VII of the Civil Rights Act of 1964, (D) the Federal Rehabilitation Act of 1973, (E) the National Labor Relations Act, (F) the Worker Adjustment and Retraining Notification Act of 1988, (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (H) the Americans with Disabilities Act of 1990, (I) the Consolidated Omnibus Budget Reconciliation Act of 1985, (J) the Multiemployer Pension Plan Amendments Act of 1980, (K) state and local discrimination laws, (L) state and local unemployment compensation laws or any other similar state and local laws, (M) state workers' compensation laws or (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with the Debtor or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) any bulk sales or similar laws; (S) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (T) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.**<br><br>By virtue of the consummation of the Proposed Sale, the Buyer and its affiliates, successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to the Debtors, (ii) have, *de facto* or otherwise, merged with or into the Debtors, (iii) be a consolidation with the Debtors or their estates or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or their estates, business or operations, or any enterprise of the Debtors, in each case by any law or equity, and Buyer has not assumed nor is it in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except with respect to the Assumed Liabilities. Except as |

| | |
|---|---|
| | expressly set forth in the Asset Purchase Agreement, the Buyer and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, de facto merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligation of the Debtors arising prior to the Closing Date, including, without limitation, liabilities on account of any taxes or other fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Purchased Assets prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date.<br><br>*See* Sale Order ¶¶ 14-15. |
| **Credit Bid**<br>Local Rule 6004-1(b)(iv)(N) | The Stalking Horse APA includes a credit bid on account of Farragut's secured debt in an amount equal to $2,400,000 pursuant to section 363(k) of the Bankruptcy Code.<br><br>*See* Stalking Horse APA § 2.2(b). |
| **Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O) | This Motion seeks, and the proposed Bidding Procedures Order approves, relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).<br><br>*See* Bidding Procedures Order ¶ 31; *infra*, ¶¶ 78-79. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br>Local Rule 6004-1(c)(i)(C) | Subject to entry of the Bidding Procedures Order and those conditions specified in the Stalking Horse APA, AAC shall be entitled to payment of (i) a Break-up Fee equal to $225,000 (i.e., an amount equal to less than 1% of the Closing Payment Amount plus the Credit Bid) and (ii) Expense Reimbursement of up to $550,000 for reasonable and documented out-of-pocket fees and expenses incurred in connection with preparation, negotiation and documentation of the Stalking Horse APA and related agreements.<br><br>The Break-Up Fee and the Expense Reimbursement shall constitute allowed superpriority Administrative Expense Claims pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code; *provided*, that the priority of such superpriority Administrative Expense Claims shall be junior and subordinate in all respects to (x) Claims arising under the DIP Financing and DIP Order granted in favor of the holders of "Aggregate Debt" and "Postpetition Factor Debt" (as such terms are defined in the DIP Order), including, without limitation, in respect of adequate protection rights and shall be secured by Liens on all property of |

| | Seller's estate, senior to all other Liens other than Liens on the "Aggregate Collateral" (as defined in the DIP Order) securing the Aggregate Debt and the Postpetition Factor Debt (as such terms are defined in the DIP Order), and (y) the Carveout (as defined in the DIP Order). *See* Stalking Horse APA §7.3. |
|---|---|

## BIDDING PROCEDURES

**B.     Overview**

22.     The Bidding Procedures are designed to promote a competitive, fair, and expedient sale process that seeks to maximize the value of the Debtors' estates.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Purchased Assets on a schedule consistent with the milestones detailed in the Postpetition Loan Agreement, as defined in the DIP Order, the Stalking Horse APA, the Bidding Procedures, and the Debtors' chapter 11 objectives.

23.     As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated in their entirety herein.  Pursuant to Local Rule 6004-1, certain of the key terms of the Bidding Procedures are highlighted in the chart below.[10]

| MATERIAL TERMS OF THE BIDDING PROCEDURES AND RELATED ORDER | |
|---|---|
| **Qualification of Bidders**<br>Local Rule 6004-1(c)(i)(A) | Prior to the Bid Deadline, each party, other than AAC, who wishes to participate in the bidding process (a "**Potential Bidder**") must deliver the following to the Notice Parties (as defined in the Bidding Procedures):<br><br>i.     a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; |

---

[10]  To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

ii.     evidence of such entity's financial capability to acquire the Purchased Assets;

iii.    if such entity has been formed for the purpose of acquiring some or all of the Purchased Assets, a written commitment from such entity's equity holder(s), sponsor(s), or other financial backer(s) ("**Bid Sponsor**") to be responsible for such entity's obligations in connection with participating in the bidding process and acquiring the applicable Purchased Assets and evidence of the Bid Sponsor's financial capability to acquire the applicable Purchased Assets;

iv.     an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtors to a Potential Bidder) in form and substance satisfactory to the Debtors, in consultation with the Consultation Parties (as defined below); without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions; and

v.      any other evidence the Debtors, in consultation with the Consultation Parties, may reasonably request to evaluate the entity's fitness to participate in the bidding process or ability to timely acquire the applicable assets of the Debtors.

A Potential Bidder that delivers the documents and information described above or that the Debtors determine, in consultation with the Agents (as defined in the DIP Order, hereinafter, collectively, the "**Agents**") and the official committee of unsecured creditors (the "**Committee**"), appointed in these Chapter 11 Cases (collectively, the "**Consultation Parties**;" *provided*, that in the event that a Consultation Party submits a bid in the Auction, such party shall no longer be a Consultation Party until such time as such party withdraws such bid), is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale, and whose Qualified Bid is received by the Debtors no later than the Bid Deadline is deemed qualified (a "**Qualified Bidder**").

*See* Bidding Procedures at III.1.

Notwithstanding the foregoing requirements, AAC is deemed to be a Qualified Bidder provided that by the Bid Deadline it has waived the conditions set forth in section 6.2(h) of the APA, and has produced evidence as is reasonably necessary to demonstrate to the Debtors, in consultation with the Consultation Parties, that AAC has the financial ability to acquire the Purchased Assets, including, but

| | |
|---|---|
| | not limited to, written commitments from the Stalking Horse's equity holders, sponsors or other financial backers. *See* Bidding Procedures III.1 & 3. |
| **Due Diligence** | The Debtors will provide any Potential Bidder such due diligence access or additional information as the Debtors, in consultation with the Consultation Parties, deem appropriate, which may include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information. The Debtors must promptly advise AAC in the event any other Potential Bidder receives diligence AAC has not previously received and AAC will contemporaneously be provided with access to such diligence materials. All due diligence requests must be directed to PPC. To the extent reasonably practicable, PPC will also facilitate meetings between any interested Potential Bidders and the Debtors' management team, which meetings will proceed in a manner determined by the Debtors.<br><br>The Debtors and the Debtors' advisors will coordinate all reasonable requests from Potential Bidders for additional information and due diligence requests; *provided* that the Debtors may decline to provide such information to any Potential Bidder who, at such time and in the Debtors' business judgment, has not established, or who has raised doubt, that such Potential Bidder intends in good faith, or has the capacity, to consummate a Sale. The Debtors shall notify the Consultation Parties as to the identity of any such Potential Bidder and reasonably identify what information was not provided to them. No Potential Bidder or Qualified Bidder shall communicate with any of the Debtors' employees, landlords, vendors, or other Potential Bidders or Qualified Bidders with respect to any bid or Sale absent the prior written consent of the Debtors (email shall suffice); *provided* that, if such consent is given, a representative of the Debtors shall be present for or party to any such communications (unless otherwise agreed upon by the Debtors in writing (email shall suffice)).<br><br>For any Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold, redact, code, or delay providing any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such Potential Bidder at such time. The Debtors shall notify the Consultation Parties as to the identity of any such Potential Bidder and identify what information was not provided to such party.<br><br>The due diligence period will extend through and including the Bid Deadline. Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors after consultation with the Consultation Parties. |

