**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No.: 20-11941 (JTD) |
| ARANDELL HOLDINGS, INC., *et al.*,[1] | (Jointly Administered) |
| Debtors. | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) USE CASH COLLATERAL, (B) INCUR POSTPETITION DEBT, (C) PROVIDE ADEQUATE PROTECTION TO CIBC BANK USA, AS AGENT, AND THE OTHER SECURED PARTIES, (D) OBTAIN POSTPETITION FACTORING FROM LSQ FUNDING GROUP, L.C. PURSUANT TO 11 U.S.C. §§ 363 AND 364 AND PROVIDE GUARANTEES IN SUPPORT THEREOF, AND (E) GRANT LIENS AND SUPERPRIORITY CLAIMS TO LSQ FUNDING GROUP, L.C.; (II) MODIFYING THE AUTOMATIC STAY; (III) APPROVING NOTICE; (IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors-in-possession (the "**Debtors**"), by and through its proposed counsel, hereby submits this objection (the "**Objection**") to the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Use Cash Collateral, (B) Incur Postpetition Debt, (C) Provide Adequate Protection to CIBC Bank USA, as Agent, and the Other Secured Parties, (D) Obtain Postpetition Factoring from LSQ Funding Group, L.C. pursuant to 11 U.S.C. §§ 363 and 364 and Provide Guarantees in Support Thereof, and (E) Grant Liens and Superpriority Claims to LSQ Funding, L.C.; (II) Modifying the Automatic Stay; (III) Approving Notice; (IV) Scheduling Final Hearing;*

---

[1] The Debtors in these Chapter 11 Cases, and the last four digits of their U.S. taxpayer identification numbers are: Arandell Holdings, Inc. (5311); Arandell Corporation (4270); and Arandell Kentucky, LLC (1505). The Debtors' corporate headquarters is located at N82 W13118 Leon Road, Menomonee Falls, WI 53051.

*and (V) Granting Related Relief* [Docket No. 10] (the "**DIP Motion**").[2]  In support of this

Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      In the DIP Motion, the Debtors allege that given their financial condition, "[t]he

DIP Facility represents the best financing option available to the Debtors and "the terms and

conditions of the DIP Facility reflect the Debtors' exercise of prudent business judgment consistent

with their fiduciary duties[.]" *See* DIP Motion at ¶¶ 26, 37.  However, the relief sought in the DIP

Motion falls well short in these respects.

2.      The Committee has concerns with, and objects to, many specific provisions of the

DIP Facility that are improper or unfairly prejudice the rights of the Debtors' estates and unsecured

creditors.  While the Committee appreciates the Debtors' need for financing in these Chapter 11

Cases, the Committee respectfully submits that the following issues, and the other issues detailed

more fully below, must be addressed by any final order:[3]

- **DIP Budget**: The DIP Facility should not be approved on a final basis unless and
  until the DIP Budget is revised to include all section 503(b)(9) claims, as well as
  stub rent and post-petition rent for the Kentucky and Wisconsin properties, so that
  all parties in interest may confirm these claims will be promptly paid.  Additionally,
  the DIP Budget provides approximately $1.6 million for the Debtors' and their
  lenders' professionals, but only $160,000 for the Committee's professionals.  The
  amount budgeted for the Committee's professionals should be substantially
  increased to remove the handcuffs the Debtors and their prepetition lenders are
  attempting to place on the Committee and afford the Committee the ability to
  effectively perform its fiduciary duties.

- **Investigation Period and Investigation Budget**: The Investigation Period is
  unreasonably short and should be extended to at least 90 days following the
  Committee's appointment.  Moreover, the Committee's $25,000 investigation

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the DIP Motion, Interim DIP Orders, or Sale and Bidding Procedures Motion, as applicable.

[3] The issues set forth in this Objection are under discussion between the Committee, on the one hand, and the Debtors and their lenders, on the other hand.  The Committee believes certain issues have been resolved in principle, but in light of the impending objection deadline and the fact that such resolutions have not yet been formally documented, files this Objection with respect to all issues in an abundance of caution.

budget should be increased to $40,000 so that the ability of the Committee to investigate and prosecute any challenges is not financially constrained. The Committee should also be granted automatic standing to bring challenges, so as to avoid the unnecessary waste of time and expense engaging in motion practice.

- <u>Waivers</u>: The Prepetition Lenders, Postpetition Lenders, and Factor should not be entitled to waivers of (a) surcharge rights under Bankruptcy Code section 506(c), (b) rights under Bankruptcy Code section 552(b) related to the "equities-of-the-case," or (c) the marshaling doctrine unless the Debtors confirm that the DIP Budget adequately funds all expected administrative costs, including section 503(b)(9) claims.

- <u>Undersecured Lenders</u>: The final DIP order should include a provision providing that if it is determined the Prepetition Lenders, Postpetition Lenders, and/or Factor are undersecured, the post-petition payments of interest, fees, and costs are deemed to be payments of principal.