| | |
|---|---|
| | *See* Bidding Procedures at III.2. |
| **Qualified Bids**<br>Local Rule 6004-1(c)(i)(B) | A bid will be considered a "Qualified Bid" only if the bid is submitted by a Qualified Bidder and the Debtors determine, after consultation with the Consultation Parties, that the bid complies with all of the following:<br><br>i. it is received by the Notice Parties prior to the Bid Deadline, unless the Bid Deadline is extended by the Debtors after consultation with the Consultation Parties, including the written consent of the Agents;<br><br>ii. it identifies the Purchased Assets to be purchased in cash or, if applicable, through a credit bid, that the applicable Qualified Bidder offers to purchase;<br><br>iii. with respect to a bid for multiple Purchased Assets, the allocation of value in U.S. dollars that the Qualified Bidder associates with each Purchased Asset or it offers to purchase all or substantially all of the Purchased Assets;<br><br>iv. it disclaims any right to receive any expense reimbursement, break-up fee, or similar type of payment in connection with the bid (other than fees associated with the Stalking Horse APA).  For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code;<br><br>v. it includes a signed writing stating that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder (each, as defined below), its offer shall remain irrevocable until the closing of the Sale to the Successful Bidder or the Back-up Bidder;<br><br>vi. it includes confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the submission of the bid;<br><br>vii. it contains no due diligence or financing contingencies of any kind; |

viii.    it includes a duly authorized and executed copy of an asset purchase agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "**Purchase Price**"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse APA (an "**Asset Purchase Agreement**"), and a proposed order for approval of the Sale by the Court;

ix.    it includes financial statements or other written evidence, including (if such bid contains any financing component of any kind) a firm, irrevocable commitment for financing, establishing the ability of the Qualified Bidder to consummate the proposed Sale and pay the Purchase Price in cash, such as will allow the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

x.    it identifies with particularity which Contracts and Leases the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related cure costs and the provision of adequate assurance of future performance (the "**Adequate Assurance Information**") to the counterparties to such Contracts and Leases;

xi.    it clearly states which liabilities and obligations of the Debtors the Qualified Bidder is agreeing to assume;

xii.    it includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid, (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Asset Purchase Agreement, and (iv) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

xiii.    it includes evidence, in form and substance reasonably satisfactory to the Debtors, in consultation with the Consultation Parties, of authorization and approval from the Qualified Bidder's board of directors (or comparable

governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

xiv.   it is accompanied by a good faith deposit (the "**Deposit**") in the form of a wire transfer (to a bank account specified by the Debtors, in consultation with the Consultation Parties), certified check or such other form acceptable to the Debtors, in consultation with the Consultation Parties, payable to the order of the Debtors (or such other party as the Debtors, in consultation with the Consultation Parties, may determine) in an amount equal to 5% of the aggregate cash portion of the Purchase Price of the bid;

   a.   All good faith deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder no later than five (5) Business Days following the conclusion of the Sale Hearing.

xv.   it states that the Qualified Bid is reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors after consultation with the Consultation Parties, which time frame shall include a closing by no later than December 4, 2020 or such other date as the Debtors, after consultation with the Consultation Parties, including the written consent of the Agents, determine to be appropriate;

xvi.   it states that the bidder consents to the jurisdiction of the Court and waives any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, and the Sale documents and the closing, as applicable;

xvii.   it contains an acknowledgement in writing that the bidder (a) has not engaged in any collusion with respect to any bids or the Sale, specifying that it did not agree with any Qualified Bidders or Potential Bidders to control price, (b) agrees not to engage in any collusion with respect to any bids, the Auction, or the Sale, and (c) by submitting a bid is agreeing, and shall be deemed to have agreed, (i) to abide by and honor the terms of the Bidding Procedures, and (ii) after the conclusion of the Auction, if any, not to submit a bid or seek to reopen the Auction; and

| | |
|---|---|
| | xviii.    it contains such other information as may be reasonably requested by the Debtors, in consultation with the Consultation Parties.<br><br>*See* Bidding Procedures at III.3.<br><br>Notwithstanding the foregoing requirements, the Stalking Horse APA is deemed a Qualified Bid provided that by the Bid Deadline the Stalking Horse Bidder has waived the conditions set forth in section 6.2(h) of the APA, and has produced by the Bid Deadline evidence as is reasonably necessary to demonstrate to the Debtors, in consultation with the Consultation Parties, that the Stalking Horse Bidder has the financial ability to acquire the Purchased Assets, including, but not limited to, written commitments from the Stalking Horse's equity holders, sponsors or other financial backers. *Id.* |
| **Bid Deadline** | **Each bid must be transmitted via email so as to be actually received on or before 5:00 p.m. (Eastern Time) on November 13, 2020.**<br><br>*See* Bidding Procedures at III. 4 & 6. |
| **Treatment of Deposits** | The Deposits of all Qualified Bidders (including AAC) shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Court; provided, however, that the Deposit of any Successful Bidder (including any Back-up Bidder that becomes a Successful Bidder) may be forfeited to the Debtors or credited toward the Purchase Price set forth in the Successful Bid, in either case as set forth in the Bidding Procedures. The Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Back-up Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Deposit of the Back-up Bidder, if any, shall be returned to such Back-up Bidder no later than three (3) business days after the closing of the transaction with the Successful Bidder. Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder (or Back-up Bidder, as applicable) timely closes on its transaction, its Deposit shall be credited towards the applicable Purchase Price(s). If the Successful Bidder (or Back-up Bidder, if applicable) fails to consummate a sale transaction because of a breach or failure to perform on the part of the Successful Bidder (or Back-up Bidder, if applicable), the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder (or Back-up Bidder, if applicable), and such Deposit shall irrevocably become property of the Debtors' estates as partial compensation for the damages caused to the Debtors and their estates as a result of such breach or failure to perform without prejudice to any claims, rights, or remedies of the Debtors or their estates for additional damages, except as provided in the Stalking Horse APA. |