- <u>Liens and Superpriority Claims</u>: The Prepetition Lenders, Postpetition Lenders, and Factor should not be granted liens on previously unencumbered property, avoidance actions or the proceeds of avoidance actions. The value of previously unencumbered assets, including avoidance actions and the proceeds thereof, should be preserved for the benefit of the Debtors' general unsecured creditors.

- <u>DIP Facility Termination Date</u>: Given that the Debtors only recently filed the Sale and Bidding Procedures Motion, the DIP Facility's November 16, 2020 Termination Date could harm the Debtors' ability to conduct a fulsome sale and (possible) auction process. The Termination Date should be extended to allow adequate time for a sale to be consummated.

- <u>Post-Termination Date Fees</u>: The Interim Order provides a carve-out of $25,000 for professional fees incurred after the Termination Date which is unreasonably low for these Chapter 11 Cases. The carve-out should be increased to $40,000.

3.      Accordingly, for the reasons set forth above and in further detail below, the DIP Motion should not be approved on a final basis unless the issues raised in this Objection are adequately addressed in any final order.

## **BACKGROUND**

4.      On August 13, 2020 (the "**Petition Date**"), the Debtors voluntarily commenced these Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). No trustee or examiner has been appointed in these Chapter 11 Cases. The Debtors are

authorized and continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     On the Petition Date, the Debtors filed the DIP Motion seeking approval of DIP financing consisting of a (i) super-priority, senior secured, debtor-in-possession revolving credit facility with a maximum credit amount of $7.5 million plus, upon entry of a final order approving the DIP Motion, a term loan in the amount of $4,567,778.06 (the "**ABL Facility**") and (ii) a super-priority, senior secured, debtor-in-possession, discretionary, factoring facility in the amount of up to $24 million (the "**Factoring Facility**," and together with the ABL Facility, the "**DIP Facility**") to be provided by LSQ Funding Group, L.C. (the "**Factor**").  The DIP Facility is generally secured by a first-priority lien on all present and after-acquired property of the Debtors of any nature whatsoever, and all the obligations of the Debtors are entitled to super-priority administrative expense status under section 364(c)(1) of the Bankruptcy Code.  The liens securing the DIP Facility prime the liens securing the Prepetition Facility (defined below).  The Debtors also seek approval of the continued use of the Prepetition Lenders' (defined below) cash collateral.

6.     The lenders under the ABL Facility are the same lenders that provided the Debtors with their prepetition revolving and term credit facility (the "**Prepetition Facility**"), consisting of CIBC Bank USA, as administrative and collateral agent (in such capacity and when acting pursuant to  the "**Prepetition Agent**," and when acting pursuant to the ABL Facility in such capacity, the "**Postpetition Agent**") pursuant to an Amended and Restated Loan and Security Agreement dated March 22, 2018 (the "**Credit Agreement**"), by and among the Prepetition Agent, the lenders party thereto from time to time (collectively, the "**Prepetition Lenders,"** and when acting pursuant to the ABL Facility, the "**Postpetition Lenders**").  As of the Petition Date, the aggregate amount of allegedly secured debt outstanding under the Prepetition Facility is approximately $11.34 million,

consisting of (a) Revolving Advances, (b) the Term Loan, and (c) accrued interest, costs, fees, and expenses (collectively, the "**Prepetition Debt**"), which the Debtors seek to roll-up (the "**Roll-Up**") into the DIP Facility.

7.      A first day hearing was held on August 14, 2020, where the Court approved the DIP Motion on an interim basis and subsequently entered the *Interim Order (I) Authorizing Debtors to (A) Use Cash Collateral on an Emergency Interim Basis Pending a Final Hearing; (B) Incur Postpetition Debt on an Emergency Interim Basis Pending a Final Hearing; (C) Grant Adequate Protection and Provide Security and Other Relief to CIBC Bank USA, as Agent, and the other Secured Parties; (D) Obtain Postpetition DIP Factoring from LSQ Funding Group, L.C. pursuant to 11 U.S.C. §§ 363 and 364 and Provide Guarantees in Support Thereof; and (E) Grant Liens and Superpriority Claims to LSQ Funding Group, L.C.; (II) Modifying the Automatic Stay; (III) Approving Notice; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (the "**Interim DIP Order**") [Docket No. 48].[4]

8.      On August 25, 2020, the Office of the United States Trustee (the "**U.S. Trustee**") appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code (the "**Committee Appointment Date**") [Docket No. 63].   The Committee subsequently selected Lowenstein Sandler LLP to serve as lead-counsel, Bayard, P.C. as Delaware counsel, and PricewaterhouseCoopers LLP to serve as its financial advisor, each subject to approval by the Court.   The Committee is currently comprised of (a) Burton & Mayer, Inc., (b) Graphic Arts Industry Joint Pension Trust, (c) Progressive Converting, Inc., (d) RR Donnelley & Sons Company, and (e) Trend Offset Printing Services, Inc.