|  | *See* Bidding Procedures at III.11. |
| --- | --- |
| **Auction Time and Location** | The Auction, if any, shall take place on November 18, 2020 at 10:00 a.m. (Eastern Time) at the offices of Young Conaway Stargatt & Taylor, LLP, or such later date, time, and location as selected by the Debtors after consultation with the Consultation Parties, including the written consent of the Agents, or by videoconference (and/or such other form of remote communication established by the Debtors in consultation with the Consultation Parties). The Auction, if any, shall be conducted in a timely fashion according to the procedures set forth herein.<br><br>*See* Bidding Procedures at III.4 & 9. |
| **Cancellation of Auction** | If no Qualified Bids other than the bid by AAC is received in accordance with the Bidding Procedures, then the Debtors shall cancel the Auction, and promptly file a notice of cancellation of the Auction and designation of the bid by the AAC as the Successful Bid.<br><br>*See* Bidding Procedures at III.8. |
| **Conduct of the Auction** | The Debtors and their professionals shall direct and preside over the Auction, if any, in consultation with the Consultation Parties. At the start of the Auction, the Debtors shall describe the material terms of the Starting Bid for the Purchased Assets on the record. The Debtors shall maintain a written transcript of the Auction and all bids made and announced at the Auction, if any, including the Starting Bid, all applicable Subsequent Bids, and the Successful Bid.<br><br>Part III.9 of the Bidding Procedures contain various other provisions governing the conduct of the Auction. |
| **Credit Bidding**<br>Local Rule 6004- 1(b)(iv)(N) | Any Qualified Bidder who has a valid, undisputed and perfected lien on any Purchased Assets (a "**Secured Creditor**") shall have the right to credit bid all or a portion of such Secured Creditor's allowed secured claims pursuant to section 363(k) of the Bankruptcy Code; *provided that* a credit bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay in full, in cash, all claims for which there are valid, perfected, and unavoidable liens on any of the Purchased Assets included in such bid that are senior in priority to those of the party seeking to credit bid (unless such senior lien holder otherwise consents to alternative treatment in writing).  All rights to credit bid shall be subject to the terms of the DIP Order.  For the avoidance of doubt, a Secured Creditor shall be required to provide cash consideration in respect of any assets to be acquired but that do not constitute collateral securing such Secured Creditor's claim(s), if any. Subject to the foregoing terms, the Stalking Horse Bidder will be entitled, but not obligated, to credit bid: (a) all or a portion of the value of the secured portion of Farragut's claims within the meaning of section 363(k) of the |

| | Bankruptcy Code; and (b) the value of the Stalking Horse Protections. |
| --- | --- |
| | Subject to the terms of Paragraph 10 of the DIP Order, each Agent, on behalf of itself and the other Secured Parties (as defined in the DIP Order), and Farragut (bidding through AAC) is and will be deemed to be a Secured Creditor for purposes of these Bidding Procedures. |
| | *See* Bidding Procedures Order ¶ 8; Bidding Procedures at III.5. |
| **Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O) | This Motion seeks, and the proposed Bidding Procedures Order approves, relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).<br><br>*See* Bidding Procedures Order ¶ 33; *infra*, ¶¶ 64-65. |
| **No-Shop or No- Solicitation Provisions**<br>Local Rule 6004-1(c)(i)(C)(1) | The Bidding Procedures Order and Bidding Procedures do not limit the Debtors' ability or right to solicit higher or otherwise better bids. The Sale Transaction contemplated by this Motion, the Bidding Procedures, and the Bidding Procedures Order calls for a fair and open bidding and auction process. |
| **Break-Up Fee and Expense Reimbursement**<br>Local Rule 6004-1(c)(i)(C)(2) | The Bidding Procedures Order approves and authorizes the Break-Up Fee and Expense Reimbursement Amount for the Stalking Horse Bidder pursuant to the amounts and conditions set forth in the Stalking Horse APA and the Bidding Procedures.<br><br>*See* Bidding Procedures Order ¶ 18. |
| **Initial Overbid and Bidding Increments**<br>Local Rule 6004-1(c)(i)(C)(3) | The Bidding Procedures provide for an initial overbid or a minimum bid increment of $100,000 plus the value of the Stalking Horse Protections.<br><br>*See* Bidding Procedures at III.9(g). |
| **Treatment of Break-Up Fee and Expense Reimbursement at Auction**<br>Local Rule 6004-1(c)(i)(C)(4) | For purposes of evaluating the value of the Purchase Price provided by each Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the Debtors shall give effect to the Stalking Horse Protections as well as any additional liabilities to be assumed by a Qualified Bidder, and any additional costs which may be imposed on the Debtors.<br><br>*See* Bidding Procedures at III.9(i). |
| **Modification of Bidding and Auction Procedures**<br>Local Rule 6004-1(c)(i)(D) | The Debtors may, in consultation with the Consultation Parties, including the written consent of the Agents, extend the Bid Deadline.<br><br>*See* Bidding Procedures Order ¶ III.6. |

| | |
|---|---|
| | The Debtors, after consultation with the Consultation Parties, may employ and announce at the Auction other or additional procedural rules that are reasonable under the circumstances for conducting the Auction, _provided_ that such rules (i) are not materially inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith, (ii) do not purport to abrogate or modify the Stalking Horse Protections, and (iii) are disclosed to each Qualified Bidder attending the Auction.<br><br>_See_ Bidding Procedures at III.9(f). |
| **Closing with Alternative Back-Up Bidders**<br>Local Rule 6004-1(c)(i)(E) | The Qualified Bidder(s) with the next highest or otherwise best Qualified Bid, as determined by the Debtors in consultation with the Consultation Parties, will be required to serve as the Back-Up Bidder and keep its bid open and irrevocable until the later to occur of twenty (20) days after the Sale Hearing and closing on the Successful Bid with the Successful Bidder. If the Successful Bidder fails to consummate the Sale Transaction, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized and directed to consummate the Sale Transaction with the Back-Up Bidder without further order of the Court.<br><br>_See_ Bidding Procedures at III.10. |
| **DIP Order** | Notwithstanding anything to the contrary contained in these Bidding Procedures or otherwise, any rights of the Agents to consent to the Sale of any portion of their collateral, including, without limitation, any Purchased Assets, on terms and conditions acceptable to such Agent (as applicable) are hereby expressly preserved and not modified, waived or impaired in any way by these Bidding Procedures or the Bidding Procedures Order. For the avoidance of doubt, nothing in these Bidding Procedures or the Bidding Procedures Order shall amend, modify or impair any provision of the DIP Order, or the rights of the Agents, any other "Secured Party," or "Factor" (as such terms are defined in the DIP Order) under the DIP Order, the Prepetition Documents, the Postpetition Documents, or the DIP Factoring Documents (as defined in the DIP Order), or otherwise.<br><br>_See_ Bidding Procedures at V. |
| **Reservation of Rights** | The Debtors reserve their rights to modify these Bidding Procedures, in their business judgment and after consultation with the Consultation Parties, in any manner that will best promote the goals of these Bidding Procedures or impose at or prior to the Auction, additional customary terms and conditions on a Sale, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures, (b) adjourning the Auction, (c) adding or modifying procedural rules that are reasonably necessary or |