---

[4] The Interim DIP Order was subsequently extended through October 7, 2020, by interim orders dated September 3, 2020 [Docket No. 93], September 14, 2020 [Docket No. 144], and September 23, 2020 [Docket No. 165].

9.     On September 30, 2020, the Debtors filed their *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all the Assets of Arandell Corporation and Arandell Holdings, (B) Approving Stalking Horse Protections, (C) Scheduling Auction for, and Hearing to Approve such Sale, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (E) Approving Assumption and Assignment Procedures, and (F) Granting Related Relief, and (II)(A) Approving such Sale Free and Clear of all Liens, Claims, Interests, and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "**Sale and Bidding Procedures Motion**") [Docket No. 176], through which the Debtors seek approval, subject to higher and better offers at Auction, of the sale (the "**Sale**") of substantially all of their assets to Arandell Acquisition Company ("**AAC**") pursuant to the terms of the Stalking Horse APA.

10.     A final hearing on the DIP Motion is currently scheduled for October 7, 2020, at 3:00 p.m. (ET).

## OBJECTION

11.     Courts recognize that parties negotiating post-petition financing have unequal bargaining power, and a debtor often is not the best party to ensure that the proposed terms of a DIP facility are fair and in the best interest of all of its creditors, particularly its unsecured creditors. *See, e.g.*, *In re Texlon Corp.*, 596 F.2d 1092, 1098 (2d Cir. 1979) ("The debtor in possession is hardly neutral.  Its interest is in its own survival, even at the expense of equal treatment of creditors.").

12.     Post-petition financing should be approved only if "the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."  *In re Ames Dep't Stores,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); *see also In re LandSource Communities Development, LLC*, Case No.

08-11111 (KJC) (Bankr. D. Del. July 14, 2008), Hr'g Tr. 206:12-16 ("The standard here is not that there's only one option available to the Debtor, and therefore the Court has to approve it.  In my view such an arrangement has to be fair and reasonable under the circumstances.  And I don't think this proposed D-I-P financing is."); *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hospital)*, 86 B.R. 393, 401-02 (Bankr E.D. Pa. 1988) (denying debtor's proposed postpetition financing arrangement with its parent because the proposed financing gave the parent a superpriority lien on all unencumbered assets of the debtor, which the court found was not fair or reasonable in light of the parties' relationship and the circumstances of the transaction).  Courts considering whether to approve postpetition financing have "focused their attention on proposed terms that would tilt the conduct of the bankruptcy case [and] prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors[.]"  *See id.* at 37-38; *see also In re MidState Raceway*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender."); *In re FCX, Inc.,* 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

12.    Though the Committee appreciates the need for the post-petition financing necessary to support the Debtors' restructuring efforts, the Debtors' entry into the DIP Facility on the terms currently contemplated entirely sacrifices the best interests of the Debtors' unsecured creditors and "tilt[s] the conduct of the bankruptcy case" solely for the benefit of the Prepetition Lenders, Postpetition Lenders, and Factor.  Therefore, in its current form, the DIP Facility should not be approved on a final basis.

A.    **THE COURT SHOULD DENY FINAL APPROVAL OF THE DIP FACILITY UNLESS THE PREPETITION LENDERS, POSTPETITION LENDERS, AND FACTOR ENSURE THAT SUFFICIENT FUNDING IS PROVIDED TO MAXIMIZE THE VALUE OF THE ESTATES, INCLUDING PROVIDING FOR THE PAYMENT OF ALL ADMINISTRATIVE EXPENSE CLAIMS.**

13.    As presently constructed, the DIP Budget does not account for the payment of 503(b)(9) claims or stub rent and post-petition rent claims for the Kentucky and Wisconsin properties.  It is unclear under the Stalking Horse APA whether AAC is assuming the Debtors' stub rent and post-petition rent obligations for the properties.  Moreover, the DIP Budget provides a woefully inadequate $25,000 carve-out for post-closing fees and expenses and for the consummation of a chapter 11 plan. [5]  As such, there is a very real threat that the Debtors' estates will be rendered administratively insolvent and unsecured creditors will be left empty-handed.

14.    It is axiomatic that the Court should not allow the bankruptcy process to be used if it only benefits a secured creditor.  *See In re Def. Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) (prohibiting "convert[ing] the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender."); *see generally In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983) (reversing order authorizing section 363 sale of substantially all of a debtor's assets because if sale was approved there would be "little prospect or occasion for further reorganization."); *In re Encore Healthcare Assocs.*, 312 B.R. 52, 54–55 (Bankr. E.D. Pa. 2004) (denying bid procedures motion finding that a section 363 sale served no legitimate business purpose when debtor admitted that it would convert the case to chapter 7

---

[5] On September 29, 2020, the Debtors filed the *Motion for Entry of an Order, Pursuant to Sections 105(a), 365(a), and 554(a) of the Bankruptcy Code, Authorizing Rejection of Unexpired Lease of Nonresidential Real Property (125 Richwood Road, Walton, Kentucky 41094), Effective as of September 30, 2020* (the "**Lease Rejection Motion**"), [Docket No. 174], through which the Debtors' seek to reject the lease of the Kentucky property, effective September 30, 2020.

following the sale, and would not have adequate funds to proceed with an administratively solvent estate).