|  | advisable under the circumstances for conducting the Auction, (d) canceling the Auction, and (e) rejecting any or all bids or Qualified Bids; *provided* that any modification to these Bidding Procedures which extends the timelines included herein shall be subject to the consent of the Agents, and the Stalking Horse Bidder, whose consent shall not be unreasonably withheld; *provided, further,* that any such modification shall treat the Stalking Horse Bidder as a Qualified Bidder provided that by the Bid Deadline it has waived the conditions set forth in section 6.2(h) of the APA, and has produced by the Bid Deadline evidence as is reasonably necessary to demonstrate to the Debtors, in consultation with the Consultation Parties, that the Stalking Horse Bidder has the financial ability to acquire the Purchased Assets, including, but not limited to, written commitments from the Stalking Horse's equity holders, sponsors or other financial backers; *provided, further,* that any modification to these Bidding Procedures shall not be inconsistent with the terms of the Bidding Procedures Order, the Bankruptcy Code, or the Bankruptcy Rules. The Debtors shall provide written notice of any such modification to the Stalking Horse Bidder and each Qualified Bidder (and their respective counsel) as soon as reasonably practicable (email shall suffice).<br><br>*See* Bidding Procedures at III. |
|---|---|

## C. Key Dates and Deadlines

24. The Debtors propose the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:[11]

| **September 30, 2020** | Deadline to file proposed Sale Order |
|---|---|
| **October 13, 2020 at 4:00 p.m. (ET)** | Deadline for objections to the Bidding Procedures, designation of the Stalking Horse, approval of the Stalking Horse Protections and entry of the Bidding Procedures Order |
| **October 16, 2020** | Hearing to consider approval of the Bidding Procedures, the designation of the Stalking Horse, approval of the Stalking Horse Protections and entry of the Bidding Procedures Order |

---

[11] The Debtors, in consultation with the Consultation Parties, reserve the right to change the proposed sale-related deadlines at any time prior to the hearing to consider approval of the Bidding Procedures.

| October 20, 2020 | Deadline for Debtors to file with the Court the Contracts Schedule |
|---|---|
| November 3, 2020, at 4:00 p.m. (Eastern Time) | Deadline for Cure Objections and for Stalking Horse to provide adequate assurance information |
| November 13, 2020 at 5:00 p.m. (Eastern Time) | Bid Deadline |
| November 16, 2020, at 5:00 p.m. (Eastern Time) | Deadline for Debtors to notify Potential Bidders of their status as Qualified Bidders |
| November 17, 2020, at 5:00 p.m. (Eastern Time) | Objection deadline to Sale (including to the Stalking Horse Bidder) and to Stalking Horse adequate assurance |
| November 18, 2020, at 10:00 a.m. (Eastern Time) | Auction to be held at offices of Young Conaway Stargatt & Taylor, LLP (if necessary) and/or by videoconference (or such other form of remote communication established by the Debtors in consultation with the Consultation Parties). |
| November 19, 2020 | Target date for the Debtors to file with the Court the Notice of Auction Results. |
| November 23, 2020 at 12 noon (Eastern time) | Deadline to object to conduct of the Auction, the designation of the Successful Bidder (if not the Stalking Horse Bidder), and the Sale Transaction to the Successful Bidder (if not the Stalking Horse Bidder) and to adequate assurance provided by the Successful Bidder (if not the Stalking Horse Bidder) |
| November 24, 2020 at 3:00 p.m. (Eastern Time) | Proposed date of the Sale Hearing to consider approval of Sale Transaction |
| December 1, 2020 | Deadline for entry of Sale Order |
| December 4, 2020 | Outside date for closing of Sale Transaction in Stalking Horse APA |

D.    **Noticing Procedures**

25.    The Bidding Procedures provide the following "**Noticing Procedures**":

a.  **<u>Sale Notice and Publication</u>**.  Within two (2) Business Days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by first-class mail upon: (i) the Office of the United States Trustee for the District of Delaware (the "**<u>U.S. Trustee</u>**"); (ii) counsel for the Committee: (a) Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020,tAttn: Robert M. Hirsch email: rhirsh@lowenstein.com and(b) Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, New Jersey 07068, Attn: Bruce Buechler email: bbuechler@lowenstein.com; and (c) Bayard, P.A., 600 N. King Street, Suite 400, Wilmington, Delaware 19801, Attn: Erin R. Fay email: EFay@bayardlaw.com;(iii) all known creditors of the Debtors; (iv) counsel to the DIP Agent: (a) Goldberg Kohn Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603, Attn: Zachary Garrett email: zachary.garrett@goldbergkohn.com and (b) Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19899, Attn: Jeremy Ryan email: jryan@potteranderson.com; (v) counsel to the Factor: (a) Levinson Arshonsky & Kurtz, LLP, 15303 Ventura Blvd., Suite 1650, Sherman Oaks, CA 91403, Attention Steven N. Kurtz, email: skurtz@laklawyers.com and (b) Fineman Krekstein & Harris PC 1300 N King Street, Wilmington, Delaware 19801, Attn: Deirdre M. Richards, email: drichards@finemanlawfirm.com; (vi) counsel to AAC, Jenner & Block LLP 333 N Clark Street, Chicago Illinois, 60654-3456; Attn: Vincent E. Lazar; email: vlazar@jenner.com and Peter H. Rosenbaum email: prosenbaum@jenner.com; (vii) the Internal Revenue Service; (viii) all applicable state and local taxing authorities; (ix) the Office of the United States Attorney for the District of Delaware;(x) the offices of the attorneys general for the states in which the Debtors operate;(xi) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Debtors' assets; (xii) other potentially interested parties identified by the Debtors, any of the Consultation Parties or any of their respective advisors; (xiii) all such other entities as may be required by applicable Bankruptcy Rules or applicable Local Rules or as may be reasonably requested by the Stalking Horse Bidder; (xiv) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Successful Bidder, and; (xv) all other known parties with any interest in, or that have asserted any lien, claim, or encumbrance in or upon, any assets of the Debtors that could potentially be acquired by the Successful Bidder (xvi)any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**<u>Sale Notice Parties</u>**").  On or as soon as practicable after such date, the Debtors will publish the Sale Notice, with such modifications as may be appropriate for purposes of publication, once in the National Edition of the Wall Street Journal or the New York Times and, to the extent the Debtors, in consultation with the Consultation Parties, deem appropriate, in any other local or regional publications.

b.  **Notice of Determination of Qualified Bids**. The Debtors, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as a Qualified Bid and will notify Potential Bidders whether they have been selected as Qualified Bidders by no later than **November 16, 2020, at 5:00 p.m. (Eastern Daylight Time)**.

   i.  At least one (1) calendar day prior to the Auction, the Debtors will provide all Qualified Bidders with one (1) copy of the Qualified Bid that the Debtors, in consultation with the Consultation Parties, believe is the highest or otherwise best offer for the Purchased Assets.

c.  **Notice of Hearing if Auction Not Held**. If no Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Debtors will not conduct the Auction for the Purchased Assets and will file with the Court, serve on the Sale Notice Parties and cause to be published on the Debtors' case information website (located at www.arandell@bmcgroup.com) (the "**Case Information Website**") a notice (i) indicating that the Auction for the Purchased Assets has been canceled, (ii) indicating that the Stalking Horse Bid is the Successful Bidder with respect to the Purchased Assets, and (iii) setting forth the date and time of the Sale Hearing.

d.  **Notice of Auction Results**. If an Auction is held, promptly following the selection of the Successful Bid(s) and Back-up Bid(s), if any, the Debtors shall file a notice of the Successful Bid(s) and Back-up Bid(s), if any (the "**Notice of Auction Results**"), with the Court and cause the Notice of Auction Results to be published on the Case Information Website.