15.     Consistent with these themes, courts have held that a secured lender cannot benefit from a section 363 sale unless they are willing to "pay the freight."  In other words, to obtain the benefits of bankruptcy, the secured lender must ensure at a minimum that the debtor's estate is administratively solvent after the sale.  *See In re Golden Cnty. Foods, Inc., et al.,* Case No. 15-11062 (KG) (Bankr. D. Del. June 22, 2015), ECF No. 175 (final DIP financing order required that sale proceeds in excess of postpetition financing obligations be available to pay administrative expense claims prior to the payment of certain alleged prepetition secured debt); Hr'g Tr. at 11:22-24, *In re Family Christian, LLC et al*., Case No. 15-00643 (JTG) (Bankr. W.D. Mich. Apr. 14, 2015) (the Court stated: "I think we'll have a problem at the Sale Hearing if the administrative expenses are not to be paid in connection with the sale."); Hr'g Tr. at 100:17-20, *In re NEC Holdings Corp., et al.* Case No. 10-11890 (KG) (Bankr. D. Del. July 13, 2010) (secured creditors have "got to the pay the freight, and . . . the freight is certainly an administratively solvent estate."); Hr'g Tr. at 23:25-24:22, *In re Townsends, Inc., et al.*, Case No. 10-14092 (CSS) (Bankr. D. Del. Jan. 21, 2011) (in response to the statement of debtors' counsel that section 503(b)(9) claims would not be paid in full, the Court stated: "***Well, we've got a problem.  Not going to run an administratively insolvent estate.***" (emphasis added) Hr'g Tr. 39:24-40:1; *In re AFA Investments Inc.,* Case No. 12-11127 (MFW) (Bankr. D. Del. July 12, 2012) (requiring sale proceeds in excess of postpetition financing obligations to be held in escrow to a later date pending resolution of administrative claims).[6]  Absent some assurance that the freight will be paid, the Prepetition Lenders and Postpetition Lenders should not be permitted to use this Court and the chapter 11

---

[6] Copies of these transcripts are available upon request.

process to liquidate or foreclose on collateral for their sole benefit. *See In re Encore Healthcare Assocs.*, 312 B.R. 52, 54, 56, 58 (Bankr. E.D. Pa. 2004) (denying bidding procedures motion because court would not approve the sale, "the sole purpose of which was to liquidate assets for the benefit of the secured creditor," and which would render the estate administratively insolvent, noting that an "asset sale can easily be accomplished outside of bankruptcy either with the consent of the secured creditor or by abandoning the asset to the secured creditor to sell on its own").

16.     The DIP Facility should not be approved on a final basis unless and until the Prepetition Lenders, Postpetition Lenders, and Factor agree to fund the costs of the administration of these Chapter 11 Cases, including payment of all 503(b)(9) claims, stub rent and post-petition rent claims for the Kentucky and Wisconsin properties, post-closing professional fees and expenses, and consummation of a chapter 11 plan.

**B.     THE PROVISIONS GOVERNING THE COMMITTEE'S CHALLENGE RIGHTS MUST BE SUBSTANTIALLY MODIFIED.**

17.     In its current form, the DIP Facility provides the Committee with an Investigation Period deadline of sixty (60) days from the Committee Appointment Date and a budget of $25,000 to investigate and prosecute any challenges against the Prepetition Agent and/or Prepetition Lenders. However, before commencing a challenge, the Committee is first required to provide the Debtors with notice and an opportunity to initiate a contested matter or adversary proceeding against the Prepetition Agent and Prepetition Lenders. If the Debtors refuse to do so, the Committee must then file a motion with the Court seeking derivative standing to prosecute its challenge(s) through a contested matter or adversary proceeding.

**(i)     The DIP Facility's short Investigation Period and standing requirements unduly restrict the Committee's ability to fulfill its fiduciary duties.**

18.     The current Investigation Period provides an insufficient amount of time for the Committee to complete its investigation. While the Committee and its professionals have been,

and are in the process of, obtaining and reviewing the prepetition loan documents, the magnitude

and complexity of the issues involved render the current Investigation Period unsatisfactory. The

Committee requests that the Investigation Period be extended to at least 90 days from the

Committee Appointment Date without prejudice to seek such further extensions as necessary in

order for the Committee to complete an appropriate investigation in accordance with its fiduciary

duties.