26.  The Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, the dates and deadlines identified in paragraph __ above. Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

27.  In connection with the Sale Transaction, the Debtors anticipate that they will assume and assign to the Successful Bidder (or its designated assignee(s)) certain of the Contracts and Leases, as they may be modified or supplemented, pursuant to section 365(b) of the Bankruptcy Code. Accordingly, the Debtors hereby seek approval of the proposed Assumption and Assignment Procedures set forth below, which are designed to, among other things, (a) outline

the process by which the Debtors will serve notice to all Counterparties regarding the proposed assumption and assignment, related Cure Costs, if any, and information regarding the Stalking Horse Bidder's or such other Successful Bidder's adequate assurance of future performance, and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of the Contracts and Leases.  Specifically, the Assumption and Assignment Procedures are as follows:

a. **Assumed Contracts Schedule**.  At least fourteen (14) calendar days prior to the deadline to file a Sale Objection (as defined in the Bidding Procedures Order), the Debtors shall file with the Court, and cause to be published on the Case Information Website, the Potential Assumption and Assignment Notice that specifies (i) each of the Contracts and Leases that may be assumed and assigned in connection with the Sale Transaction, including the name of each Counterparty, and (ii) the proposed Cure Cost with respect to each Contract and Lease (the "**Contracts Schedule**"). Within such time period, the Potential Assumption and Assignment Notice shall also be served on each Counterparty listed on the Contracts Schedule via first class mail.

b. **Assumption and Assignment Objections**.

i. <u>Objection Deadlines</u>.  Any Counterparty may object to the proposed assumption or assignment of its Contract or Lease, the Debtors' proposed Cure Costs, if any, or the ability of the Stalking Horse Bidder to provide adequate assurance of future performance (an "**Assumption and Assignment Objection**").  Except in the event that the Stalking Horse Bidder is not the Successful Bidder, all Assumption and Assignment Objections must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs the Counterparty believes are required to cure defaults under the relevant Contract or Lease, (d) be filed by no later than **November 17, 2020, at 4:00 p.m. (Eastern Daylight Time)** and (e) be served on (i) counsel to the Debtors, (a) Steinhilber Swanson LLP, 122 W. Washington Avenue, Suite 850, Madison, WI 53703; Attn: James Sweet; email: jsweet@steinhilberswanson.com and Michael P. Richman email: mrichman@steinhilberswanson.com and (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N. King Street, Wilmington, Delaware 19801 Attn:  Michael Nestor email: mnestor@ycst.com and Andrew Magaziner email: amagaziner@ycst.com, (ii) counsel to the Official Committee of Unsecured Creditors, (a) Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020; Attn: Robert M. Hirsch; email: rhirsh@lowenstein.com  and (b) Lowenstein Sandler LLP,

One Lowenstein Drive, Roseland, New Jersey 07068; Attn: Bruce Buechler; E-mail: bbuechler@lowenstein.com (iii) counsel to the DIP Agent, (a) Goldberg Kohn Ltd, Attn: Zachary J. Garrett email: Zachary.garrett@goldbergkohn.com and (b) Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19899-0951; Attn: Jeremy Ryan; email: jryan@potteranderson.com, (iv), counsel to the Factor: (a)Levinson Arshonsky & Kurtz, LLP, 15303 Ventura Blvd., Suite 1650, Sherman Oaks, CA 91403; Attention Steven N. Kurtz; email: skurtz@laklawyers.com and (b)local counsel to the Factor: Fineman Krekstein & Harris 1300 N. King Street, Wilmington, Delaware 19801; Attn: Deirdre M. Richards; email: drichards@finemanlawfirm.com (vi) counsel to AAC, Jenner & Block LLP (Attn: Vincent E. Lazar (vlazar@jenner.com) and Peter H. Rosenbaum (prosenbaum@jenner.com, and (vii) and (vii) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801;Attn: Rosa Sierra (rosa.sierra@usdoj.gov (the (collectively, the "**Assumption and Assignment Objection Notice Parties**").

ii.   Resolution of Assumption and Assignment Objections.  If a Counterparty files a timely Assumption and Assignment Objection, such objection shall be heard at the Sale Hearing or such later date that the Debtors, in consultation with the Successful Bidder and the Consultation Parties, shall determine in their discretion (subject to the Court's calendar).

iii.   Failure To File Timely Assumption and Assignment Objection.  If a Counterparty fails to file with the Court and serve on the Assumption and Assignment Objection Notice Parties a timely Assumption and Assignment Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the assumption or assignment of its Contract or Lease, and notwithstanding anything to the contrary in the Contract or Lease, or any other document, the Cure Costs set forth in the Potential Assumption and Assignment Notice or the Supplemental Assumption and Assignment Notice (as defined below) shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Contract or Lease under section 365(b) of the Bankruptcy Code arising out of or related to the Contract or Lease following the assumption and assignment thereof, whether known or unknown, due or to become due, accrued, absolute, contingent or otherwise, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Contract or Lease against the Debtors, the Successful Bidder or the property of any of them.

c.   **Modification of Assumed Contracts Schedule**.

i.   Unless otherwise provided in the Successful Bidder's Asset Purchase Agreement, at any time prior to three (3) Business Days prior to closing, the Successful Bidder may elect to exclude any Contract or Lease from the

Contracts Schedule by providing to the Debtors written notice of its election to exclude such Contract or Lease.  Any Contract or Lease that remains on the Contracts Schedule as of such date, shall be assumed by the Debtors and assigned to the Successful Bidder as part of the Sale Transaction (the "**Assumed Contracts and Assumed Leases**"), subject to the resolution of any Assumption and Assignment Objection with respect to such contract or lease.

ii.     In the event that any Contract or Lease is added to the Contracts Schedule or previously-stated Cure Costs are modified, in accordance with the Stalking Horse APA, the Successful Bidder's Asset Purchase Agreement or the procedures set forth in the Bidding Procedures Order, the Debtors will promptly serve a supplemental assumption and assignment notice, by overnight mail and, if known, e-mail, on the applicable Counterparty (each, a "**Supplemental Assumption and Assignment Notice**").  Each Supplemental Assumption and Assignment Notice will include the same information with respect to the applicable Contract or Lease as is required to be included in the Potential Assumption and Assignment Notice.