19.     Moreover, the Committee should be granted automatic standing to commence and

prosecute any challenge. Indeed, courts in the Third Circuit often grant a creditors' committee

standing in DIP financing orders to bring a challenge to prepetition liens and claims or assert

affirmative claims against a prepetition lender without the need for a formal standing motion. *See,*

*e.g.*, *Klausner Lumber One LLC*, Case No. 20-11033 (KBO) (Bankr. D. Del. June 8, 2020) ("The

Committee has standing to pursue the subordination and/or recharacterization of all purported

insider claims and prepetition liens, including, without limitation, the Prepetition Liens and Taylor

Industrial Rights."); *TZEW Holdco LLC*, Case No. 20-10910 (CSS) (Bankr. D. Del. June 4, 2020)

("the Committee . . . shall have standing to bring any such Objection"); *In re Lily Robotics, Inc.*,

Case No. 17-10426 (KJC) (Bankr. D. Del. June 27, 2017); *In re Rupari Holding Corp., et al.*, Case

No. 17-10793 (KJC) (Bankr. D. Del. May 12, 2017); *In re Prestige Industries LLC*, Case No. 17-

10186 (KG) (Bankr. D. Del. Mar. 13, 2017); *In re Xtera Communications*, Inc., Case No. 16-

12577 (KJC) (Bankr. D. Del. Dec. 28, 2016); *In re Phoenix Payment Sys., Inc.*, Case No. 14-11848

(MFW) (Bankr. D. Del. Sept. 3, 2014) [Doc. No. 149, at ¶ 20] ("The Creditors' Committee is

hereby granted standing to file, seek relief and prosecute any and all Claims and Defenses and no

further order or notice granting the Creditors' Committee standing shall be necessary."); *In re*

*Exide Techs.*, Case No. 13-11482 (KJC) (Bankr. D. Del. Jul. 25, 2013) [Doc. No. 427, at ¶ 19]

("The Creditors' Committee is granted standing and authority to pursue any Claims and Defenses in the name and on behalf of the Debtor and its estate . . . ."); *In re American Safety Razor, LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. Aug. 27, 2010) at ¶ 6; *In re Pliant Corp.*, Case No. 09-10443 (MFW) (Bankr. D. Del. Mar. 20, 2009) at ¶ 19.

20.     Under the Interim Order, the Committee must first obtain standing from the Court and then must commence a challenge within 60 days of the Committee Appointment Date.  The Committee believes that the Investigation Period deadline should be extended to 90 days from the Committee Appointment Date.  Additionally, the requirement that the Committee file a motion for standing is unnecessary and a waste of judicial and estate resources.  Instead, the Committee should be granted automatic standing and authority to commence a challenge in the final order.  Granting the Committee automatic standing now would simply avoid the unnecessary consumption of resources related to the later filing and prosecution of a standing motion and the Committee submits that any final order should expressly grant the Committee such standing.

**(ii)     The Committee's investigation should not be hindered by the proposed investigation budget cap.**

21.     The DIP Facility's proposed cap of $25,000 is woefully insufficient and intentionally negatively impacts the Committee's ability to fulfill its statutory and fiduciary duties. In addition to being unnecessary and insufficient, the investigation budget deliberately forces the Committee's professionals to finance matters related to the Debtors' Chapter 11 Cases and harms the adversary system characteristic of the chapter 11 process.  *See In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (finding cap on fees unacceptably limited the right of debtor's counsel to payment for bringing actions against the prepetition lenders, creating an economic incentive to avoid bringing such actions in disregard of its fiduciary duties toward the estate, and therefore, refusing to approve the post-petition financing); *In re Channel Master Holdings, Inc.*,

No. 03-13004, 2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. Apr. 26, 2004) (refusing to enforce a $75,000 cap on committee's professional fees under a post-petition financing facility, finding such cap unreasonable in light of the much larger caps on the other professionals in the case and, after a thorough review of all the actions of the committee's professionals, determining that the cap on the committee's fees was inadequate to compensate for such activities).

22.    The obvious design of this financial restriction, especially when viewed in the context of the DIP Facility's other restrictions on the Committee's challenge rights, is to prevent the Committee from prosecuting claims for the benefit of the Debtors' estates.  Therefore, the proposed cap is unreasonable and should be eliminated in any final order.  Additionally, the Debtors and the Committee should be authorized to use any funds available under the DIP Budget, the carve-out or otherwise to investigate or prosecute any challenges.  At the very least, the investigation budget should be increased to at least $40,000 without prejudice to seek further increases in order to facilitate the Committee's exercise of its fiduciary duties.