iii.    Any Counterparty listed on a Supplemental Assumption and Assignment Notice whose Contract or Lease is proposed to be assumed and assigned may object to the proposed assumption or assignment of its Contract or Lease, the Debtors' proposed Cure Costs, if any, or the ability of the Successful Bidder to provide adequate assurance of future performance (a "**Supplemental Assumption and Assignment Objection**").  All Supplemental Assumption and Assignment Objections must (i) be in writing, (ii) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (iii) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Cost the Counterparty believes is required to cure defaults under the relevant Contract or Lease, (iv) be filed by no later than **seven (7) calendar days from the date of service of such Supplemental Assumption and Assignment Notice** and (v) be served on the Assumption and Assignment Objection Notice Parties.  Each Supplemental Assumption and Assignment Objection, if any, shall be resolved in the same manner as an Assumption and Assignment Objection.

d.   **Post-Auction Objection**.  If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, then the Debtors shall serve the Notice of Auction Results on each Counterparty that received a Potential Assumption and Assignment Notice and any Supplemental Assumption and Assignment Notice at the same time as such Notice of Auction Results is filed with the Court and published on the Case Management Website and shall provide each such Counterparty with the adequate assurance information of the Successful Bidder.  Objections of any Counterparty related solely to the identity of and adequate assurance of future performance provided by the Successful Bidder must (i) be in writing, (ii) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (iii) state, with specificity,

the legal and factual bases thereof, (iv) be filed at or before the Sale Hearing and (v) be served on the Assumption and Assignment Objection Notice Parties.

e.  **Reservation of Rights**.  The inclusion of a Contract or Lease, or Cure Costs with respect thereto on a Potential Assumption and Assignment Notice, the Contracts Schedule or a Supplemental Assumption and Assignment Notice shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder(s) or any other party in interest that such Contract or Lease is an executory contract or unexpired lease of the Debtors within the meaning of the Bankruptcy Code.  The Debtors reserve all of their rights, claims, and causes of action with respect to each Contract and Lease listed on the Potential Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice and Contracts Schedule.  The Debtors' inclusion of any Contract or Lease on the Potential Assumption and Assignment Notice, Supplemental Assumption and Assignment Notice and Contracts Schedule shall not be a guarantee that such Contract or Lease ultimately will be assumed or assumed and assigned.

## APPROVAL OF THE RELIEF REQUESTED IS WARRANTED AND IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ECONOMIC STAKEHOLDERS

**A.    The Proposed Bidding Procedures Are Fair, Appropriate and Should Be Approved**

28.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See Burtch v. Ganz (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and…maximize the value of the debtor's assets").

29.     The Bidding Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Purchased Assets.  Given the time constraints, and in light of the extensive prepetition and postpetition marketing process, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Purchased Assets.  Additionally, and as described in greater detail above, given the constraints placed on the Debtors' business by the COVID-19 pandemic and the resulting uncertainty for the Debtors, the sale timeline proposed herein is necessary to avoid irreparable harm to the Debtors and their estates.   The Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale Transaction. Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their estates and all parties in interest.

## B.     The Proposed Sale Transaction Satisfies the Requirements of Section 363 of the Bankruptcy Code

30.     Ample authority exists for approval of the Sale Transaction contemplated by this Motion.  Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th

Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983).

31.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was provided to interested parties, (c) whether the sale will produce a fair and reasonable price for the property, and (d) whether the parties have acted in good faith.  *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry.  Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. at 656.

**1.      *The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale Transaction***

32.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders.  *See*, *e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

33.     As set forth above, a strong business justification exists for the sale of the Purchased Assets as described herein.  An orderly and expeditious sale of the Purchased Assets is critical to

maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders.

### 2.     *The Noticing Procedures Are Reasonable and Appropriate*

34.     The Noticing Procedures described above are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate and timely notice of, among other things, the proposed Sale Transaction, the Bidding Procedures, the Auction, and the Sale Hearing.

### 3.     *The Proposed Sale Transaction Will Produce a Fair and Reasonable Purchase Price for the Purchased Assets*

35.     As set forth above, the Debtors believe that the proposed sale process will produce a fair and reasonable purchase price for the Purchased Assets.  The Stalking Horse Bid is an offer to purchase the Purchased Assets and will serve as the baseline for the sale process.  Given the prepetition and continuing postpetition marketing process, as described herein, the Debtors believe that the postpetition sale process will culminate in the Debtors obtaining the highest or otherwise best offer for such assets available under the circumstances.

### 4.     *The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code*

36.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale … to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely." *In re Abbotts Dairies*, 788 F.2d at 147; *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m)…provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

37.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *In re Abbotts Diaries*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).

38.     In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession, the trustee, or other bidders to demonstrate a lack of good faith.  *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders").  Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings."  *In re Pisces Leasing*

*Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

39.     The Debtors submit that the Stalking Horse Bidder is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.   The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse APA without collusion, in good faith, and through extensive arm's length negotiations.   Indeed, the Stalking Horse Bidder and the Debtors have engaged separate counsel to represent their respective interests in the negotiation of the Stalking Horse APA and in the sale process, and the negotiations were not only at arm's-length, and vigorous, but were at times heated.   To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse APA to be set aside under section 363(m) of the Bankruptcy Code.

40.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.   Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Purchased Assets.   Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's length and in good faith.   Accordingly, the Debtors seek a finding that any Successful Bidder (including the Stalking Horse Bidder) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

41.     Based on the foregoing, the Debtors submit that they have demonstrated that the proposed Sale Transaction is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**C.    The Break-Up Fee and Expense Reimbursement Amount Have Sound Business Purposes, Are Fair and Reasonable and Should Be Approved**

42.    As noted above, the Stalking Horse APA provides for a Break-Up Fee equal to $225,000 (*i.e.*, an amount equal to less than 1% of the  Closing Payment Amount plus the Credit Bid (as defined in the Stalking Horse APA); and for an Expense Reimbursement Amount of up to $550,000.  Such amounts are only payable if the conditions applicable to payment of such amounts that are set forth in the Stalking Horse APA and the Bid Procedures are satisfied.  Such amounts shall also only be payable to the Stalking Horse Bidder.  The Stalking Horse Bidder's claim for payment of such amounts shall in all cases be subordinate and junior to (i) the liens, claims, interests, and encumbrances of the "Agents," the other "Secured Parties," and the "Factor" related to the "Aggregate Debt" and the "Postpetition Factor Debt" (as such terms are defined in the DIP Order), and (ii) the Carveout (as defined in the DIP Order).

43.    The Debtors believe that the Stalking Horse Protections are necessary for the Stalking Horse Bidder to enter into the Stalking Horse APA.  While a small portion of the consideration for the Purchased Assets under the Stalking Horse APA will be in the form of a credit bid by Farragut, the Stalking Horse Protections are nevertheless reasonable given the amount of cash component of the Purchase Price.  In addition, the Debtors believe that the presence of the Stalking Horse Bidder will set a floor for the value of the Purchased Assets and attract other potential buyers to bid for such assets, thereby maximizing the realizable value of the Purchased Assets for the benefit of the Debtors' estates, their creditors, and all other parties in interest. Further, the Debtors believe that the Stalking Horse Protections are reasonable given the cash consideration being paid in connection with the proposed transaction.