**C.    THE COURT SHOULD NOT PERMIT THE PREPETITION LENDERS, POSTPETITION LENDERS, OR FACTOR TO OBTAIN LIENS OR SUPERPRIORITY CLAIMS ON PREVIOUSLY UNENCUMBERED ASSETS, AVOIDANCE ACTIONS OR AVOIDANCE ACTIONS PROCEEDS.**

23.    The Committee objects to liens, superpriority claims, adequate protection claims or any other claims being granted on previously unencumbered assets, avoidance actions or the proceeds of avoidance actions upon entry of a final order.  To the extent that the Interim Order, Factoring Facility Documents, or ABL Loan Documents include a provision requiring that the final order grant security interests or superpriority claims on such aforementioned unencumbered assets, such provisions are objectionable and should be stricken in the final order.  The value of previously unencumbered assets, including avoidance action proceeds, must be preserved for the benefit of the Debtors' general unsecured creditors.

24.     If the Prepetition Lenders, Postpetition Lenders, and/or Factor are granted liens and claims against the Debtors' currently unencumbered property, unsecured creditors will be prevented from recovering at least as much as they would in chapter 7, as is required by the best interests test.  This significant right should not be undermined.  *See*, *e.g.*, *In re Bd. of Dirs. of Telecom Arg. S.A.*, No. 05-17811 (BRL), 2006 WL 686867, at *7 (Bankr. S.D.N.Y. Feb. 24, 2006) (noting that the best interests test is "one of the most fundamental protections provided creditors under U.S. law"); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 881 (Bankr. S.D.N.Y. 1990) (finding the best interests test and absolute priority rule are fundamental creditor plan protections that are not required to be raised prior to plan confirmation hearing).

25.     Additionally, it is well established that avoidance actions can only be exercised for the benefit of the Debtors' estates. *Bear Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) (noting that the purpose of section 547 is to ensure fair distribution between creditors, and "***the purpose of [section 548] is to protect the estate itself for the benefit of all creditors***") (emphasis added).

26.     Avoidance actions are distinct creatures of bankruptcy law designed to facilitate equality of distribution among a debtor's general unsecured creditors, are not truly property of a debtor's estate, but instead are rights that the estate holds in trust for the benefit of creditors.  *See In re Cybergenics Corp.,* 330 F.3d 548, 566-67 (3d Cir. 2000) (noting that the underlying intent of the avoidance powers is the recovery of valuable assets for the benefit of a debtor's estate). Accordingly, courts customarily frown upon and restrict the ability of debtors-in-possession to pledge avoidance actions and their proceeds as security.  *See, e.g.*, *In re Goold Electronics Corp.*, 1993 WL 408366, *3-4 (N.D. Ill., Sept. 22, 1993) (vacating DIP financing order to the extent that the order granted the lender a security interest in the debtor's preference actions); *In re Roblin*

*Indus., Inc.*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (DIP financing not approved where a condition of extending loan is the debtor's waiver of avoidance actions against lenders in violation of their fiduciary duties); *Cybergenics*, 226 F.3d at 243-44 (finding avoidance actions are not assets of a debtor and there is no legal basis to grant DIP secured parties any interests in the claims); *Mellon Bank v. Glick*, 69 B.R. 901, 905 (D.N.J. 1987) (allowing secured creditor the right to recovery would "frustrate the policy of equal treatment of creditors under the Code and would contradict the plain meaning of section 551 of the Bankruptcy Code.").

27.      Additionally, avoidance actions are aimed at ensuring equality of distribution to creditors and reversing "something for nothing" transactions such as fraudulent transfers. *See Cullen Ctr. Bank & Tr. v. Hensley (In re Criswell)*, 102 F.3d 1411, 1414 (5th Cir. 1997). The intent underlying the avoidance powers is to allow a debtor's estate to recover payments on behalf of all creditors. *In re Integrated Testing Prods. Corp.*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover preference payments); *In re Sweetwater*, 884 F.2d 1323, 1328 (10th Cir. 1989) ("[P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike . . ."). *See also In re Maxwell Newspapers*, Inc., 189 B.R. 282, 287 (Bankr. S.D.N.Y. 1995) (primary consideration is the benefit to unsecured creditors); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer."). Notably, courts in this District have expressed hesitation to grant liens on previously unencumbered assets of a debtor's estate, where such assets would otherwise inure to the benefit of unsecured creditors. *See* Hr'g Tr. 21:17-20, 26:9-23, *In re SFX Entm't, Inc.*, No. 16-

10238 (MFW) (Bankr. D. Del. Mar. 4, 2016) [Docket No. 198] (refusing to grant liens to DIP lenders on unencumbered assets, but permitting DIP lenders to retain liens on commercial tort claims to the extent such lenders had existing interests in such claims).