44.    Approval of the Stalking Horse Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have

identified at least two instances in which bid protections may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533.  Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *See id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

45.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a.      the presence of self-dealing or manipulation in negotiating the break-up fee;

b.      whether the fee harms, rather than encourages, bidding;

c.      the reasonableness of the break-up fee relative to the purchase price;

d.      whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.      the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.      the correlation of the fee to a maximum value of the debtor's estate;

g.      the support of the principal secured creditors and creditors' committees of the break-up fee;

h.      the benefits of the safeguards to the debtor's estate; and

i.      the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

46.     While none of the factors is dispositive, an application of the facts to several of such factors supports the approval of the Stalking Horse Protections.  In particular, and as is set forth in greater detail above, the Stalking Horse Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to secure an adequate floor for the Purchased Assets and to therefore insist that competing bids be materially higher or otherwise better than the Stalking Horse Bid—a clear benefit to the Debtors' estates. The Stalking Horse Protections were approved by the Debtors, and were the result of good faith, arms' length negotiations between the Debtors and the Stalking Horse Bidder.  While the Debtors sought to minimize these bid protections, the Stalking Horse Bidder would not agree to act as a stalking horse without the Stalking Horse Protections given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction.  Without the Stalking Horse Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Purchased Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  The bid of the Stalking Horse Bidder sends a message to all potential bidders that the Purchased Assets are at least worth the Purchase Price.  Therefore, without the benefit of the bid of the Stalking Horse Bidder (*i.e.*, a bid providing the floor), the bids received at auction for the Purchased Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

47.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable."  *In re Integrated Res., Inc.*, 147 B.R. at 660.  The Debtors do not believe that the Stalking Horse Protections will stifle bidding.  To the contrary, the Debtors believe that, should the Auction be held, such bid protections will encourage bidding by serving "any of three possible useful functions: (i) to attract or retain a potentially successful bid,

(ii) to establish a bid standard or minimum for other bidders to follow, or (iii) to attract additional bidders." *Id.* at 662.

48.     Here, the bid of the Stalking Horse Bidder serves all three functions. *First*, the Stalking Horse Bidder would not enter into the Stalking Horse APA without the Stalking Horse Protections. *Second*, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of the Stalking Horse Bidder. *Third*, the bid of the Stalking Horse Bidder attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Bidder heavily negotiated, including, among other things, the Stalking Horse APA and the schedules thereto, in making their bid. In sum, if the Purchased Assets are sold to a Successful Bidder other than the Stalking Horse Bidder, the Sale Transaction likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Purchased Assets and establishing a minimum acceptable price and offer against which other parties can bid.

49.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id.*

50.     Here, the Break-Up Fee is an amount equal to less than 1% of the consideration provided under the Stalking Horse Purchase APA. When considered together with the Expense Reimbursement Amount of up to $550,000, the combined totals of the Break-Up Fee and Expense Reimbursement are consistent with the range of bid protections typically paid in sale transactions that have been approved by this Court. Given the size of the Purchase Price, the Debtors believe

that the amount of the Stalking Horse Protections is appropriate.  Moreover, courts in this district have previously approved the grant of superpriority administrative expense status to claims for break-up fees and expense reimbursements.  *See, e.g.*, *In re Exide Holdings, Inc., et al.*, No. 20-11157 (CSS) (D.I. 344) (Bankr. D. Del. June 19, 2020) (approving a capped expense reimbursement that was negotiated at arm's-length and in good faith and was necessary to ensure that the bidder would continue to pursue its credit bid and the sale transaction); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019).

**D.    The Purchased Assets Should Be Sold Sale Free and Clear of Liens, Claims, Interests and Encumbrances Under Section 363(f) of the Bankruptcy Code and Successor Liability Claims**

51.    In the interest of attracting the best offers, the Purchased Assets should be sold free and clear of any and all liens, claims, interests and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests and encumbrances attaching to the proceeds of the applicable sale in the same order of relative priority, and with the same validity, force, and effect as existed immediately prior to the consummation of such sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if any one of the following conditions is satisfied:

a.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.    such entity consents;

c.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d.    such interest is in bona fide dispute; or

e.    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

52.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

53.     The Debtors submit, and to the extent necessary will demonstrate at the Sale Hearing, that the sale of the Purchased Assets free and clear of all liens, claims, interests, and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code. All of the "Aggregate Debt" and the "Postpetition Factor Debt" (as such terms are defined in the DIP Order) will be "Paid in Full" (as defined in the DIP Order) upon, and in connection with, the consummation of the Sale Transaction. Moreover, the Debtors will send the Sale Notice to any other purported prepetition lienholders. If such lienholders do not object to the proposed Sale Transaction, then their consent should reasonably be presumed. Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, or encumbrance on any of the Purchased Assets timely objects to this Motion, such party shall be deemed to have consented to any Sale Transaction approved at the Sale Hearing. *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent

to the relief requested therein).  Accordingly, the Debtors request that the Court authorize the sale of the Purchased Assets free and clear of any liens, claims, interests, and encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances attaching to the proceeds thereof in the same order of relative priority, with the same validity, force, and effect as prior to such.

54.      It is also appropriate to sell the Purchased Assets free and clear of successor liability relating to the Debtors' business.  Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is the successor in interest to one or more of the Debtors.   Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Ormet*, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an under-funded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

55.      The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, potential bidders may choose not to participate in the Auction

or, if they did, would submit reduced bid amounts.  To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' business but should hold the Purchased Assets free and clear.

**E.    Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized**

56.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice).  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

57.    Any assumption of the Contracts and Leases is an exercise of the Debtors' sound business judgment because the transfer of such Contracts and Leases is necessary to the Debtors' ability to obtain the best value for the Purchased Assets.  The assumption and assignment of Contracts and Leases is a critical component of the Stalking Horse APA.  Given that consummation of the Sale Transaction is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Contracts and Leases is an exercise of sound business judgment and, therefore, should be approved.

58.     The consummation of any Sale Transaction involving the assignment of a Contract or Lease will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) of the Bankruptcy Code requires the cure of any outstanding defaults under the Contracts and Leases to be assumed, or that the Debtors provide adequate assurance that such defaults will be promptly cured.  The Debtors' assumption and assignment of the Contracts and Leases will be contingent upon payment of the Cure Costs and effective only upon the closing of the Sale Transaction or any later applicable date of assumption and assignment of such Contract or Lease.  As set forth above, the Debtors propose to file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice, which will set forth the Debtors' good faith calculations of Cure Costs with respect to each Contract and Lease listed on such Potential Assumption and Assignment Notice.  Counterparties will have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts and Leases in advance of the Sale Hearing.

59.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").