28.     To allow the Debtors, as fiduciaries, to use their powers to effectively assign the proceeds of estate claims to the Prepetition Lenders, Postpetition Lenders, and/or Factor, as opposed to true representatives of the estate for the benefit of unsecured creditors, turns bankruptcy law on its head.  The Debtors' unsecured creditors, who are unlikely to receive any material distribution in these Chapter 11 Cases, should not be a source of recovery for the Prepetition Lenders, Postpetition Lenders, and/or Factor, and should not be denied one of their only potential avenues of recovery.  Given that avoidance actions and the avoidance action proceeds are designed to protect the interests of all creditors, the final order should not grant liens or superpriority claims on such assets or the proceeds thereof.  The final order should clearly specify that avoidance actions and avoidance action proceeds remain free of encumbrances and available to unsecured creditors.

**D.     THE DIP FACILITY'S TERMINATION DATE PROVISIONS MUST BE MODIFIED**

29.     The DIP Facility currently provides that the Termination Date shall be no later than November 16, 2020.  Given that the Debtors only recently filed the Sale and Bidding Procedures Motion, the DIP Facility's November 16, 2020 Termination Date could inhibit the Debtors' ability to see through a fulsome sale and (possible) auction process.  The Termination Date should be extended by an additional sixty (60) days.

**E.     THE 506(c), 552(b),  AND MARSHALING WAIVER PROVISIONS SHOULD NOT BE APPROVED.**

30.     Given the nature of these Chapter 11 Cases and the risks of administrative insolvency, there is no rational basis for the Prepetition Lenders, Postpetition Lenders, and Factor

to receive a waiver of surcharge rights under section 506(c), a waiver of rights under section 552(b) related to the "equities of the case," or a waiver of the marshaling doctrine.

31.     The section 506(c) waiver serves no purpose other than to eliminate a potential avenue of recovery for the Debtors' estates by ensuring that the costs of the Debtors' restructuring will be borne by the unsecured creditors alone.   Courts routinely reject attempted waivers of surcharge rights under section 506(c) of the Bankruptcy Code.   Indeed, Congress's intent in enacting section 506(c) was to ensure that the debtor-in-possession would be entitled to recover expenses from its secured lender to the extent those expenses are necessarily and reasonably associated with preserving or disposing of the lender's collateral.  *See Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325–26 (3d Cir. 1995) (discussing the Congressional Record, 124 Cong. Rec. 32,398 (cum. ed. Sept. 28, 1978) (statement of Rep. Edwards); In *re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

32.     Immunizing agreements which prohibit surcharge payment obligations under section 506(c) of the Bankruptcy Code have been found unenforceable on the basis that such provisions "operate as a windfall to the secured creditor at the expense of administrative claimants."  *In re Lockwood Corp.*, 223 B.R. 170 (8th Cir. BAP 1998).  In addition, the Supreme Court decision in *Harford Underwriters Ins. v. Union Planters Bank N.A. (In re Hen House Interstate Inc.)*, 530 U.S. 1 (2000), makes clear that such waivers, since they are binding upon all parties in interest, should never be lightly granted, nor may the management of a debtor in possession concede this issue for any but compelling reasons.  *See Hartford Underwriters Ins. Co.*

*v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000) (noting that a debtor's decision to waive section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require"). Furthermore, where, as here, the DIP Lenders are asserting a lien on unencumbered assets, the section 506(c) waiver must be denied. *See In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors.").

33.     Additionally, courts within the Third Circuit generally refuse to approve waivers of section 506(c) surcharge rights when a creditors' committee objects to the waiver. *See, e.g.*, Hr'g Tr. 20-21, *In re Mortg. Lenders Network USA, Inc.*, No. 07-10146 (PJW) (Bankr. D. Del. Mar. 27, 2007) [Docket No. 346] ("Well, let me tell you what the law in this Court's been for at least the last five years. If the Committee doesn't agree with the waiver, it doesn't happen."); *see also* Hr'g Tr. 212:12-22, *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. June 5, 2014) [Docket No. 3927] (declining to approve a 506(c) waiver over objection and stating that "Judge Walsh once told me that he'd never approve a 506(c) waiver on a non-consensual basis"); Hr'g Tr. 101:7-9, *In re NEC Holdings Corp.*, No. 10-11890 (PJW) (Bankr. D. Del. July 13, 2010) [Docket No. 224] (stating that "you don't give a 506 waiver over an objection by the committee"); *cf.* Local Rule 4001-2(a)(i)(C) (requiring debtor to justify provisions that waive rights under section 506(c)).

34.     Neither the Committee nor this Court has any assurances that there will be sufficient proceeds to pay any and all administrative claims against the Debtors' estates. The DIP Budget does not include any funds to pay section 503(b)(9) claims or stub rent and post-petition rent due

and owing for the Wisconsin and Kentucky properties.  It is also unclear under the Stalking Horse

APA whether AAC is assuming the Debtors' stub rent and post-petition rent obligations relating

to these properties.  When coupled with the significant risk of administrative insolvency present

here, a section 506(c) waiver is wholly inappropriate.