Among other things, adequate assurance may be provided by evidencing the assignee's financial

health and experience in managing the type of enterprise or property assigned.  See *In re Bygaph,*

*Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is

present when the prospective assignee of a lease has financial resources and has expressed

willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

60.    As set forth above and in the Bidding Procedures, for a bid to qualify as a Qualified

Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability

of its designated assignee, if applicable) to perform under the Contracts and Leases that it wishes

for the Debtors to assume and assign.  Each affected Counterparty will have an opportunity to

object to the ability of the Successful Bidder to provide adequate assurance as provided in the

Bidding Procedures Order.  To the extent necessary, the Debtors will present facts at the Sale

Hearing to show the financial wherewithal, willingness and ability of the Successful Bidder to

perform under the Contracts and Leases that it wishes for the Debtors to assume and assign.

61.    In addition, to facilitate the assumption and assignment of the Assumed Contracts

and Assumed Leases, the Debtors further request that the Court find that all anti-assignment

provisions contained therein, whether such provisions expressly prohibit or have the effect of

restricting or limiting assignment of such Contract or Lease, are unenforceable and prohibited

pursuant to section 365(f) of the Bankruptcy Code.[12]

---

[12]  Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory
contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment
of such contract or lease, the trustee may assign such contract or lease . . . ." 11 U.S.C. § 365(f)(1).  Section
365(f)(3) of the Bankruptcy Code further provides that "[n]otwithstanding a provision in an executory contract or
unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the
debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account
of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or
modified under such provision because of the assumption or assignment of such contract or lease by the trustee."
11 U.S.C. § 365(f)(3).

**F.     The Form, Manner and Extent of Notice of the Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances**

62.     The Debtors will serve the Sale Notice and Potential Assumption and Assignment Notice and propose to publish the Sale Notice in the National Edition of the Wall Street Journal or the New York Times in accordance with the Bidding Procedures Order.  The notice of the proposed Sale Transaction to be provided by the Debtors as set forth herein sufficiently describes the terms and conditions of the proposed Sale Transaction.

63.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements:

(a)     <u>Section 363 Notice</u> – section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing."  Under section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A).  As set forth above, creditors will be provided notice of the salient details regarding this Motion and the Sale Hearing through service of this Motion, the Sale Notice, and the Potential Assumption and Assignment Notice, each as described herein.  Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

(b)     <u>Bankruptcy Rule 2002</u> – Bankruptcy Rule 2002 requires twenty-one (21) days' notice of the proposed sale of property other than in the ordinary course of business.  In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002.  As set forth above, the notice of this Motion that has been and will be provided by the Debtors satisfies each of these requirements.

(c)     <u>Bankruptcy Rules 6004 and 6006</u> – Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business comply with Bankruptcy Rule 2002.  As set forth above, the Debtors have complied with Bankruptcy Rule 2002.  Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the non-Debtor counterparty to such contract or lease, as well as on other parties in interest as the Court may direct.  The Sale Notice and the Potential Assumption and Assignment Notice have been or will be served

on the Counterparties to the contracts to be assumed and assigned, thereby satisfying this requirement.

(d)     <u>Procedural Due Process</u> – The notices of this Motion and the Sale Transaction that are being provided as described herein, including the notice being provided by publication as described herein and the Bidding Procedures Order, are "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Motion, the Sale Transaction, the Bidding Procedures and the other relief requested herein.

64.     The Debtors submit that the notice they have provided and intend to provide as outlined above with respect to the proposed Sale Transaction, the Bidding Procedures, the Break-Up Fee, the Expense Reimbursement, and the Cure Costs, as applicable, is reasonable and appropriate and constitutes good and adequate notice of the sale of their assets and the procedures and proceedings related thereto and therefore should be approved by this Court.

## **WAIVER OF BANKRUPTCY RULES 6004(a), 6004(h) AND 6006(d)**

65.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

66.     The Debtors believe that the Sale Transaction should be consummated as soon as practicable to preserve and maximize value. Accordingly, the Debtors request that any Sale Order approving the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts and Assumed Leases be effective immediately upon entry of such order and that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## **NOTICE**

67.     Notice of this Motion will be provided to (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (ii) proposed counsel to the Committee: Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York  10020;Attn: Robert M. Hirsch; email: rhirsh@lowenstein.com  and Lowenstein Sandler LLP,  One Lowenstein Drive, Roseland, New Jersey 07068; Attn: Bruce Buechler; E-mail: bbuechler@lowenstein.com (iii) proposed local counsel for the Committee: Bayard, P.A.: 600 N. King Street, Suite 400, Wilmington, Delaware 19801 Attn: Erin R. Fay email EFay@bayardlaw.com, (iv) counsel to the DIP Agent: Goldberg Kohn Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603; Attn: Zachary Garrett; email: zachary.garrett@goldbergkohn.com; (v) local counsel to DIP Agent: Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19899-0951; Attn: Jeremy Ryan; email:jryan@potteranderson.com; (vi) counsel to the Factor: Levinson Arshonsky & Kurtz, LLP, 15303 Ventura Blvd., Suite 1650, Sherman Oaks, CA 91403; Attention Steven N. Kurtz; email: skurtz@laklawyers.com; (vii) local counsel to the Factor: Fineman Krekstein & Harris PC 1300 N King Street, Wilmington, Delaware 19801; Attention Deirdre M. Richards; email drichards@finemanlawfirm.com  (viii) counsel to AAC, Jenner & Block LLP 333 N Clark Street, Chicago Illinois, 60654-3456;Attn: Vincent E. Lazar; email: vlazar@jenner.com and Peter H. Rosenbaum email: prosenbaum@jenner.com  (ix) the Internal Revenue Service, (x) all applicable state and local taxing authorities, (xi) the Office of the United States Attorney for the District of Delaware, (xii) the offices of the attorneys general for the states in which the Debtors operate, (xiii) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Debtors' assets, (xiv) other potentially interested parties identified by the Debtors, any of the Consultation Parties or any of their

respective advisors, (xv) all such other entities as may be required by applicable Bankruptcy Rules or applicable Local Rules or as may be reasonably requested by the Stalking Horse Bidder; (xvi) all other known parties with any interest in, or that have asserted any lien, claim, or encumbrance in or upon, any assets of the Debtors that could potentially be acquired by the Successful Bidder (xvii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors believe that no further notice is required.

68.    A copy of this Motion is available on the Case Information Website.

*[Remainder of page left intentionally blank]*

WHEREFORE the Debtors respectfully request that the Court enter the Bidding Procedures Order, and, after the Sale Hearing, the Sale Order, granting the relief requested herein, and such other and further relief as the Court may deem just and proper.

Dated:  September 30, 2020
         Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Andrew L. Magaziner*

Michael R. Nestor (No. 3526)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253
Email:      mnestor@ycst.com
               amagaziner@ycst.com

- and -

**STEINHILBER SWANSON LLP**

James J. Sweet
Michael P. Richman
Virginia George
Elizabeth Eddy
122 West Washington Avenue
Suite 850
Madison, WI 53703
Telephone: (608) 630-8990
Facsimile:  (608) 630-8991
Email:      jsweet@steinhilberswanson.com
               mrichman@steinhilberswanson.com
               vgeorge@steinhilberswanson.com
               eeddy@steinhilberswanson.com

*Counsel for Debtors and Debtors in Possession*