35.     Moreover, provisions in the Interim Order, Factoring Facility Documents, or ABL

Loan Documents that provide that the "equities of the case" exception under section 552(b) of the

Bankruptcy Code are unwarranted because the Court is not, at this early stage of the case, in a

position to determine what the "equities of the case" may be or assess the impact of the elimination

of such a remedy.  *See In re Terrestar Networks, Inc.*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y.

2011) (denying request for 552(b) waiver as premature because factual record was not fully

developed).  *See also In re Metaldyne Corp.*, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23,

2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other

parties in interest may make.  If, in the event, the Committee or any other party [in] interest argues

that the equities of the case exception should apply to curtail a particular lender's rights, the Court

will consider it."); *see also In re iGPS Co. LLC*, No. 13-11459 (KG) (Bankr. D. Del. July 1, 2013)

[Docket No. 225] (no waiver of the "equities of the case" exception with respect to creditors

committee); *In re Namco, LLC*, No. 13-10610 (PJW) (Bankr. D. Del. Mar. 24, 2013) [Docket No.

5] (same).

36.     Again, these provisions are inappropriate absent evidence that the DIP Budget will

be sufficient to cover all administrative claims in these Chapter 11 Cases.  Therefore, a Section

552 waiver is unwarranted.  Similarly, the equitable doctrine of marshaling should be expressly

preserved.   The Debtors' willingness to waive their rights to marshal collateral for the benefit of

their unsecured creditors is inappropriate and premature.  If the marshaling of collateral in these

Chapter 11 Cases may ultimately inure to the benefit of unsecured creditors, that remedy should not be foreclosed at this early juncture of these Chapter 11 Cases. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.)*, 269 B.R. 560, 574 (Bankr. D. Del. 2001) (holding that chapter 7 trustee, as hypothetical lien creditor, had standing to bring an action for marshaling).

**F.    ADDITIONAL ISSUES AND OBJECTIONABLE PROVISIONS WITH RESPECT TO THE DIP CREDIT AGREEMENT AND INTERIM DIP ORDER.**

**(i)    The DIP Facility Termination Date should be extended.**

37.    The Debtors only recently filed their Sale and Bidding Procedures Motion. As proposed, the DIP Facility will expire weeks before the December 1, 2020 deadline for entry of a Sale Order. Therefore, the DIP Facility Termination Date should be extended for a period of sixty (60) days to allow for a fulsome auction process and consummation of the Sale.

**(ii)    Payments to undersecured lenders should be deemed payments of principal.**

38.    The final DIP order should include a provision providing that if it is determined the Prepetition Lenders, Postpetition Lenders, and/or Factor are undersecured, the post-petition payments of interest, fees, and costs are deemed to be payments of principal.

**(iii)    The amount earmarked for Committee professionals under the DIP Budget should be substantially increased.**

39.    The Interim Order provides a carve-out of $25,000 for professional fees incurred after the Termination Date which is unreasonably low for these Chapter 11 Cases. The fee should be increased to $40,000 in any final order approving the DIP Motion.

**(iv)    The carve-out should be increased.**

40.    The DIP Budget provides approximately $1.6 million for the Debtors' professionals, but only $160,000 for the Committee's professionals. The amount budgeted for the

Committee's professionals should be substantially increased in the final DIP order to afford the Committee the ability to effectively perform its fiduciary duties.

## RESERVATION OF RIGHTS

41.     The Committee reserves all of its rights to supplement or amend this Objection at or prior to the Final Hearing on the DIP Motion.  The Committee also reserves all of its rights with respect to any filing by the Debtors, Prepetition Lenders, Postpetition Lenders, Prepetition Agent, Postpetition  Agent,  Factor, or any other party prior to the Final Hearing.  Nothing contained in, or omitted from this Objection constitutes an admission or stipulation by the Committee, any member of the Committee or any other party with respect to any alleged claims against the Debtors, Prepetition Lenders, Postpetition Lenders, Prepetition Agent, Postpetition  Agent,  Factor, or any party, including but not limited to the amount, validity, enforceability of any alleged claims against the Debtors or the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtors' assets.

## CONCLUSION

42.     For the foregoing reasons, the Committee respectfully requests that the Court deny approval of the DIP Motion on a final basis, unless the Debtors, Prepetition Lenders, Postpetition Lenders, and Factor address the numerous issues identified in this Objection.

Dated:  October 5, 2020
       Wilmington, DE

**BAYARD, P.A.**

*/s/ Gregory J. Flasser*
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: efay@bayardlaw.com
       gflasser@bayardlaw.com

-and-

**LOWENSTEIN SANDLER LLP**
Robert M. Hirsch
John P. Schneider
1251 Avenue of the Americas
New York, New York
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402
E-mail: rhirsh@lowenstein.com
        jschneider@lowenstein.com

– and –

Bruce Buechler
Andrew D. Behlmann
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
E-mail: bbuechler@lowenstein.com
        abehlmann@lowenstein.com

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*